IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**FILED**

VANESSA L. ARMSTRONG  CLERK

JUL 1 7 2017

U.S. DISTRICT COURT
WEST'N. DIST. KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel, THERESA DUNN,<br>APRILL KESTERSON,<br>and ANGELA FOLTZ<br>          *Plaintiffs*<br>vs.<br><br>PROCARENT, INC.<br>          *Defendant* | )<br>)<br>)<br>)<br>)<br>)  Case No. 3:11-cv-704<br>)<br>)<br>)<br>)<br>) |

## SECOND AMENDED COMPLAINT

The United States of America, by and through its qui tam Relators, Theresa Dunn, Aprill Kesterson, and Angela Foltz (collectively the "Relators"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729-3733 *et seq.*, against Defendant, Procarent, Inc., to recover all damages, penalties, and other remedies provided by the False Claims Act on behalf of the United States and the Relators, and for their Second Amended Complaint state as follows:

## PARTIES

1.      Relator, Theresa Dunn ("Dunn"), is and was at all relevant times hereto, a resident of Jefferson County, Kentucky and employed at Procarent.

2.      Relator, Aprill Kesterson ("Kesterson"), is and was at all relevant times hereto, a resident of Bullitt County, Kentucky, and employed at Procarent.

3.      Relator, Angela Foltz ("Foltz"), was at all relevant times hereto, a resident of Jefferson County, Kentucky, and employed at Procarent.

4.     Plaintiff, United States of America, acting through the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program.

5.     The Defendant, Procarent Inc. ("Procarent"), is a Kentucky corporation with its principal place of business at 545 South Third Street, Suite 310, Louisville, Kentucky 40202.

## JURISDICTION & VENUE

6.     This action arises under Federal law, particularly the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

7.     Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1345 as well as 31 U.S.C. § 3730 and 31 U.S.C. § 3732.

8.     Under 28 U.S.C. § 1367(a), this Court has jurisdiction to consider Plaintiffs supplemental state law claims, which arise out of the same occurrence and facts set forth below.

9.     Venue is proper under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a). This Court has personal jurisdiction over the Defendant because it transacted business within this District.

## RELEVANT STATUTES AND REGULATIONS

### A.     THE FALSE CLAIMS ACT

10.     The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("False Claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The

FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

11.     The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("False Statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

12.     The FCA also imposes liability on any person who conspires to commit false claims or false statements ("conspiracy claim"). 31 U.S.C. § 3729(a)(1)(C).

**B.     MEDICARE REQUIRES THAT AN AMBULANCE TRANSPORT BE "MEDICALLY NECESSARY" AND PROPERLY DOCUMENTED IN ORDER FOR THE CLAIM TO BE REIMBURSABLE**

13.     Medicare pays for emergency and nonemergency ambulance services when the transport by ambulance is "medically necessary." *See* 42 C.F.R. 410.40(d).

14.     An emergency transport is one provided after the sudden onset of a medical condition that manifests itself with acute symptoms of such severity that the absence of immediate medical attention could reasonably be expected to: (a) Place the patient's health in serious jeopardy, (b) Result in serious impairment of bodily functions, or (c) Result in serious dysfunction of any bodily organ.

15.     A nonemergency transportation by ambulance is appropriate when a patient is bed-confined and his/her condition is such that other methods of transportation are contraindicated; or if the patient's condition, regardless of bed-confinement, is such that transportation by ambulance is medically required. 42 C.F.R. 410.40.

3

16.    To be considered bed-confined, the patient must meet all three of the following criteria: (a) Be unable to get up from bed without assistance, (b) Be unable to ambulate, and (c) Be unable to sit in a chair or wheelchair. 42 C.F.R. 410.40(d)(2).

17.    If nonemergency ambulance runs are repetitive, Medicare also requires that the provider, *prior* to transporting the patient by ambulance, obtains a written order from the patient's attending physician certifying that the medical necessity requirements described above were met. The physician's order- often referred to as a Physician Certification Statement ("PCS")- is to be dated no earlier than sixty (60) days prior to the date of service.

18.    A patient is considered "repetitive" if he/she is transported for treatment of the same condition either: (a) three or more times in a ten (10) day period or (b) once a week for three (3) straight weeks.

19.    While the above requirements determine whether Medicare will pay for an ambulance transport, the level of service required by the patient's condition determines the amount paid for a transport. As discussed below, Medicare only pays for the level of service deemed medically necessary, not simply on the vehicle used.

20.    The different levels of ambulance services include Basic Life Support ("BLS"), Advanced Life Support ("ALS"), and Specialty Care Transport ("SCT"), among others.

21.    These levels of service are differentiated by the qualifications and training of the crew and the equipment and supplies available on a vehicle that allows for treatment of more complex medical conditions.

