UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA, ex rel.　)
THERESA DUNN, APRILL　　　　　　　)
KESTERSON, AND ANGELA FOLTZ,　　)　　　Civil Action No. 3:11-CV-704-CHB
　　　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　　**MEMORANDUM OPINION**
v.　　　　　　　　　　　　　　　　　　)　　　　　**AND ORDER**
　　　　　　　　　　　　　　　　　　　)
PROCARENT, INC.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　　)

\*\*\*　\*\*\*　\*\*\*　\*\*\*

This matter is before the Court on the Motion to Dismiss filed by Defendant Procarent, Inc. ("Procarent"). [R. 92]. Relators Theresa Dunn, Aprill Kesterson, and Angela Foltz (the "Relators") filed a response, [R. 99], and Procarent replied, [R. 105]. The matter is therefore fully briefed and ripe for review. For the reasons set forth herein, the Court will grant in part and deny in part Procarent's Motion to Dismiss, [R. 92].

I.　　**BACKGROUND**

　　**A. Factual Background**

Defendant Procarent provides ambulance services to individuals in Louisville, Kentucky; Owensboro, Kentucky; Indianapolis, Indiana; and St. Louis, Missouri. [R. 50, ¶ 35]. Included in these services are nonemergency medical transports. *Id.* ¶ 38. Unlike emergency transports, which provide emergency transportation for individuals requiring immediate and serious medical attention, nonemergency transports provide scheduled transportation to individuals who are unable to travel by other methods of transportation, often because they are bed-confined and/or

1

their medical condition requires transportation by ambulance. *Id.* ¶ 15; *see also* 42 C.F.R. § 410.40(e) (defining medical necessity).

As part of its business, Procarent submits to Medicare claims seeking reimbursement for its nonemergency ambulance transport services. [R. 50, ¶ 38]. To receive payment, Procarent must comply with Medicare's regulations. *Id.* ¶¶ 25–33; *see also* 42 C.F.R. § 410.40(e). Three regulations are relevant to this action. First, the transport itself must be "medically necessary," which occurs when "the beneficiary is bed-confined, and . . . other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." 42 C.F.R. § 410.40(e)(1). Second, the "level of service provided" by the transport must be "medically necessary." *Id.* The level of service varies from basic life support ("BLS") to advanced life support ("ALS") and other specialized levels. *Id.* § 410.40(c). The third regulation applies to nonemergency, scheduled, repetitive ambulance services. Before furnishing such services, the ambulance provider must "obtain[] a physician certification statement dated no earlier than 60 days before the date the service is furnished." *Id.* § 410.40(e)(2)(i). A physician certification statement ("PCS") is "a statement signed and dated by the beneficiary's attending physician which certifies that medical necessity provisions of [§ 410.40(e)(1)] are met." *Id.* § 410.40(a).

Each of the Relators was employed by Procarent and worked in the billing division of its Louisville office. [R. 50, ¶ 39]. In July 2010, Relator Kesterson was hired as a Billing Manager. *Id.* ¶ 40. In this position, Kesterson was responsible for seeking reimbursements from Medicare for Procarent's ambulance runs. *Id.* At some point, Kesterson learned that Procarent "routinely transported patients by ambulance that could travel by other means" and "failed to obtain PCS forms, or valid PCS forms, for a significant number of these nonemergency repetitive ambulance

2

runs." *Id.* ¶ 43. Nevertheless, "[d]espite the lack of medical necessity and/or the failure to have the statutorily required PCS forms prior to transport, Procarent submitted these claims to Medicare for reimbursement." *Id.* ¶ 44. Kesterson reported this issue to Kathy Minx, the President of Procarent, and encouraged Procarent to self-report. *Id.* ¶ 45. Minx, however, refused to do so. *Id.* The Relators believe Procarent submitted claims to Medicare on these ambulance runs because Minx had previously told employees that all runs should be billed, "regardless of whether the run met Medicare's criteria." *Id.* ¶ 46.

The following year, in April 2011, Relator Dunn was hired as a Billing Supervisor. *Id.* ¶ 47. In that role, Dunn was responsible for overseeing other Procarent employees that were involved in the billing process. *Id.* Shortly after being hired, Dunn discovered that 2,700 ambulance transports, amounting to $1.3 million in reimbursements, lacked a valid PCS. *Id.* ¶ 50. Among these 2,700 transports, issues included missing PCS forms, missing or forged physician signatures, and missing information such as date ranges and affirmations of bed confinement. *Id.* ¶ 51. Kesterson and Dunn told Minx about these issues. *Id.* ¶ 52.

In June 2011, Relator Foltz was hired as a Controller. *Id.* ¶ 53. As a Controller, Foltz was responsible for overseeing Procarent's accounting department, including its billing department. *Id.* During Foltz's first week of work, she was informed of the 2,700 ambulance runs that could not be billed due to the missing PCS forms. *Id.* ¶ 54. Foltz met with Minx and Craig Mackin, the secretary for Procarent and one of its directors, to discuss these ambulance runs. *Id.* ¶¶ 56–63. Foltz advised Minx and Mackin that Procarent needed to self-report, but Mackin directed her not to self-report and to bill the runs, as they "had always billed that way." *Id.* ¶¶ 60–62.

In August 2011, Foltz was informed that a Procarent EMT had found the missing PCS forms for some of the 2,700 runs and was assured that the newfound forms were valid. *Id.* ¶¶ 69–

71. Mackin directed Foltz to bill the runs with these newfound forms, and Foltz told Kesterson and Dunn to do so. *Id.* ¶¶ 72–73. Kesterson and Dunn investigated these forms and found that a "small percentage" of the questionable ambulance runs could be billed to Medicare. *Id.* ¶ 78. However, the majority of the forms appeared fraudulent, with some signatures copy-pasted, backdated, and forged.[1] *Id.* ¶ 74. Upon learning this, Foltz contacted Mackin and again encouraged self-reporting. *Id.* ¶¶ 75–76. According to the Relators, Procarent has not self-reported any of these billing issues. *Id.* ¶ 77.

After Dunn refused to bill for the allegedly fraudulent claims, Procarent fired Dunn. *Id.* ¶ 119.  Dunn alleges that she was terminated for her "refusal to bill attitude," or more specifically, her unwillingness to submit questionable ambulance runs to Medicare for reimbursement. *Id.* In October 2011, Kesterson learned that her job was also in jeopardy when she was inadvertently carbon-copied on an email Foltz sent to the Board of Directors. *Id.* ¶ 120. In that email, Foltz stated her intention to terminate Kesterson. *Id.* Foltz eventually informed Kesterson that Mackin wanted to terminate Kesterson due to her refusal to bill for the claims with missing or allegedly fraudulent PCS forms. *Id.* ¶ 122. Kesterson then emailed Mackin explaining why she had refused to bill for those claims, and further noting that it would be a crime to bill for the false claims. *Id.* ¶¶ 123–24; *see also* [R. 50-8]. Mackin then promoted Kesterson to a new position that he created for her: Corporate Compliance Manager. [R. 50, ¶ 129]. However, according to the allegations in the Second Amended Complaint, Mackin stated that he only promoted Kesterson to insulate the company from potential lawsuit, and he announced his intent to "make the position so arduous that Kesterson would inevitably fail." *Id.* ¶¶ 131–32. To that end, Mackin asked Kesterson to implement a plan for corporate compliance

---

[1] The Relators have filed a representative sample of these PCS forms in the record, [R. 101], and those forms have been incorporated into the Second Amended Complaint. [R. 50 (Second Amended Complaint), ¶ 51].

within thirty days, while she was still performing her duties as Billing Manager. *Id.* ¶ 133. Kesterson found this task to be "extremely difficult," and "she was not qualified for her new position and was not given any training." *Id.* ¶ 134. In November 2011, Kesterson resigned "because of the retaliation to which she was subjected when she refused to bill [] all of the questionable 2,700 repetitive ambulance claims for reimbursement." *Id.* ¶ 136.

A few months later, in March 2012, Foltz was terminated "after repeatedly voicing her concerns regarding Procarent's billing practices and refusing to bill the runs with questionable PCS forms." *Id.* ¶ 138. She had also refused to bill hospitals at "kickback" rates, referring to Procarent's practice of charging hospitals less than it would charge Medicare or Medicaid for the same or similar services. *Id.* ¶¶ 138–39. She also claims that she refused to charge Medicare and Medicaid patients a "check processing fee" to refund their overpayment to Procarent. *Id.*

### B. Procedural History

#### 1. The Original Complaint and First Amended Complaint

On December 21, 2011, Dunn and Kesterson initiated this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 et seq. [R. 1]. The False Claims Act "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe I)*, 342 F.3d 634, 640 (6th Cir. 2003). For example, the Act imposes liability on persons who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). It also imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The Act also prohibits employers from retaliating against

employees or agents that have taken steps in furtherance of an action under the False Claims Act or have otherwise made efforts to stop a violation of the Act. 31 U.S.C. § 3730(h).

