UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA, ex rel. )
THERESA DUNN, APRILL )
KESTERSON, AND ANGELA FOLTZ, )     Civil Action No. 3:11-CV-704-CHB
)
    Plaintiffs, )
)     **MEMORANDUM OPINION**
v. )     **AND ORDER**
)
PROCARENT, INC., )
)
    Defendant. )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Motion to Dismiss the Third Amended Complaint

("Motion to Dismiss"), [R. 119], filed by Defendant Procarent, Inc. ("Procarent"). Relators

Theresa Dunn, Aprill Kesterson, and Angela Foltz (the "Relators") filed a response, [R. 122],

and Procarent replied, [R. 123]. The matter is therefore fully briefed and ripe for review. For the

reasons set forth herein, the Court will grant in part and deny in part Procarent's Motion to

Dismiss, [R. 119].

I.      **BACKGROUND**

    A.  **Factual Background**

    Defendant Procarent provides ambulance services to individuals in Louisville, Kentucky;

Owensboro, Kentucky; Indianapolis, Indiana; and St. Louis, Missouri. [R. 117, ¶ 38 (Third

Amended Complaint)]. Included in these services are nonemergency medical transports. *Id.* ¶ 39.

Unlike emergency transports, which provide emergency transportation for individuals requiring

immediate and serious medical attention, nonemergency transports provide scheduled

transportation to individuals who are unable to travel by other methods of transportation, often

because they are bed-confined and/or their medical condition requires transportation by ambulance. *Id.* ¶ 14; *see also* 42 C.F.R. § 410.40(e) (defining medical necessity).

As part of its business, Procarent submits to Medicare claims seeking reimbursement for its nonemergency ambulance transport services. [R. 117, ¶ 39]. To receive payment, Procarent must comply with Medicare's regulations. *Id.* ¶¶ 25–34; *see also* 42 C.F.R. § 410.40(e). Three regulations are relevant to this action. First, the transport itself must be "medically necessary," which occurs when "the beneficiary is bed-confined, and . . . other methods of transportation are contraindicated; or, if his or her medical condition, regardless of bed confinement, is such that transportation by ambulance is medically required." 42 C.F.R. § 410.40(e)(1). Second, the "level of service provided" by the transport must be "medically necessary." *Id.* The level of service varies from basic life support ("BLS") to advanced life support ("ALS") and other specialized levels. *Id.* § 410.40(c). The third regulation applies to nonemergency, scheduled, repetitive ambulance services. Before furnishing such services, the ambulance provider must "obtain[] a physician certification statement dated no earlier than 60 days before the date the service is furnished." *Id.* § 410.40(e)(2)(i). A physician certification statement ("PCS") is "a statement signed and dated by the beneficiary's attending physician which certifies that medical necessity provisions of [§ 410.40(e)(1)] are met." *Id.* § 410.40(a).

Before a claim can be billed to Medicare, Procarent's billing department must review the claim. The Relators describe this process as follows. First, for each ambulance transport or "run," the paramedics complete a "run report," which includes, among other things, the date of the transport, the run number, the relevant times and locations, and a description of the patient's condition at the time of the transport. [R. 117, ¶ 41]. The ambulance providers then submit the run reports to Procarent's billing department "to be billed." *Id.* ¶ 42. Once the run report is

submitted to the billing department, "the transports would go into a queue for the coder." *Id.*

¶ 43. The coder then reviews the run report to determine if the transport was medically necessary

and what level of service (BLS or ALS) was provided. *Id.* ¶ 44. For nonemergent, repetitive

transports, the coder also considers whether a PCS form, signed by a physician prior to the

transport, is on file. *Id.* ¶ 56. The coder then "code[s] the claim" so it may be submitted to either

Medicare or a third-party payer. *Id.* ¶ 45.

Prior to early 2011, Procarent's billing software allowed each coder to submit the claim

to either Medicare or a third-party payer. *Id.* ¶ 63. However, at the beginning of 2011, Procarent

implemented Zoll's RescueNet dispatch and billing software. *Id.* ¶ 61. Under this new billing

software, the runs would be coded by the coders, then sent to a queue to be billed by Relator

Kesterson, the Billing Manager. *Id.* ¶ 62. To do so, Kesterson would upload all of the queued

transports into a program called ZirMed, which would then process and submit the claims to

either Medicare or a third-party payer based on the uploaded information. *Id.*

Each of the Relators was employed by Procarent and was involved "in some way" with

these billing procedures, and specifically, "with billing Medicare for nonemergency ambulance

transports." [R. 117, ¶ 47]. Relator Kesterson, for example, was the Billing Manager, as noted

above. *Id.* ¶ 49. She was hired in 2010, "at a time when Procarent had a significant backlog of

billing work." *Id.* ¶ 56.  In her role as Billing Manager, Kesterson was responsible for overseeing

staff in the billing department, and her job duties included hiring, firing, training, and

disciplining staff. *Id.* ¶ 50. Kesterson "was also responsible for claim submission to Medicare

and other third-party payers" as well as "operational issues, documentation concerns, [and] PCS

issues," among other things. *Id.* Kesterson was "further responsible for outstanding accounts

receivable for ambulance runs, meaning ambulance transports that took place but the claim had not been paid." *Id.* ¶ 51.

Shortly after being hired into this position, Kesterson developed concerns about Procarent's billing procedures. She "learned that most if not all the coders she oversaw had no formal training on billing ambulance runs, including repetitive transports." *Id.* ¶ 52. Kesterson also learned that Procarent had "never created any type of procedure manual for coders to use as guidance when assessing whether an ambulance transport should be billed." *Id.* ¶ 54. Kesterson also discovered that "Procarent had a long-standing practice of not collecting [PCS forms] prior to transporting patients," as a result of the ambulance sites failing to obtain the form prior to the ambulance run. *Id.* ¶¶ 57–58. Thus, the billing department staff would be responsible for obtaining the post-transport PCS forms. *Id.* ¶ 59. Kesterson initially believed this practice was acceptable, so long as the PCS form was obtained within sixty days of the transport. *Id.* ¶ 60; *see also* 42 C.F.R. § 410.40(e)(2)(i) (explaining that the ambulance provider must "obtain[] a physician certification statement dated no earlier than 60 days before the date the service is furnished").

At the beginning of 2011, Relator Dunn was hired by Procarent as a temporary employee doing coding. *Id.* ¶ 64. At the time, "Procarent had no formal training process." *Id.* ¶ 65. Instead, Dunn was instructed to use the ambulance run sheets associated with a transport to determine if transportation had been medically necessary. *Id.* ¶ 65. If she determined that a transport was medically necessary, she would enter the corresponding billing code into the billing software and release the claim to be billed. *Id.* ¶ 67. At that point, the claim sat in a queue, waiting to be billed by the Billing Manager, Kesterson. *Id.* ¶ 62. Kesterson would eventually upload the claims in the

queue into the ZirMed program, as noted above, which would then "process and submit the claims based on the information uploaded." *Id.*

In March 2011, Kesterson attended a seminar on billing ambulance transports to Medicare. *Id.* ¶ 69. Through this training, she "learned that Procarent was improperly billing Medicare for repetitive transports by submitting claims when the company had not obtained a PCS prior to transport, or the PCS was invalid because it did not comply with Medicare's regulatory requirements." *Id.* ¶ 70. Kesterson "further learned that transports she thought to be medically necessary were actually not because patients could travel by means other than ambulance." *Id.* The Relators allege that, despite these deficiencies, "Procarent submitted these claims to Medicare for reimbursement." *Id.* ¶ 71.

In April 2011, Dunn was promoted to Billing Supervisor. *Id.* ¶ 72. Later that month, Procarent sent Dunn to be trained as a Certified Ambulance Coder. *Id.* ¶ 76. That training focused on "ambulance billing, coding ambulance runs, and compliance requirements for billing ambulance runs to Medicare." *Id.* ¶ 77.

At some point in April 2011, Dunn and Kesterson identified approximately 2,700 transports that could not be billed to Medicare because the PCS forms for these transports were either missing or were otherwise invalid for various reasons (e.g., missing a physician's signature or failing to state that the patient was bed-confined). *Id.* ¶¶ 80–81. The Relators allege that some of these forms were also fraudulently altered or contained fraudulent signatures. *Id.* ¶ 81. Dunn and Kesterson also discovered that some of the ambulance run sheets failed to indicate that an ambulance transport was medically necessary. *Id.* ¶ 85. Dunn and Kesterson discovered these various deficiencies when they reviewed the transports' supporting documentation (PCS forms

and run reports) in the RescueNet program. *Id.* ¶¶ 83–84. These 2,700 transports totaled around $1,300,000 that could not be billed to Medicare. *Id.* ¶ 82.

After discovering the 2,700 unbillable claims, Dunn and Kesterson began reviewing earlier claims that had been billed to Medicare "in order to see how far back this practice went." *Id.* ¶ 86. The pair discovered "prior excessive and fraudulent billing to Medicare dating back almost ten years." *Id.* ¶ 87. This included billing Medicare for "repetitive transports when the company lacked a valid PCS [form], the form was obtained after transport, the form did not exist, or the signature on the form was either forged or not from a doctor," or the run report did not indicate that the transport was medically necessary. *Id.* ¶¶ 89–90. For example, the run report might state that the patient walked to the stretcher or was assisted to the stretcher from a wheelchair, facts which indicated that the patient was not bed-confined, or the transport was not medically necessary. *Id.* ¶ 91. Kesterson and Dunn then "pulled representative examples . . . and met with Kathy Minx," the former president of Procarent. *Id.* ¶ 92. They encouraged Procarent to self-report but ultimately learned that the company declined to do so. *Id.* ¶¶ 95–96. They then moved the 2,700 questionable runs into a "held claims" folder so that each claim could be investigated. *Id.* ¶ 96.

In early June 2011, Procarent hired Relator Foltz as a Controller. *Id.* ¶ 103. In that position, Foltz was responsible for overseeing the accounting department, which included billing, and also for supervising Kesterson, Dunn, and others. *Id.* ¶ 104. During her first week on the job, Foltz was advised by Minx and Kesterson of the 2,700 held claims and Procarent's "prior billing issues, including billing Medicare for nonemergency transports even though there was no PCS, an invalid PCS, and/or the transport was not medically necessary." *Id.* ¶¶ 17–18. Shortly thereafter, Foltz had a "closed door" meeting with Minx and Craig Mackin, one of Procarent's

directors,[1] during which they discussed the 2,700 held claims. *Id.* ¶¶ 107–08. Foltz explained why certain ambulance runs could not be billed to Medicare, and further advised Procarent to self-report if Procarent had submitted any claims lacking the proper documentation. *Id.* ¶¶ 111–12. "Mackin explicitly told Foltz Procarent would not self-report, the company had always billed this way, it was not an issue." *Id.* ¶ 113. He also told Foltz that "the runs must be billed, regardless of any perceived issues." *Id.* ¶ 114. Foltz assured Mackin that she would personally evaluate the documentation to determine which runs could be properly billed. *Id.* ¶ 115.

In July 2011, the billing department began reviewing PCS forms that had not been completed properly. *Id.* ¶ 116. A spreadsheet was created to document "each of the held claims, including the date of the run, the run number, patient name, the amount of the transport, the payer, and why the transport could not be billed to Medicare." *Id.* ¶ 117. The spreadsheet included transports that took place between January 1, 2011 through June 30, 2011. *Id.* ¶ 118. The spreadsheet was emailed to Procarent's ambulance site directors. *Id.* ¶ 120.

In August 2011, a Procarent employee located some of the missing PCS forms that had been listed on the spreadsheet. *Id.* ¶ 124. Kesterson and Dunn began reviewing these forms but found that "nearly every one of the forms were invalid or fraudulent." *Id.* ¶¶ 126–34. For example, some of the forms allegedly contained forged physician's signatures. *Id.* ¶ 136. Nevertheless, Mackin "became insistent that the runs be billed" and told Foltz that "he may give a bonus to the billing department if they 'cleaned up' and billed the outstanding claims." *Id.* ¶ 131. Ultimately, Kesterson and Dunn identified only a small number of ambulance transports that could be legally billed to Medicare. *Id.* ¶ 141.

---

[1] While the Relators do not identify Craig Mackin's position in the Third Amended Complaint, they previously identified him as the secretary and one of the directors of Procarent. [R. 50, ¶ 37]. While the Third Amended Complaint controls, the Court refers to this previously alleged fact only for clarity in explaining the factual background of the case.

In September 2011, Dunn was terminated, allegedly for her "refusal to bill attitude," or more specifically, her unwillingness to submit questionable ambulance runs to Medicare for reimbursement and her objection to billing Medicare for claims that did not qualify for reimbursement. *Id.* ¶¶ 255–56. Soon after, Mackin promoted Kesterson to a new position that he created for her: Corporate Compliance Manager. *Id.* ¶ 269. However, Mackin allegedly stated that he only promoted Kesterson to insulate the company from potential lawsuit, and he announced his intent to "make the position so arduous that Kesterson would inevitably fail." *Id.* ¶¶ 271–72. In November 2011, Kesterson resigned "because of the retaliatory treatment she was experiencing after she refused to submit claims to Medicare for all of the questionable 2,700 held claims." *Id.* ¶ 277. A few months later, in March 2012, Foltz was terminated "after repeatedly voicing her concerns regarding Procarent's billing practices and refusing to bill the runs with questionable PCSs." *Id.* ¶ 279.