22.    By billing Medicare for ALS services, a provider can submit a significantly larger bill than the provider would be allowed to submit for BLS services, because ALS services must

4

be performed by EMT-Intermediates or by paramedics, who have higher levels of training than do the EMT-Basics who are able to provide BLS services.

23.     Just as the provision of any services whatsoever must be medically necessary, the provision of ALS, as opposed to BLS, service must be justified. Medicare regulations provide that "[t]he [patient's] condition must require both the ambulance transportation itself and the level of service provided in order for the billed service to be considered medically necessary." 42 C.F.R. 410.40.

24.     Medicare further requires that any provision of ALS services must include an "ALS assessment." An ALS assessment is only medically necessary where "the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment." 42 C.F.R. 414.605.

C.     **COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT**

25.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Medicare is administered by CMS, which is part of HHS. At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors," to act as agents in reviewing and paying claims submitted by healthcare providers. *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

26.     To participate in the Medicare program, health care providers, such as Procarent, enter into agreements with HHS-CMS in which the provider agrees to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal

Regulations. Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment requests. *See* 42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv), 1001.101(a)(1); 42 U.S.C. § 1320a-7b(a)(1)-(2).

27.     For outpatient treatment, all Medicare reimbursement is subject to Part B. *See* 42 U.S.C. §§ 1395j-1395w-4. Ambulance transports are included in the definition of "medical and other health services" for purposes of Medicare Part B coverage. *See* 42 C.F.R. § 410.10(e).

28.     To obtain Medicare reimbursement pursuant to Part B, providers submit claims using Medicare's forms. Among the information the provider includes on the forms are certain five-digit codes, known as Current Procedural Terminology, or CPT codes, that identify the services rendered and for which reimbursement is sought.

29.     Services are excluded from coverage under Medicare Part B if they are "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).

30.     To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855B application and supporting documentation to Medicare. [1] Among other things, that form provides "additional requirements that [] supplier[s] must meet and maintain in order to bill the Medicare program." These requirements, which are pre-requisites to payment under Medicare, include a certification that: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier . . . **I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark**

---

[1] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855b.pdf (last accessed July 12, 2017).

law), **and on the supplier's compliance with all applicable conditions of participation in**

**Medicare."** CMS-855B, at 31 (Emphasis added). The provider also certifies that "I will not

knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare,

and will not submit claims with deliberate ignorance or reckless disregard of their truth or

falsity." *Id.*

31.     In general, Medicare only requires this attestation and certification; it does not

generally require providers to submit the underlying patient file.

32.     Nonetheless, Medicare prescribes certain basic record-keeping requirements. 42 §

C.F.R. 410.32(d). Specifically, the supervising physician or the organization billing Medicare

must maintain documents showing "accurate processing" of the medical services billed. *Id.* If the

physician or organization does not have adequate documentation showing the procedure at issue,

Medicare deems that service to be nonmedically necessary and *per se* unreasonable. *See* 42 §

C.F.R. 410.32(d)(3)(ii).

33.     Claims for payment submitted to the Government in knowing violation of any

material rules or requirements constitute False Claims for purposes of the FCA. By the same

token, certifications falsely attesting to compliance with such material requirements constitute

False Statements.

34.     As detailed below, Procarent engaged in an institutionalized scheme to

fraudulently submit claims to Medicare for reimbursements by falsely certifying that

transportation of individuals by ambulance was medically necessary, when it was not; that a

valid PCS form existed prior to transporting the nonemergency repetitive patient, when it did

not; and that ALS services were rendered to patients during ambulance transports, when only

BLS services were rendered. Thus, Procarent submitted False Claims, and made False

Statements, to Medicare for reimbursement that it knew were not reimbursable under Medicare's rules and regulations.

## DEFENDANT'S FRAUDULENT SCHEME

### A.    BACKGROUND

35.    Procarent provides ambulance services to persons in Louisville, Kentucky; Owensboro, Kentucky; Indianapolis, Indiana; and St. Louis Missouri.

36.    Procarent is one of three companies held by Interlock Industries- a privately held company controlled by the Mackin family.

37.    Craig Mackin ("Mackin") was, for all relevant times hereto, the secretary and one of the directors for Procarent. Mackin was intimately involved in the day-to-day operations of Procarent and was regularly updated on the billing for ambulance runs to Medicare.

38.    As part of Procarent's business, it submits claims to Medicare for reimbursement for nonemergency ambulance transport services.

39.    During all relevant times, Relators were employed by Procarent in its Louisville, Kentucky office and all were involved- in some way- with billing Medicare for nonemergency ambulance runs.

40.    In July of 2010, Procarent hired Kesterson as a Billing Manager, and she was responsible for managing billing for ambulance runs and the accounts receivable.