The Act's *qui tam* provisions "allow private parties to recover damages for fraud committed against the United States." *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 337 (6th Cir. 2000); *see also* 31 U.S.C. § 3730(b). To initiate a *qui tam* action, the complaining party files a complaint and discloses in writing "substantially all material evidence and information the person possesses," and that complaint (and the disclosure statement) is then served on the United States government. 31 U.S.C. § 3730(b)(2). The government then has at least sixty days within which to investigate the claims and determine if it will intervene and proceed with the action. *Id.*

Dunn and Kesterson served their Original Complaint (but not their disclosure statement) on the United States government in or around early August 2012. *See* [R. 6]. In their Original Complaint, Dunn and Kesterson alleged violations of the False Claims Act against their former employer, Defendant Procarent, Inc. Specifically, the relators alleged that Procarent submitted false and fraudulent claims to Medicare for repetitive ambulance transports without proper documentation (i.e., by using fraudulent PCS forms) and with the knowledge that it was not eligible for reimbursement, in violation of 31 U.S.C. § 3729(a)(1); Procarent retaliated against Dunn and Kesterson for reporting the alleged fraudulent billing practices, in violation of 31 U.S.C. § 3730(h); and Procarent wrongfully discharged Dunn and Kesterson in violation of public policy. [R. 1, pp. 6–11].

On August 27, 2012, a First Amended Complaint was filed. [R. 6]. This pleading also named Dunn and Kesterson as relators, but this time added Foltz as well. *Id.* at 1. Like the Original Complaint, the First Amended Complaint alleged that Procarent's submission of claims

with fraudulent and invalid PCS forms constituted a false claim under 31 U.S.C. § 3729(a). [R. 6, ¶¶ 73–75]. It also alleged that Dunn and Foltz's discharge and Kesterson's constructive discharge constituted retaliatory conduct under § 3730(h) and Kentucky public policy. *Id.* ¶¶ 76–101.

This Amended Complaint, along with the Relators' disclosure statement, was served on the United States on October 2, 2012. [R. 10]. The United States therefore had sixty days in which to decide whether to intervene in the action, or in other words, whether it would assume responsibility for prosecuting the action. 31 U.S.C. § 3730(b)(2); *id.* § 3730(c). However, over the next several years, the United States government repeatedly sought extensions of time in which to consider intervention. *See, e.g.*, [R. 14; R. 31]. Such extensions of time are expressly permitted under the False Claims Act. 31 U.S.C. § 3730(b)(3). The Act further provides that the matter will remain sealed and the complaint "shall not be served on the defendant" until the Court orders otherwise. *Id.* § 3730(b)(2)–(3). Pursuant to these provisions, the United States was provided with additional time in which to investigate the Relators' claims, and during that time, the case remained sealed and Procarent did not have access to the complaints.

### 2.  The Second Amended Complaint

On July 17, 2017, a Second Amended Complaint was filed. [R. 50].  The Second Amended Complaint again names Dunn, Kesterson, and Foltz as relators. [R. 50, p. 1]. It alleges that

> Procarent engaged in an institutionalized scheme to fraudulently submit claims to Medicare for reimbursements by falsely certifying that transportation of individuals by ambulance was medically necessary, when it was not; that a valid PCS form existed prior to transporting the nonemergency repetitive patient, when it did not; and that ALS services were rendered to patients during ambulance transports, when only BLS services were rendered.

*Id.* ¶ 34.

More specifically, the Second Amended Complaint alleges that Procarent fraudulently billed Medicare for ambulance transports that were not medically necessary "from 2001 through December 2010." *Id.* ¶¶ 84–95. In support of these allegations, the Relators attach seven documents, which appear to include Procarent's stated justification for each of seven nonemergency ambulance transports. [R. 50-1]; *see also* [R. 50, ¶¶ 88–94]. The Second Amended Complaint further alleges that, "[b]eginning in 2011," Procarent fraudulently billed for ambulance transports that were not medically necessary. [R. 50, ¶¶ 96–112]. In support of these allegations, the Relators attach several documents to their Second Amended Complaint, including PCS forms and their corresponding ambulance run reports, and certain email communications about deficient documentation. [R. 50-2; R. 50-3; R. 50-4; R. 50-5; R. 50-6, R. 50-7]; *see also* [R. 50, ¶¶ 99–103, 106–111].

The Second Amended Complaint further alleges that, in response to the Relators' refusal to bill for fraudulent claims, Procarent "fraudulently altered, created and/or backdated the PCS forms" to support those claims. [R. 50, ¶ 117]; *see also id.* ¶¶ 113–18. Lastly, the Relators allege that they were terminated (either actually or constructively) for refusing to seek reimbursements from Medicare for ambulance transports that did not meet Medicare's criteria. *Id.* ¶¶ 119–41.

Relying on these allegations, the Relators assert the following causes of action:

- Count I – submitting false and fraudulent claims to Medicare for repetitive nonemergency ambulance transports, which often included ALS services, without proper documentation and when neither the transports nor the ALS services were medically necessary, in violation of the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(A)[2];

---

[2] Section 3729(a)(1)(A) imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

- Count II – submitting claims to Medicare for repetitive nonemergency ambulance transports without obtaining valid PCS forms prior to the transports and instead using false statements to receive payment for said transports, in violation of the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(B)[3];

- Count III – retaliating against the Relators for reporting the alleged fraudulent billing practices, in violation of the False Claims Act, specifically 31 U.S.C. § 3730(h)[4];

- Count IV – wrongfully discharging Relator Dunn in violation of public policy;

- Count V – wrongfully discharging Relator Kesterson in violation of public policy; and

- Count VI – wrongfully discharging Relator Foltz in violation of public policy.

*Id.* at 23–27. For Count I (the medical necessity claim) and Count II (the fraudulent forms claim), the Relators seek treble damages "for civil money penalties of $5,500 to $11,000 for each of the false claims presented or caused to be presented, plus interest" and attorney fees and costs. *Id.* at 28. With respect to Count III (the retaliation claim), the Relators are seeking back pay and special damages, including attorney fees and costs. *Id.* For Counts IV, V, and VI (the wrongful discharge claims), the Relators seek compensatory and punitive damages.[5] *Id.*

---

[3] Section 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."

[4] Section 3730(h)(1) provides relief to employees that are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts doe by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

[5] The Relators also list a seventh cause of action for punitive damages. [R. 50, p. 28]. However, a claim for punitive damages is not a separate cause of action and should instead be requested in the prayer for relief. *See Archey v. AT&T Mobility, LLC*, No. 17-19-DLB-CJS, 2017 WL 6614106, *4 (E.D. Ky. Dec. 26, 2017) (citations omitted).

### 3.   The Motion to Dismiss

On August 31, 2020, the United States notified the Court that it would not intervene in this suit. [R. 87]. However, the False Claims Act allows the Relators to maintain the action in the name of the United States. 31 U.S.C. § 3730(b)(1). The United States recommended that the Court allow the Relators to proceed, and further requested that the Original Complaint, First Amended Complaint, and Second Amended Complaint be unsealed. [R. 87]. The Court then unsealed those portions of the record, [R. 88], and Procarent was served with a copy of each of the complaints. *Id.*; [R. 90].

In response, Procarent filed the present Motion to Dismiss. [R. 92]. In its motion, Procarent argues (1) the Second Amended Complaint was filed without leave and should therefore be dismissed; (2) the Relators' medical necessity claims (Count I) are barred by the statute of limitations; (3) the Second Amended Complaint (and specifically Count II, the claim alleging falsification of the PCS forms) fails to plead a violation of the False Claims Act with the requisite specificity; (4) with respect to the allegations in Count I that Procarent billed for ALS services that were not performed, the Second Amended Complaint fails to state a claim; (5) Foltz does not qualify as a relator and must be dismissed; and (6) the retaliatory discharge claims must be dismissed as a matter of law because the Relators did not engage in a protective activity under the False Claims Act. Relying on these arguments, Procarent asks that the Second Amended Complaint be dismissed with prejudice. The Court addresses each argument in turn.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal for "failure to state a claim upon which relief may be granted." To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

## III.    ANALYSIS

### A.  Leave to File Second Amended Complaint

Procarent first argues that the Second Amended Complaint must be dismissed because the Relators did not secure leave from the Court as required by Federal Rule of Civil Procedure 15. [R. 92, pp. 10–11]. That rule allows a party to amend its pleading once as a matter of course, but "[i]n all other case, a party may amend its pleading only with the opposing party's written

11

consent or the court's leave." Fed. R. Civ. P. 15(a). The rule also provides that "[t]he court should freely give leave when justice so requires." *Id.*

In this case, the Relators filed a First Amended Complaint on August 27, 2012, without leave, as permitted by Rule 15(a). [R. 6]. They then filed a Second Amended Complaint on July 17, 2017, [R. 50], which required either Procarent's consent or the Court's leave. *See* Fed. R. Civ P. 15(a)(2). At the time, the case remained sealed as the United States continued its review, and Procarent had not yet been served and could not consent to the filing. Thus, to file their Second Amended Complaint, the Relators were required to obtain leave from the Court.