## B.  Procedural History

Much of the procedural background of this case is recited in detail in the Court's prior Memorandum Opinion and Order, [R. 110]. The Court repeats much of that procedural history below.

### 1.  The Original Complaint and First Amended Complaint

On December 21, 2011, Dunn and Kesterson initiated this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 et seq. [R. 1]. The False Claims Act "is an anti-fraud statute that prohibits the knowing submission of false or fraudulent claims to the federal government." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe I)*, 342 F.3d 634, 640 (6th Cir. 2003). For example, the Act imposes liability on persons who "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or

approval." 31 U.S.C. § 3729(a)(1)(A). It also imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B). The Act also prohibits employers from retaliating against employees or agents that have taken steps in furtherance of an action under the False Claims Act or have otherwise made efforts to stop a violation of the Act. *Id.* § 3730(h).

The Act's *qui tam* provisions "allow private parties to recover damages for fraud committed against the United States." *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 337 (6th Cir. 2000); *see also* 31 U.S.C. § 3730(b). To initiate a *qui tam* action, the complaining party files a complaint, which is then served on the United States government. 31 U.S.C. § 3730(b)(2). The government must then investigate the claims and determine if it will intervene and proceed with the action. *Id.*

In the present case, Dunn and Kesterson served their Original Complaint on the United States in or around early August 2012. *See* [R. 6]. In their Original Complaint, Dunn and Kesterson alleged violations of the False Claims Act against their former employer, Procarent. Specifically, the relators alleged that Procarent submitted false and fraudulent claims to Medicare for repetitive ambulance transports without proper documentation (i.e., by using fraudulent PCS forms) and with the knowledge that it was not eligible for reimbursement, in violation of 31 U.S.C. § 3729(a)(1); Procarent retaliated against Dunn and Kesterson for reporting the alleged fraudulent billing practices, in violation of 31 U.S.C. § 3730(h); and Procarent wrongfully discharged Dunn and Kesterson in violation of public policy. [R. 1, pp. 6–11]

On August 27, 2012, the Relators filed their First Amended Complaint. [R. 6]. This pleading also named Dunn and Kesterson as relators, but this time added Foltz as well. *Id.* at 1.

Like the Original Complaint, the First Amended Complaint alleged that Procarent's submission

of claims with fraudulent and invalid PCS forms constituted a false claim under 31 U.S.C.

§ 3729(a). [R. 6, ¶¶ 73–75]. It also alleged that Dunn and Foltz's discharge and Kesterson's

constructive discharge constituted retaliatory conduct under § 3730(h) and Kentucky public

policy. *Id.* ¶¶ 76– 101.

Over the next several years, the United States government repeatedly sought extensions

of time in which to consider intervention. *See, e.g.*, [R.14; R. 31]. Under the terms of the False

Claims Act, the matter remained sealed until the United States reached its decision, and neither

the Original Complaint nor the First Amended Complaint was served on Procarent. *See* 31

U.S.C. § 3730(b)(2)–(3).

### 2. The Second Amended Complaint and Procarent's First Motion to Dismiss

On July 17, 2017, a Second Amended Complaint was filed. [R. 50]. That complaint again

named Dunn, Kesterson, and Foltz as relators. [R. 50, p. 1]. For the first time, the Relators

alleged that Procarent fraudulently billed Medicare for ambulance transports and ALS services

that were not medically necessary. *Id.* ¶¶ 84–112, 142–45. Relying on this allegation, the

Relators asserted a cause of action (Count I) under 31 U.S.C. § 3729(a)(1)(A), which imposes

liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent

claim for payment or approval." *Id.* ¶¶ 142–45. The Second Amended Complaint also alleged

that, in response to the Relators' refusal to bill for fraudulent claims, Procarent "fraudulently

altered, created and/or backdated the PCS forms" to support those claims. *Id.* ¶¶ 117, 113–18.

The Relators therefore asserted a cause of action (Count II) under 31 U.S.C. § 3729(a)(1)(B),

which imposes liability against one who "knowingly makes, uses, or causes to be made or used a

false record or statement material to a false or fraudulent claim." *Id.* ¶¶ 146–49. Lastly, the

- 10 -

Relators alleged that they were terminated (either actually or constructively) for refusing to seek reimbursements from Medicare for ambulance transports that did not meet Medicare's criteria. *Id.* ¶¶ 119–41. Thus, the Relators again asserted a retaliation claim (Count III) under the False Claims Act, specifically 31 U.S.C. § 3730(h),[2] and wrongful discharge claims for each Relator (Counts IV, V, and VI).[3] *Id.* ¶¶ 150–76.

On August 31, 2020, the United States notified the Court that it would not intervene in this suit. [R. 87]. However, the Relators were permitted to maintain the action in the name of the United States. *See* 31 U.S.C. § 3730(b)(1). The Court then unsealed the Original Complaint, First Amended Complaint, and Second Amended Complaint, [R. 88], and Procarent was served with a copy of each. *Id.*; [R. 90].

In response, Procarent filed its first Motion to Dismiss. [R. 92]. In its motion, Procarent argued, among other things, that the Relators' medical necessity claim (Count I) was barred by the statute of limitations; the Second Amended Complaint (and specifically Count II, the fraudulent statements claim) failed to plead a violation of the False Claims Act with the requisite specificity required by Federal Rule of Civil Procedure 9(b); and the Second Amended Complaint failed to state a claim with respect to the allegations in Count I that Procarent billed for ALS services that were not performed. *Id.*

---

[2] Section 3730(h)(1) provides relief to employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

[3] The Relators also listed a seventh cause of action for punitive damages. [R. 50, ¶¶ 177–78]. However, a claim for punitive damages is not a separate cause of action and should instead be requested in the prayer for relief. *See Archey v. AT&T Mobility, LLC,* No. 17-19-DLB-CJS, 2017 WL 6614106, *4 (E.D. Ky. Dec. 26, 2017) (citations omitted)

- 11 -

The Court addressed these and other arguments[4] in a July 20, 2022 Memorandum Opinion and Order, [R. 110]. With respect to the medical necessity claim (Count I) arising under 31 U.S.C. § 3729(a)(1)(A) and the fraudulent statement claim (Count II) arising under § 3729(a)(1)(B), the Court noted that a heightened pleading standard applied under Rule 9(b). *Id.* at 14–16. For example, for the medical necessity claim under § 3729(a)(1)(A), the Relators were required to either identify specific false claims that were submitted to the government for payment or otherwise demonstrate specific personal knowledge supporting a strong inference that a false claim was submitted for reimbursement. *Id.* at 16–20. With respect to the Relators' fraudulent statement claim arising under § 3729(a)(1)(B), the Relators were required to "plead a connection between the alleged fraud and an actual claim made to the government. *Id.* at 26 (quoting *Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017)) (internal quotation marks omitted). The Court ultimately found that the allegations in the Second Amended Complaint failed to satisfy this pleading requirement with respect to both Counts I and II. *Id.* at 21–27. The Court therefore granted Procarent's Motion to Dismiss, [R. 92], to the extent it sought dismissal of those claims. Importantly, the Court dismissed these claims *without* prejudice, noting that the Relators had insisted that they could provide a spreadsheet to support their allegation that specific claims had been submitted to the federal government for payment. *Id.* at 44.

### 3. The Third Amended Complaint and Procarent's Second Motion to Dismiss

---

[4] For example, the Court also considered whether the Relators had obtained leave to file their Second Amended Complaint; whether Foltz could qualify as a relator under 31 U.S.C. § 3730(d)(3); and whether the Relators had sufficiently alleged their retaliation claim. *See generally* [R. 110]. The Court also briefly addressed Procarent's timeliness arguments but noted that it could not determine when the statute of limitations began to run because the pleadings did not provide the specific dates on which any claims were submitted for reimbursement. *See id.* at 27–30.

A Third Amended Complaint was filed on October 6, 2022, [R. 117], again listing Dunn, Kesterson, and Foltz as relators. *Id.* at 1. It alleges that

> Procarent engaged in an institutionalized scheme to fraudulently submit claims to Medicare for reimbursements by falsely certifying that ambulance transports were medically necessary, when they were not; that valid PCSs were obtained prior to transport, when they had not [been]; and that ALS services had been provided during transports, when only BLS services were provided.

*Id.* ¶ 35. The Relators further allege that "Procarent also fraudulently created PCSs for repetitive transports to support billing Medicare for these runs." *Id.*

Based on these allegations, and the factual allegations cited above, *supra* Section I(A), the Relators assert the following causes of action:

- Count I (the false claims action) – knowingly presenting, or causing to be presented, false and fraudulent claims to Medicare for repetitive ambulance runs without proper documentation (e.g., valid PCS forms), when the transports were not medically necessary, and/or when the transport did not require ALS services, in violation of the False Claims Act, specifically 31 U.S.C. § 3729 (a)(1)(A);

- Count II (the fraudulent statement action) – knowingly making, using, or causing to be made or used false records or statements relating to the PCS forms, the medical necessity of the transports, and/or the use of ALS services for the purpose of receiving reimbursement from Medicare, in violation of the False Claims Act, specifically 31 U.S.C. § 3729(a)(1)(B);

- Count III – retaliating against the Relators for reporting the alleged fraudulent billing practices, in violation of the False Claims Act, specifically 31 U.S.C. § 3730(h);

- Count IV – wrongfully discharging Relator Dunn in violation of public policy;

- Count V – wrongfully discharging Relator Kesterson in violation of public policy; and

- Count VI – wrongfully discharging Relator Foltz in violation of public policy.[5]

*Id.* ¶¶ 287–328.

Relevant here, the Relators allege the following timeline: (1) Procarent billed Medicare for repetitive ambulance transports with fraudulent or non-existent PCS forms, prior to the Relators' employment, or in other words, prior to roughly 2010 (when the first Relator, Kesterson, was hired), *id.* ¶¶ 143–150; (2) Procarent billed Medicare for ambulance transports that were not medically necessary, prior to the Relators' employment, *id.* ¶¶ 151–196; (3) Procarent billed Medicare for repetitive ambulance transports with fraudulent or non-existent PCS forms, after hiring the Relators, *id.* ¶¶ 197–227; (4) Procarent billed Medicare for ambulance transports that were not medically necessary and billed for ALS services when only BLS services were provided, after hiring the Relators, *id.* ¶¶ 229–251.

With respect to the allegations of unnecessary transports and the level of services provided, the Relators refer to this alleged misconduct as the "lack of medical necessity" scheme (i.e., the allegedly fraudulent scheme of billing Medicare for medically unnecessary ambulance transports, which took place both before and during the Relators' employment) and the "upcoding" scheme, (i.e., the allegedly fraudulent scheme of billing Medicare for ALS services when only BLS services were provided, which took place during the Relators' employment).[6]

---

[5] The Relators also list a seventh cause of action (mistakenly labeled as Count VI) for punitive damages. [R. 117, ¶¶ 329–330]. However, as the Court already explained in its prior Memorandum Opinion and Order, [R. 110, p. 9, n.5], a claim for punitive damages is not a separate cause of action and should instead be requested in the prayer for relief. *See Archey*, 2017 WL 6614106, at *4 (citations omitted).

[6] The Sixth Circuit has described "upcoding" as "a common form of Medicare fraud." *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* (*Bledsoe II*), 501 F.3d 493, 497 n.2 (6th Cir. 2007) (quoting *Bledsoe I*, 342 F.3d at 637 n.3) (internal quotation marks omitted). It "is the practice of billing Medicare for medical services or equipment

[R. 122, p. 7]. Procarent, on the other hand, often refers to both schemes collectively as the "medical necessity theory." *See, e.g.*, [R. 119, pp. 21–24]. For clarity, the Court adopts the Relators' phrasing.

Procarent now seeks dismissal of Counts I and II of the Third Amended Complaint.[7] [R. 119]. Procarent argues that (1) the Relators have again failed to sufficiently allege that any claims were submitted to Medicare for reimbursement, *id.* at 11–18; (2) the Relators fail to plead examples of false claims because "the Third Amended Complaint does not plead nonemergent, repetitive services, and therefore the PCS requirements that the Relators base their claim of falsity upon are not applicable in this case," *id.* at 18; (3) with respect to Count II, the Relators have failed to allege that the allegedly falsified documents attached to the Third Amended Complaint were submitted for reimbursement, *id.* at 20–21; and (4) the medical necessity claims (involving both the "lack of medical necessity" scheme and the "upcoding" scheme)[8] are barred under the statute of limitations, *id.* at 21–24. Lastly, Procarent argues that Counts I and II should now be dismissed *with* prejudice. *Id.* at 24–25. The Relators have responded to these arguments, [R. 122], and Procarent replied, [R. 123].