41.    After Kesterson was hired, she attended a seminar on the requirements for billing ambulance runs to Medicare for reimbursement.

42.    After attending this seminar, Kesterson learned that Procarent was improperly billing Medicare for nonemergency ambulance runs that did not meet all of Medicare's requirements for reimbursement.

43.     Specifically, Kesterson learned that prior to being hired, Procarent routinely transported patients by ambulance that could travel by other means, thus, making the transports not medically necessary. Additionally, Kesterson learned that Procarent failed to obtain PCS forms, or valid PCS forms, for a significant number of these nonemergency repetitive ambulance runs.

44.     Despite the lack of medical necessity and/or the failure to have the statutorily required PCS forms prior to transport, Procarent submitted these claims to Medicare for reimbursement.

45.     After the seminar, Kesterson reported to the then-President, Kathy Minx ("Minx"), that Procarent needed to self-report because it was improperly billing repetitive nonemergency ambulance runs. Specifically, Kesterson reported the issues with billing repetitive nonemergency ambulance runs without a PCS or valid PCS, as well as billing ambulance runs when it was not medically necessary to transport the patient by ambulance. After making this disclosure, Minx then reported to Mackin what Kesterson had conveyed to her and the need to self-report, however, upon information and belief, Mackin refused to self-report.

46.     Upon information and belief, the above claims were submitted to Medicare because of Mackin's philosophy that Procarent bill Medicare for every ambulance run regardless of whether the run met Medicare's criteria. In fact, Mackin had previously told employees of Procarent, "If the transport was made, we should bill for it." In essence, Procarent used its ambulances as taxpayer taxicabs.

47.     In April of 2011, Procarent hired Dunn as a Billing Supervisor, and she was responsible for overseeing the employees who were involved in billing.

48.     In April of 2011, Dunn underwent training to become a certified coder for billing ambulance claims to Medicare/Medicaid.

49.     During her training, Dunn learned that in order to submit a claim to Medicare for reimbursement of a nonemergency repetitive ambulance runs, the provider (in this case Procarent) is required to have a signed physician's order, prior to transporting the patient, certifying the medical necessity requirements set forth in 42 C.F.R. 410.40.

50.     In the spring of 2011, Dunn became aware that the PCS forms that Procarent was statutorily required to have in order to submit a claim to Medicare for reimbursement were deficient for approximately 2,700 ambulance runs, which amounted to approximately $1,300,000 that could not be legally billed.

51.     Specifically, Kesterson and Dunn noticed that the required PCS forms:

    a.     Were missing or did not exist;

    b.     Were invalid because a physician's signature was missing;

    c.     Were invalid because the signature of the physician was not dated;

    d.     Were invalid because the statement did not state that the patient was bed-confined;

    e.     Were fraudulently altered;

    f.     Contained fraudulent signatures;

    g.     Were missing the sixty (60) day date range that the form was valid; and/or

    h.     Contained signatures that were fraudulently purported to be that of a physician.[2]

52.     Dunn and Kesterson also reported the issues to Minx.

---

[2] *See* Exhibit A to original Complaint. Relators hereby incorporate by reference, as if fully restated herein, Exhibit A from their original Complaint as if fully set forth herein.

53.     In June of 2011, Procarent hired Foltz as a Controller, who was responsible for overseeing Procarent's accounting department, which included billing.

54.     During Foltz's first week of work, she was told by Minx, as well as Kesterson, of the issues with the 2,700 ambulance runs that could not be billed due to missing PCS forms. Foltz was also informed by Kesterson of Procarent's prior billing "issues", including billing Medicare for nonemergency ambulance runs even though there was no PCS forms, no valid PCS forms, and/or the transport was not medically necessary.

55.     Also during her first week, Foltz participated in a "closed door" meeting with Minx and Mackin.

56.     During this meeting, Mackin asked Foltz if she had reviewed the accounts receivable, meaning the above-described unbilled ambulance runs.

57.     Foltz responded that she had not, but she had heard about some "fraud" issues.

58.     Mackin quickly cautioned Foltz about using the term "fraud."

59.     Foltz then told Mackin that if Procarent did not have the correct documentation, i.e., PCS forms, then Procarent could not go back and create them after-the-fact because the forms must be received prior to the first repetitive run taking place.

60.     Foltz further told Mackin that if there were runs billed to Medicaid and Medicare without the proper documentation, then Procarent needed to self-report.

61.     Mackin then explicitly told Foltz not to self-report. Mackin stated that Procarent was not going to self-report and had always billed that way; it was not an issue.

62.     Mackin went on to state that the runs must be billed, regardless of any perceived issues.

11

63.     Foltz told Mackin that she would personally look at the documentation to see what could properly be billed and what was not billable.

64.     While Relators were looking into the 2,700 ambulance runs, they found prior excessive and fraudulent billing to Medicare and Medicaid dating back almost ten (10) years.