The Court finds that the Relators secured leave from the Court when filing their Second Amended Complaint. When the Relators filed the Second Amended Complaint, they also filed a Motion for Leave to File Sealed Document, [R. 49]. They specifically requested "an Order authorizing the filing of a sealed document," presumably referring to the Second Amended Complaint. *Id.* On July 31, 2017, the Court[6] granted the motion. [R. 51]. The Court's order does not specifically reference the amended pleading or Rule 15. *Id.*

At first glance, the Motion for Leave to Filed Sealed Document, [R. 49], appears to be a request to *seal* the Second Amended Complaint, rather than a request for leave to *file* the amended pleading. However, the Court notes that, at the time that the Relators filed the motion and the Second Amended Complaint, the entire case remained sealed. Stated another way, even without an order granting leave to seal a document, all filings were automatically filed under seal. Thus, the Relators did not need to seek leave from the Court to seal their Second Amended Complaint, nor did the Court need to enter an order directing it to be filed under seal. The Court therefore understands that the Motion for Leave to File Sealed Document, [R. 49], was actually a

---

[6] At the time, the Honorable Thomas B. Russell presided over the case.

motion seeking leave to file an amended pleading under Rule 15(a)(2). The Court's order granting the motion was therefore an order granting such leave.

Further, even if the Court had not previously granted leave to amend, the Court finds that it would be appropriate to do so now. As noted above, the Court should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).   However, a district court "may deny a motion to amend where there is 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Sims v. Atrium Medical Corp.*, 349 F.Supp.3d 628, 636 (W.D. Ky. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

In this case, Procarent does not argue that it would suffer prejudice if the Court allows the Relators to file the Second Amended Complaint. In fact, Procarent was not served with any of the three complaints until September 2020, after the Court unsealed those portions of the record. [R. 88]. Up until that point, Procarent had no access to the Relators' filings and no obligation to respond. Stated another way, Procarent was not forced to respond to three distinct complaints, thereby expending significant time and costs; instead, Procarent received only one "active" complaint, the Second Amended Complaint, requiring only one responsive pleading. The Court therefore finds that Procarent was not prejudiced by the filing of the Second Amended Complaint, nor is there any evidence of undue delay, bad faith, or dilatory motive on the part of the Relators. Further, to the extent some portions of the amended complaint may be considered deficient, the Court will allow the Relators to file a Third Amended Complaint, as addressed in more detail below.

### B.  Sufficiency of the Second Amended Complaint Under Rule 9(b)

In relevant part, the False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The Relators allege two causes of action arising from these provisions. First, in their medical necessity claim arising under § 3729(a)(1)(A) (Count I), the Relators allege that Procarent submitted false claims to Medicare for services that were not medically necessary. In their fraudulent forms claim arising under § 3730(a)(1)(B) (Count II), the Relators allege that Procarent submitted claims to Medicare without obtaining valid PCS forms and instead using false statements to obtain reimbursement. [R. 50, ¶¶ 142–49]. Procarent now seeks dismissal of those two claims, arguing that the allegations in the Second Amended Complaint do not satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9. [R. 92, pp. 15–20, 23–24].

### 1.  Rule 9 Generally

At this stage of the proceedings, the Court must determine whether the Second Amended Complaint "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679; *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe II)*, 501 F.3d 493, 505 (6th Cir. 2007) (applying same standard to a False Claims Act *qui tam* action). Generally, under Federal Rule of Civil Procedure 8, a pleading satisfies this standard if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ P. 8(a)(2). However, because some of the claims at issue in this case involve fraud, the Second Amended Complaint must also comply with Federal Rule of Civil Procedure 9(b), at least with respect to those claims. *See, e.g.*,

*Bledsoe II*, 501 F.3d at 503. Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

This heightened pleading standard "is undoubtedly more demanding than the liberal notice pleading standard which governs most cases." *United States ex rel. SNAPP, Inc. v. Ford Motor Co. (SNAPP I)*, 532 F.3d 496, 503 (6th Cir. 2008) (citation omitted). However, it "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *Id.* (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988)); *see also Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) ("[W]hen deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading. . . ."). Instead, Rule 9 "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" *SNAPP I*, 532 F.3d at 503 (quoting *Michaels Bldg. Co.*, 848 F.2d at 679). In fact, as the Sixth Circuit has explained, "Rule 9(b) exists predominately for the same purpose as Rule 8: 'to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading.'" *Id.* (quoting *Michaels Bldg.*, 848 F.2d at 678). In cases involving fraud, however, "a 'more specific form of notice' is necessary to permit a defendant to draft a responsive pleading." *Id.* (quoting *Bledsoe II*, 501 F.3d at 503). Stated another way, the overarching purpose of Rule 9 is "to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Bledsoe II*, 501 F.3d at 503.

In the context of a False Claims Act *qui tam* action, Rule 9 requires that a plaintiff at least "allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bledsoe I*, 342

F.3d at 643 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)) (internal quotation marks omitted). However, "this requirement should be understood in terms of Rule 9(b)'s broad purpose of ensuring that a defendant is provided with at least the minimum degree of detail necessary to begin a competent defense." *SNAPP I*, 532 F.3d at 504. Thus, "[s]o long as a relator pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow a defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

With this heightened pleading standard in mind, the Court considers Procarent's argument that the Second Amended Complaint must be dismissed for failure to identify any specific claims that were submitted to Medicare for payment. Procarent makes this argument with respect to both the medical necessity claim (Count I) and the fraudulent forms claim (Count II). [R. 92, pp. 15–20, 23–24]. However, because the specific pleading requirements differ somewhat for claims arising under § 3729(a)(1)(A) and § 3729(a)(1)(B), the Court addresses each cause of action separately.

### 2. Medical Necessity Claim (Count I) – 31 U.S.C. § 3729(a)(1)(A)

As noted above, § 3729(a)(1)(A) prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). This particular provision

> imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken "knowingly," i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim.

*Bledsoe I*, 342 F.3d at 640. Importantly, a claim arising under this provision "requires proof that the alleged false or fraudulent claim was 'presented' to the government." *United States ex rel.*

*Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (quoting *Marlar*, 525 F.3d at 445) (internal quotation marks omitted). As the Sixth Circuit has explained,

> At the pleading stage, this [presentment] requirement is stringent; "where a relator alleges a 'complex and far-reaching fraudulent scheme,' in violation of [31 U.S.C. § 3729(a)(1)(A)], it is insufficient to simply plead the scheme; [the relator] must also identify a representative false claim that was actually submitted to the government."

*Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 470 (6th Cir. 2011)); *see also Bledsoe II*, 501 F.3d at 5050. Stated another way, to satisfy the presentment requirement, the relator must identify specific false claims that were actually submitted to the government for payment. *See, e.g.*, *United States ex rel. Marlar v. BWXT-12, LLC*, 525 F.3d 439, 446–47 (6th Cir. 2008); *Sanderson*, 447 F.3d at 877.

For example, in *United States ex rel. Marlar v. BWXT-12, LLC*, the district court dismissed the relator's claim arising under § 3729(a)(1)(A) because she failed to identify specific claims that were submitted to the federal government. 525 F.3d at 441. In that case, the relator had worked as a nurse practitioner for BWXT-12, LLC, a company that contracted with the Department of Energy. *Id.* at 442. As part of its contractual duties, the company was required to file monthly reports detailing any work-related accidents, injuries, or illnesses. *Id.* at 442. The relator alleged that the company was underreporting such incidents to inflate its performance-based compensation from the Department of Energy. *Id.* She brought a False Claims Act *qui tam* action, alleging among other things that her former employer knowingly presented false or fraudulent claim to the federal government in violation of § 3729(a)(1)(A). *Id.* at 445–46. In her complaint, she alleged that, "[o]n information and belief," the false claims were actually presented to the federal government. *Id.* at 446. The district court found these allegations to be insufficient. The Sixth Circuit agreed, explaining,

17

> "A plaintiff may not describe a[n alleged fraudulent billing] scheme in detail but then allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. A plaintiff must provide some support for the allegation."

*Id.* (quoting *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F.Supp.2d 1027, 1034 (S.D. Fla. 2007)).

The Sixth Circuit has identified one exception to this pleading requirement. A claim arising under § 3729(a)(1)(A) may survive a motion to dismiss "if it includes allegations showing 'specific personal knowledge' supporting a 'strong inference that a [false] claim was submitted." *Ibanez*, 874 F.3d at 914 (quoting *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc. (Prather I)*, 838 F.3d 750, 769 (6th Cir. 2016)). This "strong-inference exception" was first applied by the Sixth Circuit in *Prather I*. In that case, the relator had been employed by a senior living facility for the specific purpose of reviewing documentation for residents that had received home health services. 838 F.3d at 754. The documentation needed to be reviewed so that the facility could submit claims to Medicare for reimbursement. *Id.* At the time the relator was hired, the "Medicare claims regarding those patients had been on hold for some time," and the facility risked losing payments if the claims were not promptly submitted. *Id.*; *see also id.* at 757. However, while reviewing the documents, the relator came to believe that the facility was providing services without physician certification, and then found doctors to validate the care after-the-fact, in violation of certain regulations. *Id.* at 754–55. The relator brought a False Claims Act suit, alleging that the facility submitted false Medicare claims to the federal government. *Id.* at 755. The district court dismissed her § 3729(a)(1)(A) claim, noting that she had failed to allege specific claims that were submitted to the government. *Id.* at 760.