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal for "failure to state a claim upon which relief may be granted." To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

---

designated under a code that is more expensive than what a patient actually needed or was provided." *Id.* (quoting *Bledsoe I*, 342 F.3d at 637 n.3) (internal quotation marks omitted).

[7] As explained in Procarent's motion, it plans to address the remaining claims through separate motions after resolution of the present Motion to Dismiss. *See* [R. 119, p. 1, n.1].

[8] Based on the parties' briefing, the Court understands that Procarent attacks the timeliness of *both* the medical necessity scheme and the upcoding scheme.  *See* [R. 119, pp. 21–24].

torelief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

### III.  ANALYSIS

As noted above, Procarent seeks dismissal of only Count I (the false claims action) and Count II (the fraudulent statements action) of the Third Amended Complaint. [R. 119]. Distilled, Procarent raises three main issues: failure to identify any specific claims that were submitted to Medicare for payment, in violation of Rule 9's pleading requirements (with respect to Counts I and II); failure to plead that the allegedly fraudulent PCS forms were "material to a false or

fraudulent claim," as required by § 3729(a)(1)(B) (with respect to Count II)[9]; and untimely pleading of the medical necessity theory (with respect to Counts I and II). The Court addresses each argument in turn, focusing first on the statute of limitations argument.

Before doing so, however, the Court finds it helpful to discuss the precise nature of the Relators' claims. With respect to Count I, the false claims action, the Relators allege that Procarent violated § 3729(a)(1)(A) by submitting false and fraudulent claims to Medicare "knowing full well that it did not have proper documentation (valid PCSs), the transports were not medically necessary, and/or the transport did not require ALS services." [R. 117, ¶ 289]. However, in their response, the Relators do not rely on any falsified PCS forms to support their § 3729(a)(1)(A) claim and instead focus only on claims for transports that were not medically necessary and claims for transports that did not require ALS services.[10] [R. 122, pp. 7–11]. Thus, with respect to Count I, the Relators rely only on the alleged "lack of medical necessity" scheme and the alleged "upcoding" scheme. The former can be further broken down into categories based on when the false claims were allegedly submitted: "lack of medical necessity" claims allegedly submitted prior to the Relators' employment at Procarent (hereafter, the

---

[9] The Relators clarify in their response brief that they do not rely on the allegedly fraudulent PCS form scheme to support Count I. *See* [R. 122, p. 7]; *infra* note 10. Thus, to the extent Procarent makes this argument, the Court understands it affects only Count II.

[10] In addressing Count I, the Relators state,

> Relators allege two fraudulent schemes: (1) submitting claims to Medicare when it was not medically necessary to transport the patient by ambulance ("lack of medical necessity scheme"), (R. 117, ¶¶ 151-96, 229-41), and (2) submitting claims to Medicare for a higher level of service than was medically necessary or than was provided during the transport ("upcoding scheme"), (R. 117 ¶¶ 242-51).

[R. 122, p. 7]. Those portions of the Third Amended Complaint cited in the above-quoted statement relate only to the "lack of medical necessity scheme" and the "upcoding scheme." Given this and the Relators' representation that they allege only these two fraudulent schemes in support of Count I, and given their failure to make any arguments relating to their fraudulent PCS forms theory when addressing Count I, the Court understands that the Relators rely only on their "lack of medical necessity" scheme and "upcoding" scheme to support Count I.

"preemployment lack of medical necessity" claims),[11] and "lack of medical necessity" claims allegedly submitted after the Relators began working at Procarent (hereafter, the "postemployment lack of medical necessity" claims).[12]

Turning to Count II, the Relators allege that Procarent violated § 3729(a)(1)(B), which imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). The Relators point to two theories for satisfying their § 3729(a)(1)(B) claim, which they refer to as their "false statement claim." [R. 122, pp. 11–18]. First, the Relators argue that Procarent made false statements by falsely certifying that certain claims satisfied the applicable regulations, when those claims were actually for transports that were not medically necessary or did not provide the appropriate level of services (i.e., ALS services). *Id.* at 12–13. The Court will refer to this as the "false certification" theory. Next, the Relators argue that Procarent made false statements by creating false or fraudulent PCS forms to support claims for repetitive nonemergent transports. *Id.* at 13–18. The Court will refer to this as the "fraudulent PCS forms" theory.

In sum, the Relators present three distinct categories of claims relating to Count I: "preemployment lack of medical necessity" claims, "postemployment lack of medical necessity" claims, and "upcoding" claims (with all upcoding claims allegedly submitted after the Relators began working at Procarent). And they present two distinct theories for Count II: a "false certifications" theory and a "fraudulent PCS forms" theory.

### A.  Statute of Limitations

---

[11] This includes the claims for patients E.G., L.B., J.O., C.I., J.A., K.S., and N.R. *See* [R. 117, pp. 24–28].

[12] This includes claims for patients V.B., J.H., B.M., and P.H. *See* [R. 117, pp. 33–34].

Because Procarent asserts a statute of limitations theory that potentially eliminates a portion of the Relators' Count I and II, the Court will first consider the timeliness issue. On this issue, Procarent argues that the Relators' "medical necessity claims . . . are barred by [the False Claims Act's] statute of limitations and must be dismissed." [R. 119, p. 22].[13] More specifically, Procarent argues that the Relators cited the alleged "medical necessity" violations (i.e., the submission of claims for medically unnecessary transports and for unnecessary or undelivered ALS services) for the first time in the Second Amended Complaint, which was filed in July 2017. [R. 119, pp. 22–23]. Procarent insists that the Second Amended Complaint does not "relate back" to the earlier complaints (which were filed in 2011 and 2012) and, as a result, Counts I and II are time-barred to the extent they rely on transports that were not medically necessary.[14] *Id.* at 23–24. Again, the Court understands that this argument applies to both Counts I and II, with respect to both the so-called "lack of medical necessity" scheme (which allegedly took place both before and during the Relators' employment) and the "upcoding" scheme (which allegedly took place during the Relators' employment).

In considering this argument, the Court first turns to the applicable statute of limitations. Section 3731(b) of the False Claims Act states that a civil action brought under the Act may not be initiated "more than 6 years after the date on which the violation of section 3729 is committed" or "more than 3 years after the date when facts material to the right of action are

---

[13] In its Motion to Dismiss, Procarent states that the Relators' "medical necessity claims for nonemergent, repetitive scheduled ambulance transports are barred by [the False Claims Act's] statute of limitations and must be dismissed." [R. 119, p. 22]. However, the Court understands from the briefing in this matter that Procarent's timeliness arguments apply to the medical necessity claims (i.e., the "lack of medical necessity" scheme and the "upcoding" scheme), regardless of whether those claims involved repetitive or nonrepetitive transports. *See* [R. 119, p. 22 (referencing, in statute of limitations argument, "the alleged billing for medically unnecessary ambulance transports)]; *id.* at 24 (arguing in the statute of limitations section that "[t]he allegations regarding billing for medically unnecessary services were wholly absent from" the earlier pleadings)].

[14] Procarent does not appear to dispute that the Third Amended Complaint "relates back" to the Second Amended Complaint.

known or reasonably should have been known by the official of the United States charged with the responsibility to act in the circumstances." 31 U.S.C. § 3731(b). However, in no event shall the civil action be brought "more than 10 years after the date on which the violation is committed." *Id.*

Importantly, the cause of action accrues when the claim is submitted to the federal government for payment. *United States v. Ueber*, 299 F.2d 310, 312–13 (6th Cir. 1962); *see also United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 194 (D. Md. 2019) (explaining that "the majority of Circuits have found the violation occurs at the submission of a false claim rather than the date of payment" (citations omitted)). Thus, if the Second Amended Complaint was filed more than six years after the submission of each of the allegedly false claims based on fraudulent assertions of medical necessity,[15] then Counts I and II (in the Third Amended Complaint) are time-barred to the extent they rely on transports that were not medically necessary or ALS services that were not provided.

However, under Federal Rule of Civil Procedure 15, an amendment to a pleading may "relate back" to the date of an earlier pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(1)(B). As the Sixth Circuit explained in *United States ex rel. Bledsoe v. Community Health Systems, Inc.* (*Bledsoe II*), 501 F.3d 493(6th Cir. 2007),

> When applying this standard to the facts of a given case, the Court gives content to those terms not by generic or ideal notions of what constitutes a "conduct, transaction, or occurrence," but instead by asking whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading. *See Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 573 (7th Cir. 2006) ("The criterion of relation back is whether the original complaint gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the

---

[15] Neither party argues for application of the three-year statute of limitations, and both parties appear to be proceeding under the six-year statute of limitations outlined in § 3731.

> amplification of the allegations of the original complaint in the amended one."). The Rule also must be interpreted in light of the "fundamental tenor of the Rules," which "is one of liberality rather than technicality." [*Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000)].

*Id.* at 516. The Sixth Circuit has also explained that "[t]his standard is usually met 'if there is an identify between the amendment and the original complaint with regard to the general wrong suffered and with regard to the general conduct causing such wrong.'" *Durand v. Hanover Ins. Group., Inc.*, 806 F.3d 367, 375 (6th Cir. 2015) (quoting *Miller*, 231 F.3d 242, 250 (6th Cir. 2000)).

In the present case, both the Original Complaint, which was filed on December 21, 2011, [R. 1], and the First Amended Complaint, filed on August 27, 2012, [R. 6], allege that Procarent knowingly "submitt[ed] false and fraudulent claims to and received reimbursement from the Medicare program for repetitive ambulance services knowing full well that it did not have proper documentation and that, pursuant to 42 C.F.R. 410.40, Procarent was not eligible to receive the aforementioned reimbursement." [R. 1, ¶ 44]; [R. 6, ¶ 75]. The Second Amended Complaint was filed on July 17, 2017. [R. 50]. It similarly alleges that Procarent submitted false and fraudulent claims to Medicare "for repetitive ambulance runs knowing full well it did not have proper documentation," but it also alleges that Procarent submitted false and fraudulent claims for transports that were not medically necessary "and/or . . . did not require ALS services." [R. 50, ¶ 144]. The Third Amended Complaint alleges these same theories, and Procarent does not dispute that the Third Amended Complaint relates back to the Second Amended Complaint. The question before this Court, then, is whether the allegations in the Original Complaint or First Amended Complaint gave Procarent enough notice of the nature and scope of the Relators' claims such that it should not have been surprised by the additional allegations and theories (i.e., the "lack of medical necessity" and "upcoding" schemes) added in the Second Amended Complaint.

The Relators argue that Procarent was on notice of the "lack of medical necessity" and "upcoding" theories because, as noted above, both the original Complaint and the First Amended Complaint "allege ' . . . Procarent was submitting false and fraudulent claims to and receiving reimbursement from the Medicare program for repetitive ambulance services knowing full well that it did not have proper documentation and that, pursuant to 42 C.F.R. § 410.40, Procarent was not eligible to receive the aforementioned reimbursement.'" [R. 122, p. 20 (quoting R. 1, ¶ 44; R. 6, ¶ 75)]. Because they cited to the entire regulation, rather than the specific subsection relating to PCS forms (formerly § 410.40(d)(2)),[16] the Relators argue that they clearly "intended to claim more than merely falsification of PCS forms." *Id.* The Court disagrees, however. The single citation to the entire regulation, without more, does not put Procarent on notice of which specific subsections the Relators seek to invoke. Instead, the facts alleged in reference to that regulation (and throughout the Original and First Amended Complaint) mention only repetitive ambulance transports and fraudulent or missing PCS forms, indicating to Procarent that the specific subsection at issue was § 410.40(d)(2).

Relators further argue that, under the regulations, "the presence of the signed physician certification statement [PCS] does not alone demonstrate that the ambulance transport was medically necessary." *Id.* (quoting 42 C.F.R. § 410.40(d)(2)(ii)) (internal quotation marks omitted). Thus, the Realtors argue, their "claim under 3729(a)(1)(A) for making a false claim required them to show that the ambulance transports were not medically necessary." The Court is at a loss as to what the Relators mean by this. They appear to argue that, by making a claim under § 3729(a)(1)(A), they would automatically be arguing that the transports themselves were

---

[16] At the time the Original, First Amended, and Second Amended Complaints were filed, the subsection addressing PCS form requirements for repetitive transports was § 410.40(d)(2). Those PCS form requirements can now be found in § 410.40(e)(2).

not medically necessary. The problem with this argument is that § 3729(a)(1)(A) references only the knowing presentment of "false or fraudulent claim[s]," which could, in turn, encompass any number of fraudulent schemes and theories based on a wide variety of facts.  Mere reference to that subsection alone does not advise the defendant of any "lack of medical necessity" scheme. And again, the facts alleged in reference to that provision (and throughout the Original Complaint and First Amended Complaint) mention only repetitive ambulance transports and fraudulent or missing PCS forms. The Court therefore finds that the Relators' references to § 3729(a)(1)[17] in the Original Complaint and First Amended Complaint, without more, did not put Procarent on notice of the Relators' "lack of medical necessity" and "upcoding" theories.