65.     Upon information and belief, Relators estimated the fraudulent billing to exceed $100,000,000.

66.     After noticing the above issues, Relators attempted to implement some internal controls through new policies and procedures, but were met with resistance from Procarent's operations department.

67.     Kesterson and Dunn suggested changes to PCS forms in order to be more compliant, but they could not get the Senior Operations Director, Tom Spaulding, to approve the changes.

68.     Mackin told Foltz that if Spaulding refused the change then they were not to change anything.

69.     Sometime in August of 2011, an EMT allegedly "found" the missing PCS forms, which purportedly supported some of the $1.3 million in unbilled claims.

70.     Foltz was given the "found" PCS forms, which included ones that had been missing and forms that had previously been missing the necessary information, suddenly completed.

71.     Foltz was assured by Cassie Hayes, a senior biller, that she had confirmed the validity of the signatures on the PCS forms.

72.     After the PCS forms were "found," Mackin became insistent that the runs be billed. Mackin was so adamant about the claims being billed that he told Foltz that he may give a bonus to the billing department if they "cleaned up" and billed the outstanding claims.

73.     Foltz relayed to Kesterson and Dunn Mackin's message that the runs must be billed.

74.     Dunn and Kesterson began looking into the newly "found" PCS forms and discovered the forms had been signed by physicians' after-the-fact and backdated to appear valid, some of the physicians' signatures on others had been copied and pasted or forged, and on some forms, patients' signatures had been forged by paramedics.

75.     Mackin was again contacted by Foltz to discuss self-reporting the issues discovered by Dunn and Kesterson.

76.     Foltz even created a self-reporting package and submitted it to Mackin.

77.     Upon information and belief, Procarent has not self-reported any billing issues.

78.     Out of the 2,700 questionable ambulance trips, Kesterson and Dunn only identified a small percentage of those trips that could be legally billed to Medicare.

**B.      NONEMERGENCY AMBULANCE TRANSPORTS**

79.     For every ambulance transport (i.e. every "run"), the EMTs that accompany an ambulance fill out what is known as a "run report." These run reports include information such as the date, time, and location of an ambulance pick-up and drop off, check boxes to describe various conditions that may typically affect a patient, and a box for a narrative. The narrative is simply the EMT's account of what happened during the transport.

80.     These run sheets demonstrate the patient's condition at the time of transport and show whether it was medically necessary to transport the patient by ambulance.

81.     Additionally, nonemergency repetitive ambulance runs also document medically necessity through a PCS form, which is to be filled out by the patient's physician.

82.     Procarent had a significant number of repetitive nonemergency ambulance runs for patients to dialysis facilities and these patients were transported two to three times a week. Thus, these were high-revenue generating runs for Procarent.

83.     As set forth below, a significant number of Procarent's nonemergency ambulance transports lacked medical necessity or did not have a valid PCS forms, making these runs non-reimburseable from Medicare. However, despite knowing these runs did not meet Medicare's criteria for reimbursement, Procarent still submitted the claims to Medicare, and were paid on these claims.

**C.     FRAUDULENTLY BILLING MEDICARE FOR AMBULANCE RUNS THAT WERE NOT MEDICALLY NECESSARY PRIOR TO JULY OF 2010**

84.     Prior to Kesterson being hired in July of 2010, Procarent routinely submitted claims to Medicare for reimbursement for ambulance runs, attesting to the medical necessity of these runs, when it was not medically necessary to transport the patient by ambulance.

85.     Upon information and belief, Procarent, either knowingly, recklessly, or as a product of deliberate ignorance, had been transporting patients by ambulance even when not medically necessary from 2001 through December of 2010.

86.     Procarent and its management, specifically Mackin, were acutely aware that patients were being transported by ambulance that did not medically need an ambulance transport. Specifically, in June of 2011, Foltz notified Mackin of Procarent's prior practice of billing for medically unnecessary ambulance runs. During this same conversation, Mackin

14

acknowledged knowing about the prior billing practices when he told Foltz that Procarent would not self-report because it had always billed this way.

87.     The following are a few examples of Procarent's larger scheme of defrauding Medicare by submitting claims for ambulance runs knowing that the transports were not medically necessarily.