18

The Sixth Circuit disagreed. It acknowledged that the relator had failed to allege "[t]he actual *submission* of a *specific* request for anticipated payment to the government." *Id.* at 768–69. The Court also acknowledged that it has consistently demanded such allegations, even in cases that included allegations of a detailed fraudulent scheme. *Id.* at 769 (citation omitted). It noted, however, that the Court had in the past "hypothesized that 'the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Id.* (quoting *Chesbrough*, 655 F.3d at 471). More specifically, the Court has suggested that such an exception could apply "when a relator alleges specific personal knowledge that relates directly to billing practices." *Id.* (citation omitted). Thus, the exception might apply when the relator pleads "'personal knowledge that the claims were submitted by Defendants . . . for payment' or other 'personal knowledge of billing practices or contracts with the government.'" *Id.* (quoting *Chesbrough*, 655 F.3d at 471–72). It could also apply when the relator pleads "personal knowledge that was based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government." *Id.* (quoting *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 413 (6th Cir. 2016)) (internal quotation marks omitted).

The Court ultimately applied this strong-inference exception. It noted that the relator had identified and described specific requests for payment, including the dates of care and the dates of the physician signatures, and had alleged that requests for payment had been submitted on those claims. *Id.* at 769–70. She sometimes alleged the date of submission, and she also identified the amount of payment requested. *Id.* The Court explained that these allegations "must also be viewed in context." *Id.* at 770. For example, the relator had been hired to work on a

19

project devoted to working through a backlog of Medicare claims, and she was hired to review documentation for those claims in anticipation of their submission to Medicare. *Id.* She had also received confirmation that the claims she reviewed had been submitted for payment. *Id.* More specifically, she received an email from a supervisor who reported that that they had "processed and released over 10,000 claims since 2/7." *Id.* The facility also issued weekly reports "that showed how many claims were being held and how many claims had been released for billing to Medicare." *Id.* Having reviewed these detailed allegations, the Sixth Circuit concluded that the relator's "detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment, combined with her specific allegations regarding requests for anticipated payment," created a "strong inference that the specific documentation that [she] reviewed related to patients for whom requests . . . had been submitted to the government for payment." *Id.*

Since *Prather I*, the Sixth Circuit has repeatedly affirmed the strong-inference exception; however, it has clarified that the exception is quite narrow and applies in limited circumstances. *See Ibanez*, 874 F.3d at 915; *United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017). Few courts have found allegations strong enough to merit application of the exception. However, at least one court in this circuit has applied the strong-inference exception. *See United States ex rel. Lynch v. University of Cincinnati Medical Center, LLC*, No. 1:18-CV-587, 2020 WL 1322790 (S.D. Ohio Mar. 20, 2020). In that case, the relator alleged the following facts to show that a false claim was submitted: (1) a case log including the fraudulent services that shows patient initials, the invoice number, the payment status, the date posted, and the identity of the governmental insurer (like Medicare); and (2) an email chain where an employee states that "we will be billing only Medicare." *Id.* at *28–29.

In the present case, Procarent argues that the Relators' § 3729(a)(1)(A) claim must be dismissed because they failed to allege that any specific claims were submitted to the federal government for reimbursement.[7] [R. 92, pp. 33–34]. In response, the Relators argue that one of the representative examples listed in their Second Amended Complaint was submitted to Medicare "because the number used to bill the claim shows this was a Medicare patient." [R. 99, p. 32 (citing R. 50-7)]. Referring to an exhibit attached to the Second Amended Complaint, they explain, "The first nine digits are the patient's Medicare number and the letter that follows the number identifies the social security benefits the patient is entitled to receive." *Id.* "Moreover," they argue, "the exhibit clearly states that the claim was billed to M.M.'s Medicare number." *Id.* at 33. Citing only this example, the Relators argue that they have sufficiently alleged "that Procarent billed Medicare for ALS services when the run sheet showed only BLS services were provided." *Id.*

The Court finds that the allegations surrounding M.M. and other patients, [R. 50, ¶¶ 106– 111] are insufficient to satisfy the presentment requirement. For each of these patients, including M.M., the Relators allege that Procarent transported that patient on a specific date. *Id.* However, according to the run sheets for each patient, no advanced procedures were provided, but "Procarent billed for ALS services." *Id.* To support these allegations, the Relators have attached an email from a Senior Health Care Consultant, in which she identifies those six claims and notes that the documentation for each "doesn't support ALS billing." [R. 50-7, p. 55–56]. For example, for some of these claims, the consultant simply notes, "Documentation doesn't support ALS billing. Patient did not receive any advanced procedures or treatment." *Id.* at 56.  For M.M., the consultant explains, "FMS report doesn't support ALS billing. No advanced procedures

---

[7] In making these arguments, Procarent repeatedly cites to the Original Complaint and the First Amended Complaint. As the Court has already explained, the Second Amended Complaint supersedes those prior pleadings.

provided to patient. Claim billed with 406344243D – documentation form states 406344243A – need to re-verify this." *Id.* at 55. While this may indicate that Procarent billed for this claim, there is no indication that it was billed to Medicare or another federal agency, as opposed to the patient's private insurance. On this point, the Relators insist that the string of numbers referenced by the consultant shows that the claim was submitted to Medicare; however, that conclusion is not apparent on the face of the document or the Second Amended Complaint. In fact, there is nothing in the email or the Second Amended Complaint to explain what the numbers represent. The Relators do not identify any other claim to support their contention that specific claims were submitted to Medicare for reimbursement. The Court therefore finds that the Relators have failed to satisfy the presentment requirement.

Having determined that the Relators fail to allege with the requisite particularity that any claims were actually presented to the government, the Court turns to the Relators' alternative argument. The Relators argue that they have pleaded (or can plead) facts sufficient to warrant application of the strong-inference exception. [R. 99, pp. 29–31]. They make this argument with respect to Count II, their fraudulent forms claim arising under § 3729(a)(1)(B); however, as explained below, the presentment requirement (and its strong-inference exception) applies to claims arising under § 3729(a)(1)(A), like the Relators' Count I. Accordingly, the Court considers the parties' arguments about the presentment requirement and its exception in the context of the Relators' Count I, the § 3729(a)(1)(A) claim (the medical necessity claim).

On this point, the Relators argue that they were directly involved in reviewing claims and possessed personal knowledge of the company's billing practices. *Id.* at 30. They also attach to their response brief a spreadsheet "detailing each of the 2,700 runs, and [including] the names of the patients, run numbers, cost of each run, and why each run was ineligible to be billed to

Medicare." *Id.*; *see also* [R. 101-2, pp. 271–342 (Spreadsheet)]. Based on this spreadsheet and "Relators (sic) detailed personal knowledge of Procarent's billing practices," they urge the Court to find that a strong inference exists that the allegedly fraudulent claims were "presented" to Medicare. [R. 99, p. 31].

The Court finds that the allegations within the Second Amended Complaint fall short of meriting the strong-inference exception applied in *Prather I* and *Lynch*. The spreadsheet cited by the Relators details only the following: the date of service, the "run," and the "amount." *See, e.g.*, [R. 101-2, pp. 271]. On some pages, there is also a column containing details about the PCS form, and another column containing dollar amounts. *See, e.g.*, *id.* However, it is unclear what the dollar amounts represent—the cost of the service? The amount billed to Medicare? The amount billed to the patient's private insurance? Additional details on the spreadsheet only add to the confusion. For example, the last page indicates a total "unbilled" amount, suggesting that the listed claims were *not* billed to Medicare or private insurance. *Id.* at 342. On some claims, notes in the margins indicate that the claim lacks a PCS form and indicate that perhaps the patient—not Medicare—should be billed as a result. *See, e.g.*, *id.* Lacking from the spreadsheet is any indication that any of those claims were submitted to Medicare. This distinguishes the case from *Lynch*, in which the relator's detailed spreadsheet provided invoice numbers and payment status updates for each of the claims. *Lynch*, 2020 WL 1322790, at *28–29.

The Second Amended Complaint also lacks many of the details missing from the spreadsheet, such as invoice numbers and payment status. And, unlike the complaint in *Prather I*, the Second Amended Complaint fails to allege dates of submission or the amount of payment requested for any claims. In other words, the Second Amended Complaint lacks any specific

facts that would strongly suggest the allegedly fraudulent claims had been submitted to Medicare for reimbursement.

Moreover, while it is true that the Relators allege that they each worked in Procarent's billing department or were otherwise involved in billing, [R. 50, ¶¶ 39, 40, 47, 53], the allegations do not provide any detail about their specific job duties. Stated another way, the allegations fall short of describing the Relators' personal involvement in Procarent's billing process. And while the Second Amended Complaint alleges that Procarent implored its employees to submit claims to Medicare and had a policy of submitting claims, [R. 50, ¶¶ 46, 62], there are no emails or other communications or events suggesting that claims were actually submitted to Medicare. These deficiencies further distinguish the case from *Prather I*.