Lastly, the Relators allege that Procarent was on notice of these theories because the First Amended Complaint referenced the Relators' discovery of "prior excessive and fraudulent billing to Medicare and Medicaid dating back almost ten (10) years." [R. 122, p. 20 (quoting R. 6, § 31)]. And, they argue, the exhibits attached to the original Complaint, [R. 1-1, R. 1-2], and incorporated into the First Amended Complaint, [R. 6, p. 4 n.1], "show Relators (sic) claims involve more than falsified PCS forms, as the run sheets for the patients show they were being transported when it was not medically necessary because they could walk or sit." [R. 122, p. 20]. The Court disagrees. While the Original and First Amended Complaint reference "prior excessive and fraudulent billing," neither pleading describes any fraudulent scheme beyond the alleged falsification of PCS forms. In fact, neither the Original Complaint nor the First Amended Complaint makes any reference to nonrepetitive ambulance transports, medically necessary or

---

[17] Neither the Original Complaint nor the First Amended Complaint actually cite to this specific subsection. The Original Complaint references § 3729(a)(1), [R. 1, ¶ 43], and the First Amended Complaint references § 3729(a), [R. 6, ¶ 74]. However, both allege the knowing presentment of false or fraudulent claims for payment, [R. 1, ¶ 43; R. 6, ¶ 74], which would at least put Procarent on notice of the specific subsection at issue. *See* 31 U.S.C. § 3729(a)(1)(A) (imposing liability on one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval").

not, nor is there any mention of the level of services provided, ALS or BLS, medically necessary or not. Both the Original and First Amended Complaint limit their allegations to Procarent's alleged failure to procure PSC forms for repetitive, nonemergent transports and the alleged falsification of PCS forms. A broad reference to "prior excessive and fraudulent billing," without more, did not put Procarent on notice of any factual allegations or theories relating to medical necessity or ALS services.

Further, the documents attached to those initial pleadings did not put Procarent on notice of any additional theories. *See generally* [R. 1-1; R. 1-2]. Indeed, the document index accompanying those exhibits indicates that the only theory in play was the one involving false or fraudulent PCS forms. For example, the index includes a column titled "FRAUDULENT REPRESENTATIONS OR REASON DOCUMENT CANNOT BE USED FOR BILLING." [R. 1-1, p. 1]. Nearly every description under this column relates to the allegedly fraudulent or improper signatures on PCS forms or otherwise describes issues with the PCS forms. For example, for Bates No. 000016–000017, the description states, "No letterhead, signed by RN, and signature appears to be cut and pasted." *Id.* There are no descriptions explaining any issues with medical necessity or the level of services provided. Thus, even reading these exhibits and this document index in conjunction with the Original Complaint and First Amended Complaint, Procarent would not be on notice that the Relators intended to raise any medical necessity or upcoding theories.

In short, the Original and First Amended Complaints can be fairly read as challenging only Procarent's submission of claims for nonemergent repetitive transports with fraudulently altered or missing PCS forms. The newly alleged medical necessity and upcoding theories, in contrast, challenge Procarent's submission of claims for transports that were not medically

necessary and its submission of claims for ALS services when only BLS services were required, regardless of whether the ambulance runs were repetitive and regardless of any PCS form issues. Thus the Original and First Amended Complaints did not give Procarent adequate notice of the "conduct, transaction[s], or occurrence[s] that form[] the basis of the [§ 3729(a)] claims" in the Second (and Third) Amended Complaints. *See Bledsoe II*, 501 F.3d at 518–19 (finding that allegations of improper billing for certain procedures did not relate back where the original pleadings never mentioned such procedures or otherwise put the defendant on notice that such procedures were involved in the relator's prior allegations of fraud). For this reason and those stated above, the Court finds that, to the extent the Second and Third Amended Complaints raise claims under § 3729(a)(1)(A) for the submission of false or fraudulent claims relating to the Relators "lack of medical necessity" scheme and "upcoding" scheme, those claims do not relate back to the Original or First Amended Complaint.

As noted above, neither party disputes that the Third Amended Complaint relates back to the Second Amended Complaint, which raised, for the first time, the "lack of medical necessity" and "upcoding" schemes. That Second Amended Complaint was filed on July 17, 2017. [R. 50]. Thus, under § 3731(b), to the extent Counts I and II rely on the "lack of medical necessity" and "upcoding" schemes, they are time-barred if the underlying claims were submitted for payment prior to July 17, 2011.

On this point, the Court acknowledges that a statute of limitations defense is an affirmative defense, and "a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (citations omitted). As a result, "a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is generally an inappropriate vehicle for dismissing a claim based upon the statute of

limitations." *Id.* However, when the complaint's allegations "affirmatively show that the claim is time-barred," dismissing the claim under Rule 12(b)(6) is appropriate. *Id.* (citation omitted). While the exact date of submission is not clear for each of the alleged representative examples in the Third Amended Complaint, the pleading distinguishes between medical necessity claims allegedly submitted prior to the Relators' employment and those allegedly submitted after they were hired. *See* [R. 117, pp. 21–35]. The Third Amended Complaint also makes clear that the Relators were hired prior to July 17, 2011. *See id.* ¶ 49 ("In July of 2010, Procarent hired Kesterson as Billing Manager."); ¶ 64 (explaining that Dunn was hired "at the beginning of 2011); ¶ 103 (explaining that Foltz was hired "[a]t the beginning of June 2011"). Accordingly, each of the "lack of medical necessity" claims allegedly submitted prior to the Relators' employment were necessarily submitted prior to July 17, 2011. Counts I and II are therefore time-barred to the extent they rely on these "preemployment lack of medical necessity" claims.[18]

As for the "postemployment lack of medical necessity" and "upcoding" claims, it is possible that some of these claims would also be time-barred if submitted prior to July 17, 2011. However, the Court is unable to discern the specific dates of submission for those claims, and it would therefore be inappropriate to dismiss these claims as untimely. *See generally Petty v. Bluegrass Cellular, Inc.*, 440 F.Supp.3d 692, 696 (W.D. Ky. 2020) (finding it inappropriate to grant a motion to dismiss on statute of limitations grounds where the allegations in the complaint did not "affirmatively show that the claim is time-barred"). The Court therefore considers whether those claims can survive Procarent's Rule 9 challenge,[19] turning first to the allegations in Count I.

---

[18] This includes the claims for patients E.G., L.B., J.O., C.I., J.A., K.S., and N.R. *See* [R. 117, pp. 24–28].

[19] The Court discussed Rule 9(b) at length in its July 20, 2022 Memorandum Opinion and Order, [R. 110], and repeats much of that discussion below.

**B.  The False Claims Action (Count I) – 31 U.S.C. § 3729 (a)(1)(A)**

At this stage of the proceedings, the Court must determine whether the Third Amended Complaint "states a plausible claim for relief." *Iqbal*, 556 U.S. at 679; *Bledsoe II*, 501 F.3d at 505 (applying same standard to a False Claims Act *qui tam* action). Generally, under Federal Rule of Civil Procedure 8, a pleading satisfies this standard if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ P. 8(a)(2). However, because some of the claims at issue in this case involve fraud, the Third Amended Complaint must also comply with Federal Rule of Civil Procedure 9(b), at least with respect to those claims. *See, e.g.*, *Bledsoe II*, 501 F.3d at 503. Under Rule 9(b), a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

This heightened pleading standard "is undoubtedly more demanding than the liberal notice pleading standard which governs most cases." *United States ex rel. SNAPP, Inc. v. Ford Motor Co. (SNAPP I)*, 532 F.3d 496, 503 (6th Cir. 2008) (citation omitted). However, it "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *Id.* (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 678 (6th Cir. 1988)); *see also Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) ("[W]hen deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading. . . ."). Instead, Rule 9 "should be interpreted in harmony with Rule 8's statement that a complaint must only provide 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" *SNAPP I*, 532 F.3d at 503 (quoting *Michaels Bldg. Co.*, 848 F.2d at 679). In fact, as the Sixth Circuit has explained, "Rule 9(b) exists predominately for the same purpose as

- 27 -

Rule 8: 'to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading.'" *Id.* (quoting *Michaels Bldg.*, 848 F.2d at 678). In cases involving fraud, however, "a 'more specific form of notice' is necessary to permit a defendant to draft a responsive pleading." *Id.* (quoting *Bledsoe II*, 501 F.3d at 503). Stated another way, the overarching purpose of Rule 9 is "to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Bledsoe II*, 501 F.3d at 503.

In the context of a False Claims Act *qui tam* action, Rule 9 requires that a plaintiff at least "allege the time, place, and content of the alleged misrepresentation . . . ; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Bledsoe I*, 342 F.3d at 643 (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)) (internal quotation marks omitted). In other words, "[a]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson*, 447 F.3d at 887 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)). However, "this requirement should be understood in terms of Rule 9(b)'s broad purpose of ensuring that a defendant is provided with at least the minimum degree of detail necessary to begin a competent defense." *SNAPP I*, 532 F.3d at 504. Thus, "[s]o long as a relator pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow a defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

The specific pleading requirements differ somewhat for claims arising under § 3729(a)(1)(A) and § 3729(a)(1)(B) of the False Claims Act. Because Count I arises under the former, the Court first addresses that pleading standard. As noted above, § 3729(a)(1)(A)

prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). This particular provision

> imposes liability when (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken "knowingly," i.e., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim.

*Bledsoe I*, 342 F.3d at 640. Importantly, a claim arising under this provision "requires proof that the alleged false or fraudulent claim was 'presented' to the government." *Ibanez*, 874 F.3d at 914 (quoting *United States ex rel. Marlar v. BWXT-12, LLC*, 525 F.3d 439, 445 (6th Cir. 2008)) (internal quotation marks omitted). As the Sixth Circuit has explained,

> At the pleading stage, this [presentment] requirement is stringent; "where a relator alleges a 'complex and far-reaching fraudulent scheme,' in violation of [31 U.S.C. § 3729(a)(1)(A)], it is insufficient to simply plead the scheme; [the relator] must also identify a representative false claim that was actually submitted to the government."

*Id.* (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 470 (6th Cir. 2011)); *see also Bledsoe II*, 501 F.3d at 5050. Stated another way, to satisfy the presentment requirement, the relator must identify specific false claims that were actually submitted to the government for payment. *See, e.g.*, *Marlar*, 525 F.3d at 446–47 (dismissing § 3729(a)(1)(A) claim because the relator failed to identify a specific claim that had been submitted, despite detailing the fraudulent scheme); *Sanderson*, 447 F.3d at 877 (same); *Bledsoe II*, 501 F.3d at 514–15 (finding that, for patient "MAL," the relator had sufficiently alleged the time, place, and content of the alleged misrepresentation).

Alternatively, in the absence of an actual billing or invoice, a claim arising under § 3729(a)(1)(A) may survive a motion to dismiss "if it includes allegations showing 'specific personal knowledge' supporting a 'strong inference that a [false] claim was submitted." *Ibanez*, 874 F.3d at 914 (quoting *United States ex rel. Prather v. Brookdale Senior Living Communities,*

*Inc. (Prather I)*, 838 F.3d 750, 769 (6th Cir. 2016)). This alternative method of satisfying Rule 9's presentment requirement is sometimes referred to as the strong inference or personal knowledge exception.[20] However, the Sixth Circuit has made clear that this strong inference "exception" is not an exception to Rule 9's heightened pleading standard and is instead an alternative means of satisfying that standard. *See United States ex rel. Owsley v. Fazzi Associates, Inc.*, 16 F.4th 192, 196 (6th Cir. 2020); *United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017); *United States ex rel. Richardson v. Lexington Foot & Ankle Center PSC*, No. 5:17-129-DCR, 2018 WL 2709320, *5 (E.D. Ky. June 5, 2018).

The Sixth Circuit would apply this alternative method for the first time in *United States ex rel. Prather v. Brookdale Senior Living Communities, Inc. (Prather I)*, 838 F.3d 750 (6th Cir. 2016)).  In that case, the relator had been employed by a senior living facility for the specific purpose of reviewing documentation for residents that had received home health services. *Id.* at 754. The documentation needed to be reviewed so that the facility could submit claims to Medicare for reimbursement. *Id.* At the time the relator was hired, the "Medicare claims regarding those patients had been on hold for some time," and the facility risked losing payments if the claims were not promptly submitted. *Id.*; *see also id.* at 757. However, while reviewing the documents, the relator came to believe that the facility was providing services without physician certification, and then found doctors to validate the care after-the-fact, in violation of certain regulations. *Id.* at 754–55. The relator brought a False Claims Act suit, alleging that the facility submitted false Medicare claims to the federal government. *Id.* at 755. The district court

---

[20] Because the Sixth Circuit has referred to this as the strong inference or personal knowledge exception, this Court sometimes uses similar language. *See, e.g.*, [R. 110 July 20, 2022 Memorandum Opinion and Order)].

 we understand that this is not an exception to Rule 9, but rather an alternative means of satisfying. In that sense, it is an exception to the traditional method of satisfying Rule 9, which would be…..

dismissed her § 3729(a)(1)(A) claim, noting that she had failed to allege specific claims that were submitted to the government. *Id.* at 760.