88.     Procarent transported E.G. on April 5, 2007. (**Exhibit 1,** p. 1.) The stated justification for transporting E.G. by ambulance was that the patient had a history of Alzheimer's disease. However, the mere fact that E.G. had a history of Alzheimer's did not mean the patient needed to be transported by ambulance. E.G. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

89.     Procarent transported L.B. on June 25, 2008. (**Exhibit 1,** p. 2.) The stated justification for transporting L.B. by ambulance was that the patient had an altered mental status. However, the mere fact that L.B. had an altered mental status did not mean the patient needed to be transported by ambulance. L.B. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

90.     Procarent transported J.O. on June 7, 2009. (**Exhibit 1,** p. 3.) The stated justification for transporting J.O. by ambulance was that the patient had cancer. However, the mere fact that J.O. had cancer did not mean the patient needed to be transported by ambulance. J.O. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

91.     Procarent transported C.I. on August 15, 2009. (**Exhibit 1,** p. 4.) The stated justification for transporting C.I. by ambulance was that the patient had cancer. However, the mere fact that C.I. had cancer did not mean the patient needed to be transported by ambulance.

C.I. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

92.     Procarent transported J.A. on November 18, 2009. (**Exhibit 1,** p. 5.) The stated justification for transporting J.A. by ambulance was that the patient had hip pain. However, the mere fact that J.A. had hip pain did not mean the patient needed to be transported by ambulance. J.A. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

93.     Procarent transported K.S. on March 6, 2010. (**Exhibit 1,** p. 6.) The stated justification for transporting K.S. by ambulance was that the patient had leg pain. However, the mere fact that K.S. had leg pain did not mean the patient needed to be transported by ambulance. K.S. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

94.     Procarent transported N.R. on July 6, 2010. (**Exhibit 1,** p. 7.) The stated justification for transporting N.R. by ambulance was that the patient had cancer. However, the mere fact that N.R. had cancer did not mean the patient needed to be transported by ambulance. N.R. was not bed confined and did not require or qualify for ambulance transportation under the Medicare requirements.

95.     The above claims were submitted to the federal government for reimbursement. In so doing, Procarent certified to the medical necessity of these transports. However, the stated reason for transporting the patients by ambulance clearly was not medically necessary.

**D.     FRAUDULENTLY BILLING MEDICARE FOR AMBULANCE RUNS THAT WERE NOT MEDICALLY NECESSARY FROM 2011 FORWARD**

96.     Beginning in 2011, Procarent either knowingly, recklessly, or as a product of deliberate ignorance, transported patients by ambulance even when not medically necessary or

submitted a claim to the federal government for ALS services, when no such services were provided.

97.    Procarent and its management, specifically Mackin, were acutely aware that patients were being transported by ambulance that did not medically need an ambulance transport. In particular, Foltz discussed the lack of medical necessity for numerous nonemergency ambulance transports with Mackin and Minx during her employment.

98.    The following are a few examples of Procarent's larger scheme of defrauding Medicare by submitting claims for nonemergency repetitive ambulance runs, even though the patients were not bed confined and could ambulate.

99.    Procarent transported V.B. from January of 2011 to May of 2011. (**Exhibit 2.**) According to the PCS forms, V.B. was bed confined, which meant was unable to ambulate, unable to get out of bed without assistance, and unable to sit up in a wheelchair. However, the run sheets did not support medical necessity. Moreover, Procarent's own evaluation of the patient noted that the patient's daughter took transported her to other appointments. The fact that V.B. could travel to other appointments with her daughter is inconsistent with the notion that the patient was bed confined.

100.    Procarent transported J.H. on February 3, 2011. (**Exhibit 3.**) According to the PCS form, J.H. was bed confined, which meant was unable to ambulate, unable to get out of bed without assistance, and unable to sit up in a wheelchair. However, according to the run sheet, the EMTs noted that when J.H. was taken home, she was transferred to chair. Again, the fact that J.H. could sit in a chair is inconsistent with the notion that the patient was bed confined.[3]

---

[3] An email between Cassie Hayes and Jillian Becht further shows that it was not medically necessary to transport J.H. by ambulance because the EMTs repeatedly found J.H. standing upon arrival to the residence. *See* **Exhibit 3,** pp. 3-4.)

101.    Procarent transported B.M. on February 15, 2011. (**Exhibit 4.**) According to the PCS form, B.M. was bed confined, which meant was unable to ambulate, unable to get out of bed without assistance, and unable to sit up in a wheelchair. However, according to the run sheet, the EMTs noted that when B.M. was taken home, patient ambulated to couch, with walker, with minimum assistance. Again, the fact that B.M. could ambulate to the couch with the assistance of a walker is inconsistent with the notion that the patient was bed confined.

102.    Procarent transported P.H. on April 1, 2011. (**Exhibit 5.**) According to the PCS form, P.H. was bed confined, which meant was unable to ambulate, unable to get out of bed without assistance, and unable to sit up in a wheelchair. However, according to the run sheet, the EMTs noted that "upon arrival found [patient] sitting in [wheelchair]." The fact that P.H. was sitting in a wheelchair is inconsistent with the notion that the patient was bed confined.