Instead, the allegations in the Second Amended Complaint more closely resemble those set forth in *United States v. Heartland Hospice, Inc.*, 386 F. Supp. 3d 884 (N.D. Ohio 2019), *aff'd sub nom. United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836 (6th Cir. 2020). There, the relator was a hospital consultant who evaluated the hospital's entitlement to payment for medical services. *Id.* at 890. She alleged fraudulent activity from employees falsely representing patients' eligibility for services, and she included information about these ineligible patients and the services provided in her complaint. *Id.* at 891, 902. But because the list of services and patients provided did not include any information regarding "amounts billed and/or paid, the Medicaid or Medicare certification dates, and the specific services provided," the *Prather* exception was inappropriate. *Id.* at 902; *see also United States ex rel. Richardson v. Lexington Foot & Ankle Ctr. PSC*, No. CV 5:17-129-DCR, 2018 WL 2709320, at *5 (E.D. Ky. June 5, 2018) (denying *Prather* exception to relators with knowledge about billing processes who could not show that the fraudulent services they alleged were actually submitted to

Medicare). Like in *Heartland Hospice*, the Relators have personal knowledge of Procarent's billing practices, but they do not provide any detailed allegations suggesting that the claims have actually been submitted, other than the fact that there was a pro-billing attitude within Procarent's upper management. These allegations are insufficient to warrant application of the narrow strong-inference exception.

Simply put, the Relators in this case have not alleged facts that make it "highly likely that a claim was submitted to the government for payment." *Lynch*, 2020 WL 1322790, at *27 (quoting *Chesbrough*, 655 F.3d at 472) (internal quotation marks omitted). Instead, to conclude that a claim or claims were submitted to the government, the Court must make a series of strained assumptions. *Id.* As a result, the Court finds that this case is "not one 'in which the alleged facts support a strong inference—rather than a mere possibility—that a false claim was presented to the government.'" *Id.* (quoting *Chesbrough*, 655 F.3d at 472).

In sum, the Court finds that (1) the Relators have failed to allege with the requisite particularity that the alleged fraudulent claims relating to Count I, the medical necessity claim, were presented to the United States government and (2) the allegations in the Second Amended Complaint do not warrant application of the strong-inference exception outlined in *Prather I.* As a result, the Court will grant Procarent's Motion to Dismiss, [R. 92], to the extent it seeks dismissal of Count I, the medical necessity claim arising under § 3729(a)(1)(A). As explained in more detail below, that dismissal is without prejudice.

### 3. Fraudulent Forms Claim (Count II) – 31 U.S.C. § 3729(a)(1)(B)

As noted previously, § 3729(a)(1)(B) imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). This provision does not require a relator to plead

the presentment element outlined above for claims arising under § 3729(a)(1)(A). *See Chesbrough*, 655 F.3d at 473; *Ibanez*, 874 F.3d at 916. However, this provision does require a relator "to 'plead a connection between the alleged fraud and an actual claim made to the government.'" *Ibanez*, 874 F.3d at 916 (quoting *Chesbrough*, 655 F.3d at 473). The connection between the alleged fraud and the submitted claim "must be evident." *Id.* (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671–72 (2008)). The Sixth Circuit has affirmed the dismissal of such claims where the pleadings "rely on a too-attenuated chain connecting alleged false statements to the submission of claims." *Id.* (citing *Chesbrough*, 655 F.3d at 473); *see also Allison Engine Co.*, 553 U.S. at 672 (explaining that relators relied on a "link between the false statements and the Government's decision to pay or approve a false claim [that] is too attenuated to establish liability").

Neither party cites this standard. Instead, their arguments focus on the presentment pleading requirement outlined above for claims arising under § 3729(a)(1)(A). Procarent argues that, with respect to the Relators' fraudulent forms claim, they fail to "plead[] any claims being submitted to the government." [R. 92, p. 19]. In response, the Relators insist that they can show that the allegedly fraudulent claims were submitted to the government. [R. 99, p. 29]. For support, they cite to an exhibit attached to their brief. *Id.* (citing [R. 101-1]). This exhibit contains various documents, but the Relators point to a single page, which appears to be a screenshot of a page generated by Procarent's billing software. [R. 101-1, p. 11]. Citing to this page, they claim that "Procarent's billing software shows that L.H.'s ambulance transport was billed to Medicare." [R. 99, p. 29]. However, the Court has reviewed this document and, even if it could be considered for purposes of this motion, it does not clearly indicate that an ambulance transport was submitted to Medicare. Accordingly, with respect to the fraudulent forms claims

26

(Count II) arising under § 3279(a)(1)(B), the Court finds that the Relators have failed to allege any connection between the allegedly fraudulent PCS forms and a claim that was submitted to the government. The Court will therefore grant Procarent's Motion to Dismiss, [R. 92], without prejudice to the extent it seeks dismissal of that claim.

In sum, the Court finds that the Relators have failed to plead the medical necessity claim (Count I) and the fraudulent forms claim (Count II) with the particularity required by Rule 9(b). The Court will therefore grant Procarent's Motion to Dismiss, [R. 92], to the extent it seeks dismissal of Counts I and II for failure to satisfy Rule 9(b)'s heightened pleading requirement. As explained in more detail below, these dismissals will be without prejudice.

### C.  Other Issues Relating to the Medical Necessity Claim (Count I)

Although the Court is dismissing the Relators' medical necessity claim (Count I) and the fraudulent forms claim (Count II), it will allow the Relators to file a Third Amended Complaint, as explained below. The Court will therefore address Procarent's other arguments relating to the medical necessity claim (Count I). Procarent argues that (1) the statute of limitations has expired for this claim and (2) regardless, the Relators have, at most, alleged a failure to properly document the use of ALS services, and the mere failure to document is not actionable under the False Claims Act. [R. 92, pp. 11–15, 20–23]. The Court addresses each argument in turn.

### 1.  Statute of Limitations

Procarent argues that the medical necessity claim (Count I) is time barred. [R. 92, pp. 11–15]. Section 3731(b) of the Act provides the relevant statute of limitations. That provision states that a civil action brought under the Act may not be initiated "more than 6 years after the date on which the violation of section 3729 is committed" or "more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of

the United States charged with the responsibility to act in the circumstances." 31 U.S.C.

§ 3731(b). However, in no event shall the civil action be brought "more than 10 years after the

date on which the violation is committed." *Id.*

Importantly, the cause of action accrues when the claim is submitted to the federal

government for payment. *United States v. Ueber*, 299 F.2d 310, 312–13 (6th Cir. 1962); *see also*

*United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 194 (D. Md. 2019)

(explaining that "the majority of Circuits have found the violation occurs at the submission of a

false claim rather than the date of payment" (citations omitted)).  Thus, if the Second Amended

Complaint was filed more than six years after the submission of each of the allegedly fraudulent

claims comprising the medical necessity claim (Count I), or more than three years after the

material facts relating to the medical necessity claim were or should have been discovered by the

appropriate United States official, the medical necessity claim is time barred.

However, under Federal Rule of Civil Procedure 15, an amendment to a pleading may

"relate back" to the date of an earlier pleading if "the amendment asserts a claim or defense that

arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the

original pleading." Fed. R. Civ. P. 15(1)(B). Thus, if the medical necessity claim (which was not

asserted until the Second Amended Complaint) relates back to the Original Complaint or the

First Amended Complaint, the claim will not be time-barred unless that earlier pleading was filed

more than six years after the submission of each of the allegedly fraudulent claims, or more than

three years after the material facts relating to the medical necessity claim were or should have

been discovered by the appropriate United States official.

It is important to note that a statute of limitations defense is an affirmative defense, and

"a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim."

*Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citations omitted). As a result, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Id.* However, when the complaint's allegations "affirmatively show that the claim is time-barred," dismissing the claim under Rule 12(b)(6) is appropriate. *Id.* (citation omitted). On the other hand, when the allegations in the complaint do *not* "affirmatively show that the claim is time-barred," this Court has found it inappropriate to grant a motion to dismiss based on a statute of limitations defense. *See Petty v. Bluegrass Cellular, Inc.*, 440 F.Supp.3d 692, 696 (W.D. Ky. 2020).

In the present case, the Court cannot find that the allegations in the Second Amended Complaint "affirmatively show that the [medical necessity claim] is time-barred." *Id.* As the Court has already explained, the medical necessity claim will be dismissed for failure to comply with Rule 9(b). *See supra* Section III(B)(2). More specifically, the medical necessity claim will be dismissed because the Relators have failed to allege with particularity that any specific claims were actually submitted to Medicare. *Id.* Because the Second Amended Complaint does not allege that specific claims were submitted to Medicare, the Court cannot discern from the pleading the *dates* on which any specific claims were submitted. This information is essential to Procarent's statute of limitations argument because, as noted above, the cause of action accrues when the claim is *submitted*. *See, e.g.*, *Ueber*, 299 F.2d at 312–13. Accordingly, at this time, the Court finds that it would be inappropriate to grant Procarent's Motion to Dismiss, [R. 92], based on its statute of limitations defense.