The Sixth Circuit disagreed. It acknowledged that the relator had failed to allege "[t]he actual *submission* of a *specific* request for anticipated payment to the government." *Id.* at 768–69. The Court also acknowledged that it has consistently demanded such allegations, even in cases that included allegations of a detailed fraudulent scheme. *Id.* at 769 (citation omitted). It noted, however, that the Court had in the past "hypothesized that 'the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted." *Id.* (quoting *Chesbrough*, 655 F.3d at 471).

The Court ultimately found that the relator had alleged facts satisfying this strong inference method. It noted that the relator had identified and described specific requests for payment, including the dates of care and the dates of the physician signatures, and had alleged that requests for payment had been submitted on those claims. *Id.* at 769–70. She sometimes alleged the date of submission, and she also identified the amount of payment requested. *Id.* The Court explained that these allegations "must also be viewed in context." *Id.* at 770. For example, the relator had been hired for the specific purpose of working through a backlog of Medicare claims, and she was hired to review documentation for those claims in anticipation of their submission to Medicare. *Id.* She had also received confirmation that the claims she reviewed had been submitted for payment. *Id.* More specifically, she received an email from a supervisor who reported that that they had "processed and released over 10,000 claims since 2/7." *Id.* The facility also issued weekly reports "that showed how many claims were being held and how many claims had been released for billing to Medicare." *Id.* Having reviewed these detailed allegations, the

Sixth Circuit concluded that the relator's "detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment, combined with her specific allegations regarding requests for anticipated payment," created a "strong inference that the specific documentation that [she] reviewed related to patients for whom requests . . . had been submitted to the government for payment." *Id.*

Since *Prather I*, the Sixth Circuit has continued to acknowledge the strong inference method for satisfying Rule 9. However, as stated above, it has clarified that this alternative method, sometimes referred to as the strong inference or personal knowledge "exception," is not an exception to Rule 9's pleading requirements. In other words, despite its previous use of the phrase "relaxed standard," the Court has no authority to "relax" or otherwise modify the Federal Rules of Civil Procedure, including Rule 9's pleading standard. *See Hirt*, 846 F.3d at 881; *Richardson*, 2018 WL 2709320, *5. Instead, "the standard applied in [*Prather I*] is simply an alternative means of meeting Rule 9(b)'s particularity requirement." *Richardson*, 2018 WL 2709320, at *5 (citing *Hirt*, 846 F.3d at 881–82); *see also Owsley*, 16 F.4th at 196 (discussing the "two ways" to satisfy Rule 9's pleading requirements).

The Sixth Circuit has also clarified that this strong inference method of satisfying Rule 9 applies in limited circumstances. *See, e,g,*, *Ibanez*, 874 F.3d at 915 (explaining that *Prather I*'s "personal knowledge exception applies in limited circumstances"); *Hirt*, 846 F.3d at 881 (noting that "we have applied the 'relax[ed]' standard just once"); *see also United States ex rel. Sharma v. Miraca Life Sciences, Inc.*, 472 F. Supp. 3d 429, 442–43 (N.D. Ohio 2020) (referring to the strong inference exception as "a narrow exception" and "extremely narrow"); *United States ex rel. Petkovic v. Foundations Health Solutions, Inc.*, No. 5:10-cv-2846, 2019 WL 251556, at *5 (N.D. Ohio Jan. 17, 2019) ("[T]he relaxed standard exception is extremely narrow."). In fact, in

the years following *Prather I*, few courts within the circuit have found allegations strong enough to merit application of the strong inference method. *See, e.g.*, *Sharma*, 472 F. Supp. 3d 429, 442–443 (declining to apply *Prather I* exception); *Petkovic*, 2019 WL 251556, *5–6 (same); *Richardson*, 2018 WL 2709320, *5–6 (same).

However, at least one court in this circuit has applied the strong inference method post-*Prather I*. In that case, *United States ex rel. Lynch v. University of Cincinnati Medical Center, LLC*, No. 1:18-CV-587, 2020 WL 1322790 (S.D. Ohio Mar. 20, 2020), the relator, a physician, alleged that the defendants violated § 3729(a)(1)(A) by submitting false claims relating to certain medical procedures. *Id.* at *8. The district court found that the relator had demonstrated a strong inference that fraudulent claims had been submitted to the government, citing to the following allegations in the complaint: (1) a case log for the fraudulent procedures, obtained from the billing manager, that showed patient initials, the invoice number, the payment status, the date posted, and the identity of the governmental insurer (like Medicare); and (2) an email chain where an employee stated that "we will be billing only Medicare"; and (3) an employment agreement that essentially explained why the relator, a physician, could not produce detailed allegations about the company's billing procedures. *Id.* at *28–30. From this, the district court found that the "[r]elator has provided the necessary factual predicates to convince the Court that in all likelihood, [the defendant] submitted actual false claims by billing from the procedures detailed in the log." *Id.* at *30.

Having reviewed Rule 9's presentment requirement and the strong inference option for satisfying Rule 9, the Court turns to the allegations of the Third Amended Complaint. As already noted, only two "categories" of claims have survived Procarent's timeliness arguments: the "postemployment lack of medical necessity" claims and the "upcoding" claims. With respect to

each of these categories, the Court considers whether the Relators have satisfied Rule 9 by sufficiently alleging that Procarent presented false or fraudulent claims to Medicare or otherwise alleging facts showing "'specific personal knowledge' supporting a 'strong inference that a [false] claim was submitted." *Ibanez*, 874 F.3d at 914 (quoting *Prather I*, 838 F.3d at 769).

### 1. Postemployment Lack of Medical Necessity Claims

As noted above, the Relators allege that, *after* they began working at Procarent, the company submitted false claims to Medicare for transports that were not medically necessary. *See, e.g.*, [R. 117, ¶ 229]. The Relators cite to the following patients as representative examples of such "postemployment lack of medical necessity" claims: patients V.B., J.H., B.M., and P.H. *See id.* ¶¶ 231–241.

For patient V.B., the Relators attach a 2011 email chain between Kesterson and members of Procarent's billing department. [R. 117-28]. In the emails, Kesterson voices her concern that V.B's transports for dialysis were not medically necessary, and an employee with the billing department explains that an updated assessment is necessary and "we need more information as to her condition on if we are able to bill these." *Id.* at 1. The Relators also include a portion of a spreadsheet, which lists the date of service, run number, and "amount" for V.B.'s January 5, 2011 transport. *Id.* Beside V.B.'s entry is a note: "Runs for patient do not appear to be medically necessary due to ability to travel via other means – Cannot bill primary or secondary Mcare/Mcaid – Bill patient for runs??" *Id.* at 4. This spreadsheet and the 2011 email chain indicate that Kesterson held concerns as to whether V.B.'s transport was medically necessary, and she relayed her concerns to other Procarent employees. However, these documents do not suggest that the claim was ever submitted to Medicare.

Similarly, for patient J.H., the Relators include the ambulance run sheets and an email chain between Foltz and another Procarent employee, who suggests that an updated evaluation is necessary to determine if the patient's transports are medically necessary. [R. 117-29]. That same email states that, "with proper documentation, we MAY be able to bill the questionable runs." *Id.* at 3. For patient B.M., the Relators provide only a PCS form and ambulance run sheets. [R. 118 (labeled as Exhibit 30)]. And for patient P.H., the Relators submit a PCS form, an ambulance run sheet for run number 15925, and what appears to be a screen shot of Procarent's billing software, which relates to run number 53754 and which contains a notation under the header "Billing Status" of "pending verification." [R. 117-30 (labeled as Exhibit 31)]. While these documents might indicate that the transports for J.H., B.M., and P.H. were not medically necessary (an issue which this Court does not reach here), they do *not* indicate that any of these claims were submitted to Medicare for payment. In fact, these exhibits indicate that the claims were likely *not* billed. Accordingly, the Relators have failed to show that the claims relating to services for patients V.B., J.H., B.M., and P.H. were submitted to Medicare for payment.

The Court next considers whether the Relators have alleged facts demonstrating "'specific personal knowledge' supporting a 'strong inference that [these allegedly false claims were] submitted" to Medicare for payment. *Ibanez*, 874 F.3d at 914 (quoting *Prather I*, 838 F.3d at 769). In many ways, the allegations in the Third Amended Complaint are similar to the facts alleged in *Prather I* and *Lynch*. Like those relators, the Relators here allege personal knowledge of Procarent's billing procedures and outline those procedures in detail. [R. 117, ¶¶ 41–45]. They also allege details about their personal involvement in those billing procedures. *See, e.g.*, *id.* ¶¶ 47–56 (discussing Kesterson's role), ¶¶ 64–67 (discussing Dunn's role), ¶¶ 107–08, 111–14 (discussing Foltz's role). Further, the Relators allege that they had personal conversations with

other Procarent employees, including members of Procarent's management, which indicate that Procarent was aware of the Relators' concerns. *See supra* Section I(A). The Relators also provide documents like screenshots of invoices, transaction summaries, ambulance run sheets, excerpts from spreadsheets, and email communications. From these allegations and documents, the Court finds that the Relators have provided a detailed description of their personal knowledge of the billing process and the allegedly fraudulent scheme. As already explained, however, such allegations, without more, are insufficient to trigger the strong inference exception. *See Chesbrough*, 655 F.3d at 472; *United States ex rel. Eberhard v. Physicians Choice Laboratory Servs., LLC*, 642 F. App'x 547, 552 (6th Cir. 2016). Instead, the Relators must also allege sufficient personal knowledge of the *submission* of fraudulent claims.

The Court finds that the Third Amended Complaint does not provide a sufficient level of detail about the *submission* of any of the "postemployment lack of medical necessity" claims. Instead, the Third Amended Complaint essentially alleges that the Relators identified approximately 2,700 postemployment claims, refused to submit them to Medicare for payment, created a spreadsheet to document these held claims, and again refused to submit most of these claims to Medicare, even when Procarent employees "found" PCS forms and even after Procarent management pushed for the submission of these claims, because the Relators believed the claims to be fraudulent. *See, e.g.*, [R. 117, ¶¶ 80–141]. Based on the allegations in the Third Amended Complaint regarding the "postemployment lack of medical necessity" claims, the Court understands that the Relators submitted to Medicare only those claims that they felt complied with Medicare's regulations. *Id.* ¶ 141 ("Out of the 2,700 held claims, Kesterson and Dunn only identified a small percentage of trips that could be legally billed to Medicare."). They do not allege that they personally submitted any allegedly fraudulent "lack of medical necessity"

claims, nor do they allege that other employees submitted such claims. They do not allege personal knowledge of any facts or circumstances indicating that such claims were submitted. They do not allege that they reviewed billing statements or invoices for these claims. *See Richardson*, 2018 WL 2709320, at *7. They do not allege submission dates or amounts billed. *See Prather I*, 838 F.3d at 769–70; *Lynch*, 2020 WL 1322790, at *28. Instead, the Relators refused to bill such claims and were then terminated or quit, and they allege no personal knowledge of what happened to the 2,700 held claims after they left Procarent. Instead, to support their "lack of medical necessity" scheme, they allege in a conclusory manner that Procarent billed Medicare for at least some of these allegedly fraudulent "postemployment lack of medical necessity" runs. *See, e.g.*, *id.* ¶ 241 ("The above claims were submitted to the federal government for reimbursement."). But they must allege sufficient facts to support this allegation. *See Ibanez*, 874 F.3d at 921 ("But absent any factual support for this allegation and lacking any identifying information on who may have submitted a claim to the government . . . , we are not to simply assume a claim was presented to the government because relators say so."). They have failed to do so.

On this point, the Court feels compelled to address the Relators' allegation that, in July 2011, "a spreadsheet was created documenting each of the [2,700] held claims, including the date of the run, the run number, patient name, the amount of the transport, the payer, and why the transport could not be billed to Medicare." [R. 117, ¶ 117]. When the Court granted Procarent's first Motion to Dismiss, it dismissed the Relators' claims without prejudice. [R. 110, pp. 42–44]. It did so, at least in part, because the Relators had alleged that they could produce a spreadsheet and such spreadsheet, along with additional information, could trigger the strong inference exception. *Id.* at 44–45. The Relators have failed to attach that spreadsheet to their Third

Amended Complaint, though they do attach what appear to be spreadsheet excerpts, most of which lack any clear labeling or description of the information contained within them. *See* [R. 117-19; R. 117-21; R. 117-22, R. 117-24; R. 117-28, pp. 4–6]. None of these spreadsheet excerpts clearly identify any claims submitted for payment, the dates of submission, or other information suggesting that the claims were submitted to Medicare for payment.