103.    Procarent transported C.G. on April 18, 2011. (**Exhibit 6.**) According to the PCS form, C.G. was bed confined, which meant was unable to ambulate, unable to get out of bed without assistance, and unable to sit up in a wheelchair. However, according to the run sheet, the EMTs noted that "upon arrival [patient] was found sitting in chair." The fact that C.G. was sitting in a chair is inconsistent with the notion that the patient was bed confined.

104.    The above claims were submitted to the federal government for reimbursement. In so doing, Procarent certified to the medical necessity of these transports. However, the run reports not only do not support medical necessity, but actually contraindicate the need for ambulance transport.

105.    Additionally, Procarent engaged in a scheme to defraud Medicare by submitting claims for ALS services, when the run sheets failed to document that any such advanced

18

procedures were provided to the patient. The following are a few examples of Procarent's larger scheme.

106.    Procarent transported M.M. on December 7, 2011. (**Exhibit 7**, p. 1.) According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

107.    Procarent transported G.H. on October 25, 2011. (**Exhibit 7**, p. 1.) According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

108.    Procarent transported J.G. on September 14, 2011. (**Exhibit 7,** p. 2.) According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

109.    Procarent transported M.P. on November 8, 2011. (**Exhibit 7**, p. 2.)  According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

110.    Procarent transported E.P. on November 22, 2011. (**Exhibit 7,** p. 2.)  According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

111.    Procarent transported R.R. on December 28, 2011. (**Exhibit 7,** p. 2.)  According to the run sheet, no advanced procedures were provided to the patient, however, Procarent billed for ALS services.

112.    The above are but just a few examples of a much more systematic scheme to defraud the government by submitting claims for ALS services that were not rendered, thus receiving a higher rate for the transport.

### E.      FALSIFICATION OF PCS FORMS

113.    Beginning in 2001 and going through 2011, Procarent either knowingly, recklessly, or as a product of deliberate ignorance, transported nonemergency repetitive patients by ambulance without first obtaining a PCS form from the patient's physician documenting the medical necessity for such transport.

114.    Despite lacking the statutorily required documentation to submit a nonemergency repetitive ambulance run to Medicare, Procarent submitted the claims- certifying that each of the claims were in compliance with Medicare's requirements- when the claims were not.

115.    Specifically, from 2001 to 2010, Procarent routinely submitted claims to Medicare without even obtaining a PCS form.

116.    In 2011, Relators refused to submit the above-described 2,700 claims to Medicare for nonemergency repetitive runs because the runs lacked valid PCS forms.

117.    Because Relators would not bill Medicare without first having the statutorily required PCS forms, Procarent fraudulently altered, created, and/or backdated the PCS forms to support the 2,700 ambulance runs.

118.    Procarent billed Medicare for the above repetitive ambulance runs, despite knowing that it did not have the required documentation, or the documentation that it did have was invalid and/or fraudulent.

### F.      RELATORS WERE TERMINATED FOR REFUSING TO SEEK REIMBURSEMENTS FROM MEDICARE FOR AMBULANCE RUNS THAT DID NOT MEET MEDICARE'S CRITERIA

119.    After Dunn repeatedly refused to bill the 2,700 claims, she was terminated for her "refusal to bill attitude" as indicated by her unwillingness to submit all of these questionable repetitive ambulance runs to Medicare.

20

120.    In October of 2011, Kesterson learned her job was in jeopardy when she was accidentally carbon-copied on an email sent by Foltz and meant only for the Directors. In the email, which was sent at the direction of Mackin, Foltz states that she intended to terminate Kesterson.

121.    After Kesterson contacted Human Resources, Foltz called her to discuss the issue.

122.    Foltz informed Kesterson that the owner of Procarent, Mackin, wanted Kesterson terminated because she would not bill the $1.3 million in claims that were missing PCS forms or that were supported by fraudulent documentation.

123.    On October 19, 2011, Kesterson wrote in an email to Mackin outlining why she would not bill the claims, in which she stated:

> [T]he majority of the documents had been altered to look like a valid PCS; and upon further research with the pickup facilities, doctor searches, etc, I discovered that all but 1 of the documents were invalid. Some of the documents claimed that RN's, LPNs and nurse techs were doctors. Some of the documents had forged doctor signatures (we have a copy of the real signature for Dr. Linda Stropes). Angie sent the email, including the forged PCSs, to you, copying a supervisor and one of my hourly staff, on 08/29 promising that I would bill 720k based on the documents that Care [a division of Procarent], Stacy Cottrell found.

124.    Kesterson told Mackin that she could and would not bill those claims because it is a crime to bill false claims.

125.    Kesterson noted that many of the PCSs were very obviously altered, and she could tell because the original PCS is attached to each and every transport recorded in their computer software.

126.    Kesterson has since learned that Mackin contacted the IT department and attempted to have her email erased from the server, however, a copy of this email is attached as **Exhibit 8**.