However, because Procarent may raise this same defense in response should the Relators file a Third Amended Complaint, the Court feels compelled to address certain statements made in Procarent's Motion to Dismiss, [R. 92]. In that motion, Procarent claims that "the United

States, as part of its pre-intervention investigation, met with Procarent and informed Procarent that its investigation into medical necessity of Procarent's ambulance transports *predated* the Relators' filing of the *qui tam*." *Id.* at 12. Procarent also claims that "the United States' investigation dated back to at least spring of 2011," but "the Kentucky Attorney General had an open investigation as early as 2009." *Id.* Relying on these statements, Procarent argues that the "three-year 'discovery' portion of 31 U.S.C. §3731(b)(2) is inapplicable to the facts in the present case." *Id.* However, Procarent does not cite to any allegations in the pleadings, or any evidence of record, to support these assertions. To the extent that Procarent asks the Court to look beyond the pleadings to decide its Rule 12 Motion to Dismiss, such request transforms the Motion to Dismiss into a motion seeking summary judgment. *See* Fed. R. Civ. P. 12(d). To the extent that Procarent asks the Court to look beyond the pleadings to decide this issue on summary judgment, Procarent must cite "to particular parts of materials in the record" to support its argument. *See* Fed. R. Civ. P. 56(c)(1)(A).

### 2. "Failure to Document" Allegation in Count I

Procarent argues that the medical necessity claim arising under § 3729(a)(1)(A) must also be dismissed to the extent that the Second Amended Complaint alleges that Procarent failed to properly document its provision of ALS services to patients, but fails to allege that Procarent did so knowingly, recklessly, or with deliberate indifference. [R. 92, p. 21–23]. For example, Procarent cites to the Second Amended Complaint's allegation that Procarent "engaged in a scheme to defraud Medicare by submitting claims for ALS services, when the run sheets failed to document that such advanced procedures were provided to the patient." [R. 50, ¶ 105]. The Second Amended Complaint then cites to the seven examples of improper documentation outlined by a Senior Health Care Consultant in an email. *Id.* ¶¶ 106–111. Procarent argues that

this "failure to document is not an actionable basis for liability under the [False Claims Act,]" and the medical necessity claim (Count I) must therefore be dismissed.[8] [R. 92, p. 21].

As Procarent correctly states in its brief, the False Claims Act is not a strict liability offense. Rather, the Act requires that the defendant "knowingly presented, or caused to be presented" a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(A). The Act defines the term "knowingly" as "ha[ving] actual knowledge of the information; act[ing] in deliberate ignorance of the truth or falsity of the information; or act[ing] in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). Relying on these provisions, Procarent argues that the failure to document the provision of advanced services may be negligent, but it does not amount to a False Claims Act violation. *See* [R. 105, pp. 14–15].

However, the Relators clarify in their response brief that their claims "are not for lack of documentation." [R. 99, p. 32]. Rather, they intended to allege that "Procarent is documenting on run sheets that only BLS services were provided and then submitting claims to Medicare for ALS services." *Id.* From this, the Court understands that the Relators intended to allege that only BLS services were provided, but Procarent billed Medicare for ALS services regardless. The Court also understands from the response brief that the Relators intended to allege Procarent did so knowingly, recklessly, or with deliberate indifference, rather than negligently. To the extent that the Relators intended to make such allegations, they may clarify their claims in their Third Amended Complaint.

---

[8] Procarent makes this argument only with respect to the Relators' claims that Procarent billed for ALS services when no such services were documented. The Relators also allege that Procarent submitted claims for nonemergency repetitive ambulance runs, even when an ambulance transport was not medically necessary. *See* [R. 50, ¶¶ 97–104].

### D.  Foltz's Role as a Relator

Procarent next argues that, even if the claims in the Second Amended Complaint survive this motion to dismiss, Foltz must still be dismissed pursuant to 31 U.S.C. § 3730(d)(3). [R. 92, pp. 25–26]. That provision provides,

> Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under [the False Claims Act], taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation.

31 U.S.C. § 3730(d)(3). The statute further provides that, "[i]f the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action." *Id.* Thus, under § 3730(d)(3), a relator that "planned and initiated" the False Claims Act violations *may* see his award reduced, while a relator that is convicted of criminal conduct arising from the False Claims Act violations *shall* be dismissed from the proceedings.

In this case, Procarent seeks dismissal of Relator Foltz, but it does not allege that Foltz was convicted of any criminal conduct arising from the alleged False Claims Act violations, nor is there evidence of record that she was prosecuted (or even charged) for any such crime. Instead, Procarent argues that the pleadings demonstrate "that Foltz was intimately involved in the alleged fraudulent schemes." [R. 92, p. 25]. Procarent specifically points to the Original Complaint,[9] in which Kesterson and Dunn alleged that Kesterson reported the PCS form

---

[9] Procarent does not cite to a specific complaint and instead cites to certain numbered paragraphs. *See* [R. 92, p. 25]. The Court has reviewed those paragraphs in each of the complaints and understands that Procarent is referencing the Original Complaint. *See* [R. 1, ¶¶ 18, 20, 21, 24].

irregularities to Foltz, and Foltz then "found" the missing PCS forms and advised Kesterson and Dunn not to email anyone else about the billing issues. *Id.* (citing [R. 1, ¶¶ 18, 20–21, 24]).

The Court finds Procarent's argument to be misguided for multiple reasons. First, Procarent seems to rely entirely on the allegations in the Original Complaint, but the Relators have since filed two amended complaints. Thus, the Original Complaint and the First Amended Complaint have been superseded by the Second Amended Complaint. *See Calhoun v. Bergh*, 769 F.3d 409, 410 (6th Cir. 2014) (citations omitted). Further, even if the Court were to consider the allegations in the Original Complaint, they are merely allegations. Yet, based on these allegations, Procarent asks the Court to make a factual finding that Foltz "planned and initiated" the alleged violations, as required by § 3730(d)(3). The Court finds that it would be inappropriate to do so at this stage of the proceedings. In fact, in one of the two cases cited by Procarent,[10] the district court reduced the relator's award only after conducting a bench trial and after finding that the defendant violated the False Claims Act. *See United States ex rel. Stearns v. Lane*, No. 2:08-cv-175, 2010 WL 3702538, *5 (D. Vt. Sep. 15, 2010). Lastly, the Court finds that Procarent's reliance on § 3730(d)(3) is misguided because that provision does not authorize the Court to dismiss a relator upon a finding that the relator planned and initiated the alleged False Claims Act violations. Rather, it authorizes the Court, at its discretion, to reduce that relator's award. *See* 31 U.S.C. § 3730(d)(3).

Accordingly, the Court will deny Procarent's Motion to Dismiss to the extent it seeks dismissal of Relator Foltz under § 3730(d)(3). Should the Relators succeed in this action,

---

[10] Procarent cites to only one other case in support of its argument that Foltz should be dismissed: *United States ex rel. Taxpayers Against Fraud v. GE*, 41 F.3d 1032 (6th Cir. 1994). However, that court did not apply § 3730(d)(3) to reduce a relator's award; instead, that Court considered other subsections of § 3730 relating to attorney's fees and costs.

Procarent may move the Court to reduce Foltz's award under § 3730(d)(3) if the evidence warrants such a motion.

### E.  The Employment Retaliation Claim

In their Second Amended Complaint, the Relators allege that Procarent retaliated against them for reporting the allegedly fraudulent billing practices by terminating Dunn and Foltz and constructively terminating Kesterson. [R. 50, ¶¶ 119–41]. More specifically, they allege that Dunn and Foltz were terminated for their efforts to "stop and/or correct" the suspected False Claims Act violations, "as exemplified by their refusal to bill claims to Medicare . . . and/or encouraging Procarent to self-report prior fraudulent billing." *Id.* ¶ 155. With respect to Kesterson, the Relators argue that, because she refused to submit false claims to Medicare, Procarent made her job "so intolerable that she was forced to resign." *Id.* ¶¶ 156–57.

The Relators assert four causes of action relating to their terminations: retaliation in violation of the False Claims Act, specifically 31 U.S.C. § 3730(h) (Count III); wrongful discharge of Relator Dunn in violation of public policy (Count IV); wrongful discharge of Relator Kesterson in violation of public policy (Count V); and wrongful discharge of Relator Foltz in violation of public policy (Count VI). Procarent claims that each of these claims must be dismissed; however, its substantive briefing of this issue focuses only on Count III, the False Claims Act retaliation claim.[11] [R. 92, pp. 26–28; R. 105, pp. 16–17]. For the reasons stated below, the Court finds that the Relators have sufficiently alleged a retaliation claim under § 3730(h) of the False Claims Act.

---

[11] The retaliation claim (Count III) alleges that the Relators were terminated because they refused to submit fraudulent claims and made efforts to stop or correct violations of the False Claims Act. *See* [R. 50, ¶¶ 150–57]. The wrongful discharge claims (Counts IV–VI), on the other hand, allege that the Relators were terminated for refusing to violate "state and federal law," including KRS 523.100. *See* ¶¶ 159, 165, 172. Procarent focuses only on the Relators' actions in relation to the False Claim Act, and it does not address the "state and federal law" referenced in the wrongful discharge claims. As a result, the Court does not address those claims (Counts IV–VI).