And even if the Court assumed that a complete spreadsheet exists, the Relators' description of that spreadsheet does not indicate that it contains any information about the *submission* of the allegedly fraudulent claims. [R. 117, ¶ 117 (describing spreadsheet as "documenting each of the [2,700] held claims, including the date of the run, the run number, patient name, the amount of the transport, the payer, and why the transport could not be billed to Medicare")]. The Relators do not allege that the spreadsheet contains any information about the submission of these claims, such as the date of submission or the amount billed. Instead, it appears that the spreadsheet details the 2,700 *held* claims, which the Relators refused to bill to Medicare based on their belief that they were fraudulent. As the Court has already explained, the Relators have failed to sufficiently allege that those allegedly fraudulent held claims relating to the "lack of medical necessity" scheme were submitted to Medicare for payment. The Court further finds that the Relators have failed to allege facts showing "'specific personal knowledge' supporting a 'strong inference that [these allegedly false claims were] submitted." *Ibanez*, 874 F.3d at 914 (quoting *Prather I*, 838 F.3d at 769).

Accordingly, the Court finds that none of the "postemployment lack of medical necessity" claims survive Procarent's Rule 9 challenge.

## 2.  Upcoding Schemes

The Court next considers whether the Relators have satisfied Rule 9's pleading requirements with respect to the alleged "upcoding" scheme. As to that claim, the Relators allege that Procarent "submitted claims to the federal government for ALS services, when only BLS services were provided." [R. 117, ¶ 229]; *see also id.* 242, 249–50. The Relators cite to the following patient's transports in support of this claim: M.M., G.H., J.G., M.P., E.P., R.R. *Id.* ¶¶ 242–251. Regarding these transports, they attach to their Third Amended Complaint a March 2012 email from a senior health care consultant to Foltz. [R. 117-31 (March 2012 email, marked Exhibit 32)]. They do not submit any other exhibits or documentary evidence relating to these representative examples.

Notably, the Relators referenced these same representative examples and attached the same email to their Second Amended Complaint. [R. 50, ¶¶ 106–11]; [R. 50-7]. The Court found the allegations in that complaint and the email to be insufficient to satisfy Rule 9's presentment requirement. [R. 110, pp. 21–22]. The Court explained that, while the email may indicate that Procarent billed for one or more of these claims, "there is no indication that it was billed to Medicare or another federal agency, as opposed to the patient's private insurance." *Id.* at 22. The Relators now include the same allegations and the same email chain to support their claim that Procarent improperly submitted claims to Medicare for ALS services that were not provided. *Compare* [R. 50, ¶¶ 106–12] *with* [R. 117, ¶¶ 243–49]. The Relators do not include new documents, like billing invoices or transaction summaries, relating to the cited representative examples. They appear to acknowledge as much in their response brief, stating, "While the Court found that the examples Relators pled did not show a claim was presented to the government as part of the upcoding scheme . . . Relators would submit that the evidence allows the court to draw this conclusion." [R. 122, p. 10]. But again, the Relators do not submit any additional

evidence to support their allegations, like invoices or transaction summaries, showing that any of these claims were submitted to Medicare for payment. Accordingly, for the same reasons discussed in the Court's July 20, 2022 Memorandum Opinion and Order, *see* [R. 110, pp. 21–22], the Court finds that the Relators have failed to show that the claims relating to services for patients M.M., G.H., J.G., M.P., E.P., R.R. were submitted to Medicare for payment.

The Court next considers whether the Relators have alleged facts demonstrating "'specific personal knowledge' supporting a 'strong inference that [these allegedly false claims were] submitted" to Medicare for payment. *Ibanez*, 874 F.3d at 914 (quoting *Prather I*, 838 F.3d at 769). In doing so, the Court again notes that the only documentary evidence submitted in support of these claims is the March 2012 email from a senior health care consultant to Foltz. [R. 117-31 (March 2012 email, marked Exhibit 32)]. The Relators do not submit any other exhibits or documentary evidence relating to these representative examples, and the allegations in the Third Amended Complaint fail to mention the email or otherwise provide context about the email. Thus, the Court must consider whether the email itself, and the Third Amended Complaint's limited allegations about these patients and the upcoding claims, are sufficient to support a strong inference that these claims were submitted.

The email is dated March 12, 2012 and is addressed to Foltz from a health care consultant. *Id.* The subject line reads "Procarent – Status update." *Id.* In the body of the email, the health care consultant states, "The status update," and proceeds to list the initials of several patients (including M.M., G.H., J.G., M.P., E.P., and R.R.). *Id.* Beside each patient's initials is a date, followed by a note. *Id.* For example, the notes for some patients indicate problems with PCS forms, such as incomplete or improperly signed forms. *Id.* (discussing patients J.J. and K). The notes for G.H. similarly identifies an issue with the claim, stating, "Run report doesn't

support ALS billing – No Advanced procedures provided to patient." *Id.* The notes for M.P., E.P., and R.R. include similar comments. *See id.* (noting that "Documentation [for M.P.] doesn't support ALS billing. Patient did not receive any advance procedures or treatment," and noting the same for E.P. and R.R.). The notes for patients M.M. and J.G. also raise similar concerns regarding the level of services provided.  M.M.'s note, for example, states "EMS report doesn't support ALS billing. No advanced procedures provided to patient. Claim billed with 4[redacted]D – documentation form states 4[redacted]A – need to re-verify ins." *Id.* And J.G.'s notes state, "Billed ALS but documentation only supports BLS. Does not have insurance listed on signature sheet." *Id.*

From the body of the email alone, the Court understands that the health care consultant is discussing certain patients' claims with Foltz. The consultant's notes indicate issues with the claims, including issues with the PCS forms and the level of services indicated on the run sheets. And importantly, the body of the email clearly indicates that two of these patients' claims—the claims for M.M. and J.G.—were "billed." Thus, from the email alone, the Court understands that the health care consult is discussing certain patients' claims and issues arising from those claims, at least two of which had already been billed at the time of the email.

However, the email does not clearly state that the claims for M.M. and J.G. (or any of the other claims listed in the email) were billed *to Medicare*. And in the Court's Memorandum Opinion and Order addressing Procarent's first motion to dismiss, the Court found that the email chain and the Relators' allegation surrounding those claims were insufficient to satisfy Rule 9. [R. 110, pp. 21–22]. Now, however, the Court must view the email in the context of the allegations in the Third Amended Complaint.

Those allegations are sparse and provide little detail about the "who, what, when, where, and how" of these specific claims. As for patients M.M. and J.G. (the only two claims listed in the email as "billed"), the Third Amended Complaint alleges that Procarent transported M.M. on December 7, 2011, the same date listed by M.M.'s initials in the email. *Id.* ¶ 243. The Relators also allege that, "[a]ccording to the run sheet, no advanced procedures were provided to [M.M.], however, Procarent billed for ALS services." *Id.* The Relators similarly allege that Procarent transported J.G. on September 14, 2011, the same date listed in the email chain beside J.G.'s initials. *Id.* ¶ 245. And the Relators similarly allege that J.G.'s run sheet indicates that no advanced procedures were provided, but Procarent nevertheless billed for ALS services. *Id.* No run sheets are attached for either claim or for any of the other claims listed in the email.

On this point, the Court also notes that the email lists certain redacted numbers and letters in the comment for M.M.: "EMS report doesn't support ALS billing. No advanced procedures provided to patient. Claim billed with 4[redacted]D – documentation form states 4[redacted]A – need to re-verify ins." [R. 117-31]. The Third Amended Complaint does not provide any further information about these letters and numbers. Nevertheless, the Relators allege in their response brief that

> back in 2012, a patient's Medicare number consisted for nine digits and a letter at the end, signifying the social security benefits the beneficiary was entitled to receive. For M.M., "D" indicates an "aged widow, age 60 or over," and an "A" indicates "primary claimant (wage earner)."

[R. 122, p. 10]. The Court responded to similar arguments when considering the sufficiency of the Second Amended Complaint, specifically noting that the Relators had failed to include such allegations in their complaint. *See* [R. 110, p. 22]. Surprisingly, the Relators have again failed to include these allegations in their Third Amended Complaint. As a result, the Court may not consider the allegations raised in the response brief. *See Trustees of Detroit Carpenters Fringe*

*Benefit Funds v. Patrie Cost. Co.*, 618 F. App'x 246, 255 (6th Cir. 2015) ("In considering a Rule 12(b)(6) motion, a district court cannot consider matters beyond the complaint." (citations omitted)).

Looking only to the allegations of the Third Amended Complaint and its exhibits, the Court finds that the details relating to the upcoding claims are sparse. Those details include, at most, the patient's initials and the date of transport. They do not include dates of submission, amounts billed, invoice numbers, the patient's government insurer (if any), or any other information about these allegedly fraudulent claims. As such, the Third Amended Complaint falls short of alleging the level of detail included in cases like *Prather I* and *Lynch*, where the strong inference method was applied. *See Prather I*, 838 F.3d at 769–70 (finding strong inference method applied where the relator included details about four patient's services, the start and end dates of those services, the dates of the allegedly fraudulent certifications, the dates that the defendants requested payment, and the amounts paid or billed, and a spreadsheet providing details for over 1,200 other allegedly fraudulent claims); *Lynch*, 2020 WL 1322790, at *28–29 (finding strong inference method applied where the relator submitted a case log that identified the payment status for recipients of the medical procedure at issue, including the patient initials, their medical record numbers, the code specifying the procedure, the dates of the procedures, the "date posted," the specific invoice numbers, and the identity of the government insurance carriers; *see also United States v. Heartland Hospice, Inc.*, 386 F. Supp. 3d 884 (N.D. Ohio 2019), *aff'd sub nom. United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836 (6th Cir. 2020) (finding that the relator had failed to include any information regarding "amounts billed and/or paid, the Medicaid or Medicare certification dates, and the specific services provided," and as a result, the strong inference method had not been sufficiently alleged).

To be clear, this case presents a close call. The Relators have alleged personal knowledge of Procarent's billing practices, and each Relator was involved in the billing procedures. Their Third Amended Complaint adds more detail about these billing practices and the Relators' role in those procedures. And it continues to allege that the Relators expressed their concerns about the allegedly fraudulent practices to upper-level management at Procarent. In both *Prather I* and *Lynch*, the courts considered similar allegations. *Prather I*, 838 F.3d at 769; *Lynch*, 2020 WL 1322790, at *29–30. But the courts in *Prather I* and *Lynch* also considered other factual allegations not present here, namely, details about the *submission* of allegedly fraudulent claims. *Prather I*, 838 F.3d at 769–770 (discussing details in the relators' spreadsheet); *Lynch*, 2020 WL 1322790, at *28–29 (discussing details in the relators' case log). Unlike the complaints in those cases, the Third Amended Complaint in this case fails to allege facts presenting more than a mere possibility that these allegedly false claims were actually submitted to the government for payment. In other words, while the Relators allege personal knowledge of the fraudulent scheme, they do not allege facts creating a strong inference that the allegedly fraudulent claims were likely submitted to Medicare. As a result, the Court finds that the Relators have failed to allege facts showing "'specific personal knowledge' supporting a 'strong inference that a [false] claim was submitted." *Ibanez*, 874 F.3d at 914 (quoting *Prather I*, 838 F.3d at 769).[21]

To summarize its findings regarding Count I, the Court finds that all "preemployment lack of medical necessity" claims are time-barred, and the Relators have failed to satisfy Rule 9's pleading requirements with respect to their "postemployment lack of medical necessity" claims

---

[21] Like the court in *Lynch*, this Court acknowledges that the Relators do not have to *prove* the submission of claims at this stage in the proceedings. *See Lynch*, 2020 WL 1322790, at *29 n.18. Instead, at this stage, the Relators need only plead that Procarent submitted or caused to be submitted allegedly fraudulent claims to Medicare for payment. *Id.* But to do so, they must satisfy Rule 9's pleading requirements.

and their "upcoding" claims. As a result, the Court will grant the Motion to Dismiss in part and will dismiss Count I, the false claims action.

### C.  The Fraudulent Statements Action (Count II) – 31 U.S.C. § 3729(a)(1)(B)

Section 3729(a)(1)(B) imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). As previously noted, the Relators point to two theories for satisfying this "false statement claim." [R. 122, pp. 11–18]. First, the Relators assert their "false certification theory," alleging that Procarent made false statements by falsely certifying that certain claims satisfied the applicable regulations, when those claims were actually for transports that were not medically necessary or did not provide the appropriate level of services (i.e., ALS services). *Id.* at 12–13. Next, the Relators assert a "fraudulent PCS forms theory," alleging that Procarent made false statements by creating false or fraudulent PCS forms to support claims for repetitive nonemergent transports. *Id.* at 13–18.

Procarent argues that Count II must be dismissed because the Relators have failed to satisfy Rule 9's pleading requirements, and they further fail to assert that the allegedly false statements were material to a false or fraudulent claim. The Court addresses each argument in turn.

### 1.  Rule 9 Pleading Requirements

Section 3729(a)(1)(B) does not require a relator to plead the presentment element outlined above for claims arising under § 3729(a)(1)(A). *See Chesbrough*, 655 F.3d at 473; *Ibanez*, 874 F.3d at 916. However, this provision does require a relator "to 'plead a connection between the alleged fraud and an actual claim made to the government.'" *Ibanez*, 874 F.3d at 916 (quoting *Chesbrough*, 655 F.3d at 473). The connection between the alleged fraud and the

- 45 -

submitted claim "must be evident." *Id.* (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671–72 (2008)). The Sixth Circuit has affirmed the dismissal of such claims where the pleadings "rely on a too-attenuated chain connecting alleged false statements to the submission of claims." *Id.* (citing *Chesbrough*, 655 F.3d at 473); *see also Allison Engine Co.*, 553 U.S. at 672 (explaining that relators relied on a "link between the false statements and the Government's decision to pay or approve a false claim [that] is too attenuated to establish liability").