21

127.     Mackin eventually set up a meeting with Kesterson to "figure out what to do" with her.

128.     A couple of days later, Mackin scheduled another meeting with Kesterson.

129.     At the second meeting, Kesterson was given a "promotion" to position created especially for her- Corporate Compliance Manager.

130.     However, it was hardly a step-up from her previous position.

131.     Mackin stated that Kesterson was only being "promoted" so as to insulate Procarent from possible suit by Kesterson.

132.     Mackin also stated that he would intentionally make the position so arduous that Kesterson would inevitably fail.

133.     For example, Kesterson was given only thirty (30) days to implement a new plan for her position, which was in addition to still performing her job duties as a Billing Manager.

134.     Kesterson found this assignment extremely difficult because she was not qualified for her new position and was not given any training.

135.     When Kesterson asked to purchase a book to help her learn, she was told by Mackin that she needed to learn from the internet.

136.     In November of 2011, Kesterson resigned her position because of the retaliation to which she was subjected when she refused to bill the all of the questionable 2,700 repetitive ambulance claims for reimbursement.

137.     Upon information and belief, the position of Corporate Compliance Manager was not been filled for several years after Kesterson's resigned.

138.     In March of 2012, Foltz was terminated after repeatedly voicing her concerns regarding Procarent's billing practices and refusing to bill the runs with questionable PCS forms.

139.   In addition to billing with invalid PCS forms, Foltz refused to bill hospitals at "kickback" rates.

140.   Procarent often charged Medicare and Medicaid two times the amount that they would charge hospitals for the same or similar services. Foltz insisted that hospitals must be charged in line with Medicare and Medicaid rates, otherwise it appeared to be a kickback.

141.   Foltz also refused to charge Medicare/Medicaid patients a "check processing fee" to refund their overpayment to Procarent.

## COUNT I
## VIOLATION OF 31 U.S.C. §3729(a)(1)(A)

142.   Relators incorporate by reference, as set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

143.   Defendant knowingly presented false or fraudulent claims for payment, and knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government, in violation of 31 U.S.C. §3729(a), by submitting claims for repetitive ambulance runs, even though it was medically necessary to transport the patient by ambulance.

144.   Specifically, Procarent was submitting false and fraudulent claims to, and receiving reimbursement from, the Medicare program for repetitive ambulance runs knowing full well that it did not have proper documentation, the transport was not medically necessary, and/or the transport did not require ALS services, and that pursuant to 42 C.F.R §410.40, Procarent was not eligible to receive the aforementioned reimbursement.

145.    By virtue of the false or fraudulent claims that Procarent made and/or caused to be made, Defendant is liable to the United States for statutory damages as allowed b  law and civil penalties for each of these false or fraudulent claims in an amount to be determined at trial.

## COUNT II
## VIOLATION OF 31 U.S.C. §3729(a)(1)(B)

146.    Relators incorporate by reference, as set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

147.    Defendant knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid by the United States for ambulance transports that were ineligible for payment.

148.    Specifically, by submitting claims to Medicare without having valid PCS forms prior to the nonemergency repetitive ambulance transport, Procarent knowingly used False Statements to get these otherwise ineligible claims paid by the government.

149.    By virtue of the false or fraudulent statements that Procarent made and/or caused to be made, Defendant is liable to the United States for statutory damages as allowed by law and civil penalties for each of these false or fraudulent claims in an amount to be determined at trial.

## COUNT III
## CLAIMS PURSUANT TO 31 U.S.C. § 3730(h)

150.    Relators incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

151.    Kesterson reported the fraudulent billing and the need to self-report to Minx after attending a seminar on billing ambulance runs to Medicare for reimbursement.

152.    Dunn and Kesterson reported the fraudulent billing to the Controller, Foltz, and to Procarent's President.

153.   Foltz then reported the fraudulent billing to Procarent's Secretary and acting-President, Craig Mackin.

154.   Procarent terminated Relators after they engaged in protected activity by reporting the fraud.

155.   Procarent terminated Dunn and Foltz for their efforts to stop and/or correct violations under 31 U.S.C. §3729(a) as exemplified by their refusal to bill claims to Medicare where the ambulance runs were not medically necessary; the statutorily required supporting documentation, i.e., the Physician's Certification Statement, was missing, invalid, and/or fraudulently altered; and/or encouraging Procarent to self-report prior fraudulent billing.

156.   Procarent retaliated against Kesterson because she refused to violate Federal and Kentucky law by billing fraudulent claims.

157.   The retaliation to which Kesterson was subjected was so intolerable that she was forced to resign.

## COUNT IV
### Wrongful Discharge in Violation of Public Policy- Dunn

158.   Relators incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

159.   Dunn refused to violate state and federal law by submitting claims to Medicare and/or Medicaid that were based upon forged documents, a violation of KRS 523.100 (unsworn falsification to authorities).