The False Claims Act "protects 'whistleblowers' who pursue or investigate or otherwise contribute to a *qui tam* action, exposing fraud against the United States government." *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 513 (6th Cir. 2000) (citing 31 U.S.C. §§ 3729–3730). For example, § 3730(h) provides,

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). Stated simply, this provision "protect[s] employees who expose fraud against the federal government" by forbidding the discharge of an employee "because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop" violations of the False Claims Act. *Jones-McNamara v. Holzer Health Systems*, 630 F. App'x 394, 397 (6th Cir. 2015) (quoting 31 U.S.C. § 3730(h)(1)) (internal quotation mark omitted).

Retaliatory discharge claims brought under this section of the False Claims Act "proceed under the same rules applicable to other employment-related retaliation claims." *Id.* at 397–98 (citation omitted). Thus, as with other employment-related retaliation claims, the Relators may prove their case by either direct or circumstantial evidence. *Id.* at 398 (citations omitted). Direct evidence, "if believed, does not require an inference that unlawful retaliation motivated an employer's action." *Id.* (quoting *Spengler v. Worthington*, 615 F.3d 481, 491 (6th Cir 2010)) (internal quotation marks omitted). When a relator relies on such direct evidence, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Id.* (quoting

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)) (internal quotation marks omitted).

A relator may also prove a retaliation claim with circumstantial evidence, or in other words, evidence requiring the factfinder to draw inferences to conclude that the relator was subject to unlawful retaliation. *See Pelcha v. MW Bancorp., Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (defining circumstantial evidence). "Where a plaintiff proceeds with circumstantial evidence of retaliation, the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973) applies." *Jones-McNamara*, 630 F. App'x at 398. Under that framework, the relator "bears the initial burden to demonstrate a prima facie case of retaliation." *Id.* (citation omitted). To do so, the relator must demonstrate the following elements: "(1) she was engaged in a protected activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* (citation omitted). This burden is "not onerous," and the relator need only prove these elements by a preponderance of the evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citation omitted). If the relator proves a prima facie case of retaliation, then burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Jones-McNamara*, 630 F. App'x at 398 (citation omitted). Once the employer does so, the burden shifts back to the relator "to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.* (citation omitted).

In this case, the Court understands that the Relators rely on circumstantial evidence to support their retaliation claims, and the Court must therefore apply the burden-shifting framework outlined above. However, at this stage of the proceedings, the relators do not have to

plead a prima facie case of employment retaliation. As the Sixth Circuit has explained, "an

employment discrimination plaintiff is not required to plead a prima facie case of discrimination

because the *McDonnell Douglas* framework is an evidentiary standard, not a pleading standard."

*Jackson v. Crosset Co.*, 33 F. App'x 761, 762 (6th Cir. 2002) (citing *Swierkiewicz v. Soreman,*

*N.A.*, 534 U.S. 506 (2002)).

Nevertheless, the Court finds that the Relators have sufficiently alleged a prima facie case

of employment retaliation. On this point, Procarent argues that the Relators did not engage in a

protected activity because they did not bring a False Claims Act lawsuit while employed with

Procarent. [R. 92, pp. 26–28].  For support, Procarent relies on *Yuhasz v. Brush Wellman, Inc.*,

341 F.3d 559 (6th Cir. 2003). In that case, a terminated employee brought a *qui tam* action

against his former employer, a manufacturer of alloys. *Id.* at 562. The employee claimed that the

manufacturing company had falsely certified that its alloys met applicable standards. *Id.* He

further claimed that he advised his employer of the unlawful nature of its certification processes

and warned that other companies had incurred False Claims Act liability for similar infractions.

*Id.* at 567. However, that internal report did not qualify as a protected activity under the False

Claims Act, as it was insufficient to show that the employer was aware that the employee was

pursuing a False Claims Act case at the time it discharged him. *Id.* at 567–68. Rather, the

employee's internal reports were simply within the scope of his "ordinary duties" and

"employment obligations." *Id.* at 568.  Relying on this analysis, Procarent argues that the

Relators failed to allege that they engaged in an activity in furtherance of a potential or actual *qui*

*tam* action; instead, they allege only that they made internal reports of suspected fraud. [R. 92,

pp. 26–28]. As a result, Procarent argues, the Relators failed to allege that they engaged in a

protected activity under § 3730(h). *Id.*

However, the *Yuhasz* case was decided in 2003, prior to more recent amendments to the False Claims Act that expanded the scope of "protected activity." At the time *Yuhasz* was decided, § 3730(h) of the False Claims Act read:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer *because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section*, shall be entitled to all relief necessary to make the employee whole.

*Id.* at 566 (quoting 31 U.S.C. § 3730(h) (2003)). Thus, when *Yuhasz* was decided, the language of the Act limited the scope of the protected activity to "acts done . . . in furtherance" of a *qui tam* action, including investigations for such an action, initiating the action, or testifying or assisting in the action. *See id.* at 567–68.

However, in 2009 and 2010, the legislature amended § 3730(h), formally expanding the scope of protected activity covered by the Act. After the 2009 and 2010 amendments, § 3730(h) not only protects "lawful acts done . . . in furtherance of" a *qui tam* action brought under the Act, but also "other efforts to stop 1 or more" False Claims Act violations. [12]  *See* 31 U.S.C. § 3730(h); *Miller v. Abbott Labs.*, 648 F. App'x 555, 560 (6th Cir. 2016) (explaining 2009 amendment). Thus, under the most recent version of § 3730(h), the Act protects actions taken in furtherance of a *qui tam* action, as well as "steps taken to remedy the misconduct through methods such as internal reporting to a supervisor . . . and refusals to participate in the misconduct that leads to the false claims, whether or not such steps are clearly in furtherance" of

---

[12] The 2010 amendments also specified a three-year statute of limitations for retaliation claims brought under § 3730(h).

a *qui tam* action. *See* 155 Cong. Rec. E1295-03, E1300 (June 3, 2009) (statement of Rep. Berman).

In this case, the Relators were discharged (or constructively discharged) in 2011 and 2012. [R. 1, ¶¶ 119, 136, 138]. At that time, this amended version of § 3730(h) was in place. Accordingly, the Court must consider the Relator's retaliation claims in light of the 2009 and 2010 amendments. *See generally Jones-McNamara*, 630 F. App'x at 399 (applying the version of § 3730(h) in place at the time of the plaintiff's termination).

Nevertheless, Procarent urges the Court to apply the standard announced in *Yuhasz*. [R. 105, pp. 16–17]. It acknowledges the most recent amendments to § 3730(h) but insists that "courts have continued to interpret its provisions in light of the Sixth Circuit's holding in *Yuhasz* even after the amendment[s] occurred." *Id.* at 16. For support, Procarent cites to a single case, *Goodwin v. Novartis Pharmaceuticals, Corp.*, No. 3:11–CV–350–H, 2012 WL 1079086 (W.D. Ky., Mar. 30, 2012). In that case, the district court noted that an employee brought her retaliation claim under the 2010 version of § 3730(h). *Id.* at *2, n.1 (citing the 2010 version). Nevertheless, the court applied case law holding that "there must be a reasonable connection between the plaintiff's actions and the [False Claims Act]." *Id.* at *2 (citing *McKenzie*, 219 F.3d at 513–14). That case law interpreted the *pre*-2009 version of § 3730(h). *See id.* at *3–4 (citing to several cases analyzing the pre-2009 version of the statute). While the *Goodwin* court did not explain this discrepancy, this Court has reviewed the *Goodwin* case and understands that much of the retaliatory conduct at issue in that case occurred in 2009. *See id.* at *1–2 (describing retaliatory conduct and constructive discharge). It is therefore possible that the *Goodwin* court believed the 2009 version of § 3730(h) had not been enacted at the time of that conduct and, as a result, the pre-amendment version of § 3730(h) applied to the plaintiff's retaliation claims. Further, even if

the *Goodwin* court only mistakenly referenced the pre-amendment version of the statute, the Court notes that the district court case is not binding on this Court. Moreover, the Court is unaware of any other court citing to *Goodwin* for the proposition that the post-amendment version of § 3730(h) requires a reasonable connection between the employee's activities and an action under the False Claims Act.

More recent Sixth Circuit case law resolves any doubts on this issue. In 2016, after *Goodwin* was decided, the Sixth Circuit clarified that "pre-amendment case law holding that activity is protected only if it is in furtherance of a potential or actual qui tam action is no longer applicable." *Miller*, 648 F. App'x at 560. Thus, if there existed any confusion about the application of the 2009 and 2010 amendments, *Miller* explained that an employee's activities are protected if they "reasonably embody 'efforts to stop' [False Claims Act] violations," and this includes internal reports of fraud on the government. *Id.* (quoting *Jones-McNamara*, 630 F. App'x at 399) (internal quotation marks omitted). However, the Sixth Circuit has also clarified that the "efforts to stop" suspected violations "must stem from a reasonable belief that fraud is being committed against the federal government." *Fakorede v. Mid-S. Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017) (citing *Jones-McNamara*, 630 F. App'x at 400). Thus, "to plead protected activity, [the plaintiff] must allege conduct directed at stopping what he reasonably believed to be fraud committed against" the United States government. *Id.* (citing *Miller*, 648 F. App'x at 560).