### a.   False Certifications

Relators first argue that Procarent made false statements by submitting claims that were not covered by Medicare's regulations, i.e., claims for transports that were not medically necessary and claims for transports with ALS services where only BLS services were provided. *Id.* at 12–13. More specifically, the Relators argue that Procarent certified for each claim that those claims complied with the applicable regulations. *Id.* at 13. Because those claims did *not* comply with the regulations, the Relators argue, Procarent made a false statement or "false certification" in violation of the False Claims Act. *Id.* at 12. Procarent does not address this "false certification" argument in its reply brief. *See* [R. 123].

The Court understands that the Relators' false certifications theory relies entirely on the "lack of medical necessity" and "upcoding" claims it cited in support of Count I. Stated another way, the Relators argue that, by submitting those specific false claims to Medicare, Procarent made false certifications in violation of § 3729(a)(1)(A). As already explained, however, Count I's "preemployment lack of medical necessity" claims are time-barred, and the Court will therefore dismiss Count II to the extent the Relators rely on those time-barred schemes to allege that Procarent falsely certified that those claims satisfied the applicable regulations.

- 46 -

Turning to the "postemployment medical necessity" claims and the "upcoding" claims cited in support of Count I (and now, in support of Count II's false certifications theory), the Court has already determined that the Relators fail to allege that any specific claim was submitted to Medicare for payment, and they have further failed to allege facts creating a strong inference that the allegedly fraudulent claims were likely submitted. While the Relators do not have to satisfy this same pleading standard for their § 3729(a)(1)(B) claim, they must at least "'plead a connection between the alleged fraud and an actual claim made to the government.'" *Ibanez*, 874 F.3d at 916 (quoting *Chesbrough*, 655 F.3d at 473). For all of the same reasons already stated, *see supra* Section III(B), the Court finds that the Relators have failed to allege a connection between any allegedly fraudulent certifications and an actual claim submitted to Medicare.

Accordingly, to the extent the Relators allege a false certifications theory relying on their "lack of medical necessity" and "upcoding" claims, Count II must be dismissed.

### b.  Fraudulent PCS Forms

The Relators also argue that Procarent made, used, or caused to made or used, false records or statements in violation of § 3729(a)(1)(B) by creating false or fraudulent PCS forms to support claims for repetitive nonemergent transports. [R. 122, pp. 13–18]. Procarent argues that the Relators have failed to satisfy Rule 9 with respect to this "fraudulent PCS forms" theory. *See* [R. 119, pp. 20–21]. However, Procarent's argument is largely undeveloped, and it relies heavily on the Court's ruling on its first Motion to Dismiss. *Id.* at 21 ("This Court specifically identified these requirements in its July 20, 2022 Order and found that the Relators had failed to plead a connection between the allegedly falsified documentation and any claims submitted to the government. The Relators continue to fail to plead any representative examples of actionable

claims."). Procarent's Motion to Dismiss fails to acknowledge, however, the newly-alleged representative examples included in the Third Amended Complaint. For example, the Third Amended Complaint alleges that Procarent fraudulently altered a PCS form for patient G.B., to support that patient's repetitive ambulance transports. [R. 117, ¶¶ 201–209]. They further allege that, "[o]n December 7, 2011, Cassie Hayes [Procarent's Repetitive Transport Billing Specialist] set G.B.'s transports between February 24, 2011, and March 17, 2011, *to be filed with Medicare*, assuring Foltz that the forms were compliant." *Id.* ¶ 202 (emphasis added). The Relators similarly allege that Procarent fraudulently altered a PCS form for patient J.C., to support J.C.'s repetitive ambulance transports. *Id.* ¶¶ 210–214. They allege that, "[o]n December 7, 2011,[22] Cassie Hayes set J.C.'s transports between February 9, 2011, and April 8, 2011, *to be filed with Medicare*, assuring Foltz that the form was signed by a doctor." *Id.* ¶ 210 (emphasis added).

In support of these allegations, the Relators attach an email chain between Hayes and Foltz, dated December 12, 2011 with the subject line reading "Filed 12/7 through 12/9." [R. 117-17]. In the first email, dated December 12, 2011, Hayes advises Foltz that she "set the following to file off the spreadsheet" and lists various "filed" dates, the names of the patients, and the dates of service. *Id.* at 2. For patient G.B., Hayes lists the dates of service (February 24, 2011 through March 17, 2011) under "Filed 12/7/11." *Id.* For patient J.C., Hayes lists the dates of service (February 9, 2011 through April 8, 2011) under "Filed 12/8/11." *Id.* In response, Foltz replies, "Their PCS's were good, correct?" *Id.* Hayes responses, "These are some of the patients that we discussed earlier about the located PCS's and you were OK with setting to file. They all have a

---

[22] Based on the email chain with Cassie Hayes, the Court understands that the claim was filed on December 8, 2011. *See* [R. 117-17].

signature of an MD." *Id.* at 1. In a follow up email, Hayes explains why she feels okay "using these" PCS forms, as she believed "there were signed and dated by MD's." *Id.*

The Relators also attach spreadsheet excerpts for patients J.C. and G.B. *See* [R. 117-19; R. 117-22]. While not clearly labeled, each spreadsheet excerpt has a column with entries listing "MEDICARE IN." *See* [R. 117-19; R. 117-22]. Again, this column is not labeled, but it suggests that G.B. and J.C. each had Medicare listed as a potential payer in their file. The other columns and notes within the spreadsheet further support the Relators' allegations relating to G.B. and J.C. For example, in their Third Amended Complaint, the Relators explain that, during their initial investigation, the original PCS form on file for G.B.'s February 24, 2011 through March 17, 2011 transports (those transports listed in the email chain) was not signed by a physician. [R. 117, ¶ 203]. As a result, the Relators held those claims. *Id.* ¶ 204. The only other PCS form that was properly signed by a physician was dated March 19, 2011, *after* those dates of service, meaning it could not have supported those nonemergent repetitive transports. *Id.* ¶ 205; *see also* [R. 117-19]. To support these allegations, the Relators attach a copy of the original PCS form (the one not signed by a physician), *see* [R. 117-18], as well as the spreadsheet excerpt.[23] That spreadsheet excerpt shows that, for the transports dated February 24, 2011 through March 17, 2011, the PCS form on file was dated March 19, 2011.

In its reply brief, Procarent argues that "[i]t is unclear what is intended by the transports being 'set to be filed with Medicare,'" as stated in the December 12, 2011 email, and the email chain does not specifically mention Medicare. [R. 123, p. 9]. However, reading the email chain in context and in conjunction with the allegations in the Third Amended Complaint, the Court disagrees. In the Third Amended Complaint, the Relators allege that Hayes filed the claims for

---

[23] Similar documents are attached for patient J.C. [R. 117-23 ("found" PCS form)]; [R. 117-24 (spreadsheet excerpt)].

patients G.B. and J.C. "with Medicare." [R. 117, ¶¶ 202, 210]. And as already discussed, *see, e.g.*, *supra* Section I(A), the Relators' Third Amended Complaint also includes many details about their personal involvement in the billing process, lending credence to their allegation that "setting to file" means "setting to file with Medicare"—something that the Relators, as members of the billing department, would know. Further, in the email chain, Hayes and Foltz appear to be discussing the requirement that a PCS form for repetitive transports be signed by a physician. [R. 117-17]. As already explained, a timely and properly signed PCS form would be a prerequisite to receiving a payment from Medicare. In other words, the email conversation, in which Foltz and Hayes are discussing whether certain claims had timely and properly signed PCS forms, indicates that they were discussing whether those claims could be submitted to *Medicare*. And, as noted above, the spreadsheet excerpts and PCS forms attached to the Third Amended Complaint further support the Relators' allegations relating to G.B. and J.C.  The Relators have therefore sufficiently supported their factual allegations with documentary support, in addition to alleging personal knowledge. Accordingly, viewing the allegations and exhibits in context and accepting the Relators' allegations as true for the purpose of this Motion to Dismiss, the Court finds that the Relators have sufficiently alleged that the claims for patients G.B. and J.C. were submitted to Medicare for payment.

Turning to the remainder of the fraudulent PCS form examples, the Court notes that they can be broken down into preemployment claims (i.e., claims allegedly submitted prior to the Relators' employment at Procarent) and postemployment claims (i.e., claims allegedly submitted after the Relators began working at Procarent). These postemployment examples include patients L.H., K.F., and C.G. *See* [R. 117, ¶¶ 215– 227]. For each of these patients, the Relators attach the allegedly faulty and fraudulent PCS forms. *See* [R. 117-25 (documents for L.H.); R. 117-26

(documents for K.F.); R. 117-27 (documents for C.G.)]. To show that these claims were submitted to Medicare, they attach what appear to be screenshots of Procarent's billing software. *See* [R. 117-25, p. 2; R. 117-26, p. 2; R. 117-27, p. 2]. However, from what the Court can tell, none of those screenshots indicate that the claims were submitted to Medicare for payment. L.H.'s screenshot shows that the claim's billing status is "Billed" but it does not indicate what payer (government payer or private insurance) was billed. [R. 117-25, p. 2]. As for patients K.F. and C.G., those screenshots indicate that the billing status is "Pending Verification." [R. 117-26, p. 2; R. 117-27, p. 2]. The screenshots do not otherwise indicate that the claims were billed, much less billed to Medicare. The Court therefore finds that the Relators have failed to satisfy Rule 9 with respect to the claims for patients L.H., K.F., and C.G.

Some of the other examples listed in support of the Relators' falsified PCS forms theory present a closer call. With respect to the preemployment claims for patients E.Z., B.D., and H.F., the Relators attach only the allegedly falsified documents. *See* [R. 117-4 (Documents for E.Z);[24] R. 117-5 (PCS forms for B.D. and H.F.)]. The Relators allege that they discovered the forgeries in these documents once they started to review Procarent's previously submitted claims (i.e., claims submitted prior to the Relators' employment with Procarent). *See* [R. 117, ¶ 143]. But other than identifying these documents and alleging that they contain forged signatures, the Relators do not provide any further information about the alleged *submission* of these claims or any specifics (such as dates of submission). However, these claims (for patients E.Z., B.D., and H.F.) were allegedly personally discovered by the Relators through their roles in the billing department and as part of their process of reviewing *billed* claims. *See id.* ¶¶ 86–87, 89. In other

---

[24] The Relators refer to these documents as PCS forms, but they are written in the style of a letter under letterhead for the Yellow Ambulance Service. [R. 117-4]; *see also* [R. 117-5].

words, they allege personal knowledge that these claims were billed to Medicare, which may be enough to demonstrate a connection between the allegedly fraudulent scheme and the submission of a specific claim.[25] The Court need not decide this precise issue, however, because the Relators have sufficiently alleged two representative examples for this claim, for patients G.B. and J.C. Accordingly, this claim moves forward.

In sum, the Court finds that the Relators have sufficiently "plead a connection between the alleged fraud [specifically, the use of fraudulent PCS forms in support of claims for repetitive transports] and an actual claim made to the government." *Ibanez*, 874 F.3d at 916 (quoting *Chesbrough*, 655 F.3d at 473) (internal quotation marks omitted). The Court will therefore deny the Motion to Dismiss to the extent it seeks dismiss of Count II on these grounds.

### 2. Materiality

Procarent also argues that "the Third Amended Complaint does not plead nonemergent, repetitive services, and therefore the PCS requirements that the Relators base their claim of falsity upon are not applicable in this case." [R. 119, p. 18]. Stated another way, the Third Amended Complaint alleges that Procarent performed transport services without the proper PCS forms, but such forms are only required for "nonemergency, scheduled, repetitive ambulance services," and the Third Amended Complaint fails to allege such nonemergent, repetitive services. *Id.* Thus, Procarent argues, the Third Amended Complaint "fails to plead examples of claims that were false." *Id.*

The Court understands this to be an attack on the materiality of the allegedly false statements. Under § 3729(a)(1)(B), a person may be liable for if he or she "knowingly makes,

---

[25] The Court understands that the strong inference analysis, as applied to Count I, is applicable to claims arising under § 3729(a)(1)(A), while Count II implicates § 3729(a)(1)(B). Nevertheless, the Court believes that the level of personal knowledge alleged in the Third Amended Complaint would be relevant to this Rule 9 analysis as well.

use, or cause to be made or used, a false record or statement *material to* a false or fraudulent

claim." 31 U.S.C. § 3729(a)(1)(B) (emphasis added). The False Claims Act defines "material" as

"having a natural tendency to influence, or be capable of influencing, the payment or receipt of

money or property." *Id.* § 3729(b)(4). The Sixth Circuit has similarly explained, "A false

statement is material if it has 'the objective, natural tendency to influence a government decision

maker.'" *United States ex rel. USN4U, LLC v. Wolf Creek Federal Servs., Inc.*, 34 F.4th 507, 516

(6th Cir. 2022) (quoting *United States ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced

Sys. Int'l*, 600 F. App'x 969, 973 (6th Cir. 2015)) (internal quotation marks omitted). While this

materiality standard "is demanding," the Court "may examine a variety of factors, with no one

factor being dispositive, when determining whether allegations of fraud are material." *Id.*

(quoting *Universal Health*, 579 U.S. at 194–96) (internal quotation marks omitted).