160.   When Procarent submits a claim to Medicare and/or Medicaid, it certifies that the claim is compliant with Medicare's regulations, including the requirement that Procarent has a valid PCS form, signed by a doctor, prior to the repetitive patient being transported.

161.  Dunn knew that the claims Procarent wanted her to submit to Medicare and/or Medicaid were supported by PCS forms that were forged, so she refused to submit the claims.

162.  As a result of her refusal to submit the ambulance runs to Medicare and/or Medicaid based upon the forged PCS forms, Dunn was terminated for her "refusal to bill attitude."

163.  As a direct and proximate result of the aforementioned conduct, Dunn has suffered emotional distress, embarrassment, humiliation, mental anguish, and loss of wages and benefits.

**COUNT V**
**Wrongful Discharge in Violation of Public Policy- Kesterson**

164.  Relators incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

165.  Kesterson refused to violate state and federal law by submitting claims to Medicare and/or Medicaid that were based upon forged documents, a violation of KRS 523.100 (unsworn falsification to authorities).

166.  When Procarent submits a claim to Medicare and/or Medicaid, it certifies that the claim is compliant with Medicare's regulations, including the requirement that Procarent has a valid PCS form, signed by a doctor, prior to the repetitive patient being transported.

167.  Kesterson knew that the claims Procarent wanted her to submit to Medicare and/or Medicaid were supported by PCS forms that were forged, so she refused to submit the claims.

168.  As a result of her refusal to submit the ambulance runs to Medicare and/or Medicaid based upon the forged PCS forms, Kesterson was subjected to retaliatory and illegal treatment, discussed above, which resulted in her being constructively discharged

169.   Such retaliation violates the common law of Kentucky as the reason for Kesterson's termination was her refusal to violate the law in the course of her employment.

170.   As a direct and proximate result of the aforementioned conduct, Kesterson has suffered emotional distress, embarrassment, humiliation, mental anguish, and loss of wages and benefits.

**COUNT VI**
**Wrongful Discharge in Violation of Public Policy- Foltz**

171.   Relators incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

172.   Foltz refused to violate state and federal law by submitting claims to Medicare and/or Medicaid that were based upon forged documents, a violation of KRS 523.100 (unsworn falsification to authorities).

173.   When Procarent submits a claim to Medicare and/or Medicaid, it certifies that the claim is compliant with Medicare's regulations, including the requirement that Procarent has a valid PCS form, signed by a doctor, prior to the repetitive patient being transported.

174.   Foltz knew that the claims Procarent wanted her to submit to Medicare and/or Medicaid were supported by PCS forms that were forged, so she refused to submit the claims.

175.   As a result of her refusal to submit the ambulance runs to Medicare and/or Medicaid based upon the forged PCS forms, Foltz was terminated.

176.   As a direct and proximate result of the aforementioned conduct, Foltz has suffered emotional distress, embarrassment, humiliation, mental anguish, and loss of wages and benefits.

## COUNT VII
**Punitive Damages**

177.    Relators incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

178.    The conduct of the Defendant was done with a reckless disregard for the rights of the Relators and/or was grossly negligent, malicious, oppressive and/or fraudulent. Accordingly, the Relators are entitled to punitive damages from the Defendant.

**WHEREFORE,** the Relators, by counsel, respectfully demand as follows:

1.    With respect to Counts I and II, judgment be entered in favor of Relators and against Defendant for treble damages sustained by it, for civil money penalties of $ 5,500 to $ 11,000 for each of the false claims presented or caused to be presented, plus interest, attorneys' fees, costs, and any and all relief that the Court deems just and proper.

2.    With respect to Count III, judgment be entered in favor of Relators and against Defendant for two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees.

3.    With respect to Counts IV, V, VI, and VII judgment be entered in favor of Relators and against Defendant for an award of compensatory and punitive damages for Relators against the Defendant;

4.    For a trial by jury on any and all issues so triable; and

5.    Any and all other relief to which Relators may appear entitled.

Respectfully Submitted,

*/s/ David N. Ward*
THOMAS E. CLAY, P.S.C.
DAVID N. WARD
CLAY DANIEL WALTON & ADAMS PLC
462 South Fourth Street, Suite 101
Louisville, Kentucky  40202
(502) 561-2005
tclay@tclaylaw.com
david@justiceky.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on July 14th, 2017, the above was hand delivered and/or mailed to the following persons:

Attorney General of the United States
U.S. Department of Justice
441 4th Street, NW
Washington, DC 20001

Hon. L. Jay Gilbert
Assistant United States Attorney
United States Attorney's Office
717 West Broadway
Louisville, Kentucky 40202

*/s/ David N. Ward*
DAVID N. WARD