Having determined that internal reports of suspected fraud may qualify as a protected activity regardless of their nexus to a potential or actual *qui tam* action, the Court now turns to the allegations in the Second Amended Complaint and finds that each element of a prima facie case has been alleged. On this point, it is important to note that retaliation claims arising under

the False Claims Act are not subject to the heighted pleading standard of Rule 9(b). *See Goodwin*, 2012 WL 1079086, at *3 (citing *Kachaylo v. Brookfield Township Bd. of Trustees*, No. 4:10-CV-00795, 2011 WL 867585, at *5, n.1 (N.D. Ohio Mar. 9, 2011)).

Turning to the first element of a prima facie case—i.e., that each relator was engaged in a protected activity—the Court finds that the Second Amended Complaint sufficiently alleges this element. Specifically, it alleges that each of the three Relators made internal reports of suspected False Claims Act violations. For example, it alleges that Relator Kesterson reported her concerns to Procarent's president and advised that "Procarent needed to self-report because it was improperly billing repetitive ambulance runs." [R. 50, ¶ 45]; *see also id.* ¶¶ 151–52. It also alleges that Relator Foltz had multiple conversations with Procarent's president and a board member, *id.* ¶¶ 86, 97, 153, and even created a "self-reporting package," which she submitted to the president. *Id.* ¶ 76. There are no allegations, nor any evidence of record, suggesting that the Relators' concerns were unreasonable. The Second Amended Complaint also alleges that Procarent, through its agents, knew that each of the relators was engaging in that protected activity. *See, e.g.*, *id.* ¶¶ 45, 86, 97, 151–53. Finally, the Second Amended Complaint also alleges that Procarent discharged or otherwise discriminated against the Relators as a result of the protected activity. For example, it alleges that Relator Dunn "was terminated for her 'refusal to bill attitude' as indicated by her unwillingness to submit all of [the] questionable repetitive ambulance runs to Medicare." *Id.* ¶ 119; *see also* ¶¶ 154–55. It further alleges that Relator Kesterson "resigned her position because of the retaliation to which she was subjected when she refused to bill" for the questionable ambulance claims. *Id.* ¶ 136; *see also* ¶¶ 156–57. It also alleges that Relator Foltz "was terminated after repeatedly voicing her concerns regarding Procarent's billing practices and refusing to bill the runs with questionable PCS forms." *Id.*

¶ 138; *see also id.* ¶ 155. Accordingly, the Court finds that the Relators have sufficiently alleged a prima facie case of retaliation under § 3730(h) of the False Claims Act. The Court will therefore deny Procarent's motion to the extent it seeks dismissal of the Relators' retaliation claim (Count III).

### F.  Leave to File a Third Amended Complaint

In its Motion to Dismiss, Procarent asks the Court to dismiss the Second Amended Complaint with prejudice, arguing that "there is no reason to believe that after all this time, that the Relators would be able to draft a better complaint if given a second chance." [R. 92, pp. 28–29]. In response, the Relators ask the Court for leave to amend their complaint, if necessary. [R. 99, pp. 35–36]. The Court construes this request as a motion seeking leave to amend under Federal Rule of Civil Procedure 15. The Court also notes that Procarent had an opportunity to respond to this motion and did so in its reply brief. [R. 105, p. 17].

Under Rule 15, a district court should "freely give" leave to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Sixth Circuit has further explained that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *United States ex rel. Bledsoe v. Community Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003) (quoting *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 546 (6th Cir. 1993)) (internal quotation marks omitted). However, it may be appropriate to deny leave to amend "where there is undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Id.* (quoting *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002)) (internal quotation marks omitted). When undue delay is alleged, the

relevant inquiries include "(1) whether Relator[s] had sufficient notice that [the] amended complaint was deficient, and (2) if so, whether Relator[s] had an adequate opportunity to cure the deficiencies." *Id.*; *see also United States v. Garman*, 719 F. App'x 459, 465 (6th Cir. 2017), *abrogated on other grounds by United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813 (6th Cir. 2021) ("When a district court denies a motion to amend based on undue delay, we look to see whether the plaintiff had sufficient notice that his complaint was deficient, and if so, whether the plaintiff had an adequate opportunity to cure the deficiencies.").

In the present case, Procarent asks that the Second Amended Complaint be dismissed with prejudice. [R. 92, pp. 28–29]. For support, Procarent explains that the "case has been pending in this court for over nine years," during which time the United States government "undertook an extensive investigation and ultimately declined intervention," and the statute of limitations on some of the Relators' claims expired. *Id.* Procarent argues, "This case has been pending for nearly a decade and there is no reason to believe that after all this time, that (sic) the Relators would be able to draft a better complaint if given a second chance." *Id.* at 28–29. Thus, while Procarent does not cite to Rule 15 or the standard for amendment, it appears to argue that no such amendment should be permitted due to undue delay and the futility of amendment.

The Court disagrees. First, the Court notes that the nine-year passage of time between the filing of the Original Complaint (in 2011) and the present motion (in 2020) was due in large part to the United States government's repeated requests for extensions of time in which to investigate the claims. The fact that the United States ultimately declined to intervene is irrelevant, as the False Claims Act expressly permits the Relators to continue pursuing their claims. *See* 31 U.S.C. § 3730(b)(1). Further, Procarent has not explained how this passage of time prejudices its ability to defend in this case or has otherwise caused prejudice. As the Court

has already noted, Procarent was not served with any complaint until late 2020, after the Court ordered that the Original Complaint, Amended Complaint, and Second Amended Complaint be unsealed and served. [R. 88]. Thus, Procarent was not forced to expend fees and costs defending in this suit throughout the nine-year period between the initiation of this action and Procarent's receipt of the Second Amended Complaint.

Moreover, this is Procarent's first motion to dismiss. It was not until this motion was filed on December 28, 2020 that Relators were aware that the defendant challenged the sufficiency of the allegations in the Second Amended Complaint. *See* [R. 92]. In their response brief, they requested leave to amend that complaint, if necessary. [R. 99, pp. 35–36]. This Memorandum Opinion and Order will be the Court's first communication to the Relators that their Second Amended Complaint fails to satisfy Rule 9, and this will be their first opportunity to cure those specific defects. *See Bledsoe I*, 342 F.3d at 644. The Court therefore finds that the Relators did not have sufficient notice that the Second Amended Complaint was deficient, nor did they have an adequate opportunity to cure those deficiencies. For this reason, and those reasons stated above, the Court finds that there is no undue delay or prejudice in this case that would prohibit the filing of a Third Amended Complaint.

In addition, the Court finds that amendment is not futile. As previously noted, the Second Amended Complaint fails to satisfy Rule 9(b) because it fails to allege that specific claims were submitted to the federal government for payment. However, the Relators cite to a spreadsheet that they claim can cure this deficiency. *See* [R. 101-2, pp. 271–342]. As noted above, this spreadsheet, on its face, does not clearly identify specific claims that have been submitted. However, the Court acknowledges the possibility that the spreadsheet may potentially trigger the presentment exception outlined in *Prather I* if additional information is provided. *See Lynch*,

2020 WL 1322790, at *28–29. The Court will therefore allow the Relators an opportunity to provide such information and clarification in a Third Amended Complaint. The Court has also addressed Procarent's other challenges to these claims—i.e., the statute of limitations and the sufficiency of the medical necessity claim allegations—and has concluded that these arguments are either prematurely raised or may potentially be resolved by the filing of a Third Amended Complaint. *See supra* Section III(C).

Accordingly, the Court finds that there is a reasonable probability that the Relators' most recent complaint can be saved by amendment. *See Newberry v. Silverman*, 789 F.3d 636, 646 (6th Cir. 2015) (citation omitted). The Court will therefore dismiss the Second Amended Complaint without prejudice and will allow the Relators to file a Third Amended Complaint.

## IV.   CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Procarent's Motion to Dismiss, [R. 92], and will dismiss Count I (the medical necessity claim) and Count II (the fraudulent forms claim) without prejudice. The Court will allow the Relators to file a Third Amended Complaint.

Accordingly, **IT IS HEREBY ORDERED**:

1.   Defendant Procarent, Inc.'s Motion to Dismiss, [**R. 92**], is **GRANTED IN PART** and **DENIED IN PART**.

   a.   Said motion is **GRANTED** to the extent it seeks dismissal of Count I and Count II for failure to satisfy Rule 9(b)'s pleading standard. Counts I and II are **DISMISSED WITHOUT PREJUDICE**.

   b.   Said motion is **DENIED** in all other respects.

2. The Relators **SHALL** file a Third Amended Complaint within **sixty (60) days** of the

   entry of this Memorandum Opinion and Order.

This the 20th day of July, 2022.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc: Counsel of Record

46