Regarding this materiality standard, Procarent's argument appears to be that the PCS

forms, even if fraudulently altered, were not required to have a physician's signature for

nonrepetitive ambulance transports, so they could not have had any influence on Medicare's

decision to pay on such claims. *See* [R. 119, p. 18]. In making this argument, Procarent insists

that "[t]he entire theory of the Relators' [False Claims Act] case is that Procarent performed

ambulance services without the requisite PCS form having been completed prior to transport."

*Id.* But this is an incorrect characterization of the theories alleged in the Third Amended

Complaint. The Third Amended Complaint clearly alleges three separate theories by alleging

that

> Procarent engaged in an institutionalized scheme to fraudulently submit claims to
> Medicare for reimbursements by falsely certifying that ambulance transports were
> medically necessary, when they were not; that valid PCSs were obtained prior to
> transport, when they had not [been]; and that ALS services had been provided
> during transports, when only BLS services were provided.

[R. 117, ¶ 35]. In other words, the Relators allege a "lack of medical necessity" scheme (for *nonrepetitive* transports that do *not* require a PCS form signed by a physician prior to service), an "upcoding" scheme, and a scheme relating to the use of fraudulent PCS forms (for *repetitive* transports that *do* require a PCS form signed by a physician prior to service). Indeed, the Relators address these various theories of liability in their response. *See generally* [R. 122]. Procarent, on the other hand, makes no further effort to address this specific issue in its reply brief. *See* [R. 123].

Perhaps more importantly, Procarent fails in its Motion to Dismiss to distinguish between claims for transports that were not medically necessary (i.e., *nonrepetitive* transports that did *not* require a PCS form signed by a physician prior to service), claims relating to ALS services, and claims lacking a proper PCS form (i.e., *repetitive* transports that *do* require a PCS form signed by a physician prior to service). *See* [R. 119, pp. 18–19]. Instead, when arguing that the Relators failed to allege nonemergent *repetitive* transports, Procarent spends the bulk of its argument attacking representative examples relating to the "lack of medical necessity" theory, i.e., transports that Relators allege were not medically necessary (patients V.B., J.H., B.M., E.G., L.B., J.O., C.I., J.A., K.S., and N.R.). *Id.* However, the nonemergent *nonrepetitive* transports relating to the "lack of medical necessity" scheme do *not* require a PCS form to be signed by a physician prior to the service date. *Compare* 42 C.F.R. § 410.40(e)(1) *and* 42 C.F.R. § 410.40(e)(2)(1). As such, the Relators do not rely on fraudulently signed or altered PCS forms to support their "lack of medical necessity" scheme.  Accordingly, to the extent Procarent argues that the above-listed transports (that were allegedly not medically necessary) must fail because the Third Amended Complaint does not allege that they were for nonemergent repetitive services, that argument is without merit. And regardless, as the Court has already explained,

Counts I and II will be dismissed to the extent either action relies on the alleged "lack of medical necessity" scheme and the "upcoding" scheme.

Procarent does cite to four examples (patients C.G., L.H., J.C., and G.B.) in the Third Amended Complaint that relate to Relators' fraudulent PCS forms theory. *See, e.g.*, [R. 119, pp. 10–11 (referencing patients L.H. and J.C.)]; *id.* at 18 (referencing patients C.G. and J.C.); [R. 123, p. 4 (referencing patient G.B.)]. Regarding these four examples, Procarent argues that the Relators have failed to allege that these patients received repetitive, nonemergent ambulance transports such that a properly signed PCS form would be required to receive payment. *See* [R. 119, pp. 10–11]; *id.* at 18; [R. 123, p. 4]. Stated another way, Procarent argues that "there is nothing within the pleadings that would suggest these transports were repetitive, non-emergent transports that would necessitate a PCS form prior to transport in order to be reimbursable, and Relators have failed to plead any facts that would establish such a theory." [R. 119, pp. 10–11 (discussing patient J.C.)].

The Court disagrees. Regarding patient J.C., the spreadsheets relating to this patient appear to show multiple dates of service between February 9, 2011 and April 8, 2011, *see* [R. 117-22; R. 117-24], and the email chain relating to patient G.B. similarly indicates that G.B. was transported on multiple occasions within this date range. *See* [R. 117-17]. The Relators also allege that they harbored concerns about J.C.'s transports because the PCS form (which was initially "missing") was not signed by a physician, [R. 117, ¶¶ 211–14], which is required only for repetitive transports. *See, e.g.*, [R. 117-20 (PCS form, indicating that, for repetitive patients, the attending physician must sign the form prior to the first transport, but for non-repetitive transports, the form may be signed by a physician assistant, nurse practitioner, etc.)]. The Relators allege that Procarent "billed Medicare for the above *repetitive* ambulance runs,

[including J.C.'s transport], despite knowing that it did not have the statutorily required documentation, or the documentation that it did have was invalid and/or fraudulent." [R. 117, ¶ 226 (emphasis added)].[26] Accepting these allegations as true for purposes of this Motion to Dismiss, the Court finds that the Relators have sufficiently alleged that J.C.'s transport was repetitive, thereby requiring a properly signed PCS form. The submission of a fraudulently signed form, then, would have an "objective, natural tendency to influence" Medicare to make a payment. *USN4U*, 34 F.4th at 516 (quoting *Am. Sys. Consulting*, 600 F. App'x at 973) (internal quotation marks omitted).

Regarding patient G.B., the spreadsheets relating to this patient appear to show multiple dates of service between February 24, 2011 and March 17, 2011, *see* [R. 117-19; R. 117-21], and the email chain relating to patient G.B. similarly indicates that G.B. was transported on multiple occasions within this date range. *See* [R. 117-17]. The Relators also allege that they were initially concerned with this patient's claims because the PCS form was not signed by a physician, [R. 117, ¶¶ 203–04], which, as already noted, is required only for repetitive transports. *See, e.g.*, [R. 117-20]. Further, the Relators allege that Procarent "billed Medicare for the above *repetitive* ambulance runs, [including G.B.'s transport], despite knowing that it did not have the statutorily required documentation, or the documentation that it did have was invalid and/or fraudulent." [R. 117, ¶ 226 (emphasis added)]. Accepting these allegations as true for purposes of this Motion to Dismiss, the Court finds that the Relators have sufficiently alleged that G.B.'s transport was repetitive, thereby requiring a properly signed PCS form. The submission of a fraudulently signed form, then, would have an "objective, natural tendency to influence" Medicare to make a

---

[26] As already explained, the Relators have sufficiently plead a connection between the alleged fraudulent PCS forms scheme and an actual claim made to the government with respect to patients G.B. and J.C. *See supra* Section III(C)(1)(b); *see also* [R. 117-17].

- 56 -

payment. *USN4U*, 34 F.4th at 516 (quoting *Am. Sys. Consulting*, 600 F. App'x at 973) (internal quotation marks omitted).

On this point, the Court feels compelled to address Procarent's argument regarding the email chain in which Foltz and Cassie Hayes discuss G.B. and J.C's claims. *See* [R. 117-17 (email)]. As the Court previously explained, the subject line of the email chain reads "Filed 12/7 through 12/9." *Id.*; *see also supra* Section III(C)(1)(b) (discussing email in relation to Procarent's Rule 9 argument). In the first email, dated December 12, 2011, Hayes advises Foltz that she "set the following to file off the spreadsheet" and lists various "filed" dates, the names of the patients (including G.B. and J.C.), and the dates of service. [R. 117-17, p. 2]. In response, Foltz replies, "Their PCS's were good, correct?" *Id.* Hayes responses, "These are some of the patients that we discussed earlier about the located PCS's and you were OK with setting to file. They all have a signature of an MD." *Id.* at 1. In a follow up email, Hayes explains why she feels okay "using these" PCS forms, as she believed "there were signed and dated by MD's." *Id.* Foltz responds, "Ok thanks." *Id.*

Procarent references this email chain when discussing the Relators' Count II, specifically Rule 9's pleading requirements and the materiality of the allegedly false PCS forms. *See* [R. 123, pp. 7–10 (discussing email chain in section labeled "The False Record Claim Fails to Plead Presentment or Material Falsehood")]. The Court has already addressed this email in the context of Procarent's Rule 9 argument. *See supra* Section III(C)(1)(b). As for its material falsehood argument, Procarent argues that Foltz "vouched for the veracity of the PCS forms" in the email chain. [R. 123, p. 9]. Thus, Procarent argues, the Third Amended Complaint "contains contradictory information that would establish that the Relator herself vouched for the veracity of the forms that she now pleads were false." *Id.* at 10.

- 57 -

The Court finds this argument to be both undeveloped and meritless. First, Procarent completely fails to tie Foltz's alleged approval of the forms to either their falsity or their materiality. Procarent does not explain how Foltz's alleged approval of the forms makes them any less false if the signatures were, in fact, fraudulently added,[27] nor does it explain how the PCS forms become any less material to a claim for nonemergent repetitive transports merely because they were approved by Foltz. Moreover, Procarent's argument also ignores the allegations that Relators Kesterson and Dunn both expressed concerns about these specific claims (i.e., the claims for G.B. and J.C.), namely that the PCS forms had been fraudulently altered. *See, e.g.*, [R. 117, ¶¶ 200–214]. Accordingly, to the extent Procarent relies on Foltz's alleged approval of the forms to argue that Relators have failed to plead material falsehood, the Court disagrees.

As for patients L.H. and C.G., the Court has already concluded that the Relators failed to satisfy Rule 9 with respect to these patients' transports. *See supra* Section III(C)(1)(b). Accordingly, it need not consider whether the Relators also alleged materiality with respect to those claims. Regardless, the Court finds that the Relators have sufficiently alleged that the transports for patients J.C. and G.B., the two representative examples that survived Procarent's Rule 9 challenge, were repetitive transports requiring a properly and timely signed PCS form. Because the Relators have alleged at least one representative example, this claim moves forward. The Court will therefore deny the Motion to Dismiss to the extent it seeks to dismiss Count II, the fraudulent statements claim, for lack of materiality.

### D.  Dismissal With Prejudice

---

[27] Beyond citing to this email chain, Procarent does not argue that the PCS forms were *not* false or fraudulent.

In its Motion to Dismiss, Procarent asks this Court to dismiss the Third Amended Complaint with prejudice. [R. 119, pp. 24–24]. The Relators do not address this argument, nor do they seek leave to file an additional amended complaint under Federal Rule of Civil Procedure 15. *See generally* [R. 122]. Moreover, Procarent filed its first motion to dismiss on December 28, 2020, and both that motion and the Court's ruling on that motion put the Relators on notice that their pleadings failed to satisfy Rule 9, and potentially failed to satisfy the statute of limitations. *See* [R. 92; R. 110]. The Relators were given an opportunity to cure those deficiencies. They have failed to do so, except with respect to the fraudulent PCS forms, as explained above. And again, they fail to address this argument and do not seek leave to file another amended complaint. Accordingly, the Court's dismissal of Count I (in full) and Count II (in part) will be *with* prejudice.

## IV.     CONCLUSION

For the reasons set forth above, the Court will grant in part and deny in part Procarent's Motion to Dismiss, [R. 119]. The Court will dismiss Count I (the fraudulent claims action) with prejudice because the Relators' "preemployment lack of medical necessity" claims are time-barred, and they fail to satisfy Rule 9 with representative examples of their "postemployment lack of medical necessity" and "upcoding" schemes. The Court will partially dismiss Count II (the fraudulent statement action) with prejudice to the extent the Relators rely on a "false certifications" theory arising from "lack of medical necessity" and "upcoding" claims. Count II survives to the extent the Relators allege that Procarent violated § 3729(a)(1)(B) by submitting claims for nonemergent repetitive transports with fraudulent PCS forms. The Relators' other causes of action for retaliation (Count III) and wrongful discharge (Counts IV, V, and VI), which were not challenged in this Motion to Dismiss, also remain.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant Procarent, Inc.'s Motion to Dismiss Third Amended Complaint, [**R. 119**], is

   **GRANTED IN PART** and **DENIED IN PART**.

   a. The motion is **GRANTED** to the extent Procarent seeks dismissal of Count I.

      Count I is **DISMISSED WITH PREJUDICE**.

   b. The motion is **GRANTED** to the extent Procarent seeks dismissal of Count II's

      "fraudulent certification" theory. Count II is **DISMISSED IN PART, WITH**

      **PREJUDICE**.

   c. The motion is **DENIED** in all other respects.

This the 7th day of March, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:   Counsel of Record